MAIN, Judge.
Christopher (Chris) Dewayne Revis appeals from his convictions of capital murder for the intentional murder of Jerry Stidham[1] by shooting him with a .22-cali-ber rifle during the course of committing a first-degree robbery of money and drugs. § 13A-5-40(a)(2), Ala.Code 1975. The jury recommended that Revis be sentenced to death by a vote of 11-1. Following a separate sentencing hearing, the trial court determined that the aggravating circumstance that the murder was committed during a robbery, § 13A-5-49(a)(4), Ala. Code 1975, outweighed the one mitigating circumstance argued — that he had no significant criminal history, § 13A-5-51(l), Ala.Code 1975. Revis was sentenced to death by the trial court.
The evidence presented by the State tended to show the following. On February 22, 2004, Revis telephoned Jerry Stid-ham, a friend of his from whom he had often purchased prescription pain pills. He arranged to purchase pills from Stid-ham. Later, Revis, accompanied by his uncle, Eddie Revis, and his younger brother, Jason Revis, took his great-aunt to the hospital and the men then returned to her house. There, they determined to get the pills from Jerry Stidham and, if Stidham would not give them the pills on credit, they decided that they would rob him. Eddie Revis lived in Eddie’s aunt’s (Chris Revis’s great-aunt’s) house, so the three men retrieved a .22-caliber rifle[2] that Eddie Revis had hidden in his room. In a later statement given to an investigator, Revis admitted that he formulated the plan to rob Stidham.
Jason Revis drove Revis and Eddie Re-vis to Stidham’s mobile home. Revis went into the mobile home alone and spoke with Stidham. Stidham then walked outside to his vehicle in order to get the pills[3] he intended to sell to Revis from the trunk. He carried the pills into the mobile home, whereupon Revis told him that he would go out to his vehicle to get the money to pay for the pills.
He got the rifle from the vehicle, and, when he reentered the mobile home, he began shooting Stidham. He fired eight shots, and Stidham was hit five times. Eddie Revis and Jason Revis walked into the mobile home as soon as Revis began firing shots, and Eddie Revis cut Stid-ham’s throat. Revis grabbed the pills, and he and Eddie Revis picked up some of the *260 shell casings. Jason Revis took Stidham’s wallet.[4] The men walked outside to their vehicle and drove back to Revis’s great-aunt’s house. There, they split up the pills and the money.[5] They then put Stidham’s wallet in a can, poured gasoline over it, and burned it.
Revis stated that he became nervous and decided that they should leave the aunt’s house. The men rented a room at the Days Inn motel. After approximately three hours, they checked out of the motel and drove Eddie Revis to his aunt’s house. Revis and Jason Revis then picked up their grandmother and went to church. Afterwards, they returned to the hospital to visit their great-aunt, whereupon Revis received a telephone call from his mother informing him that Stidham had been found dead.
Eddie Revis, who was on parole at the time of the offense, asked a friend, Burlón Mauldin, if he could leave his guns[6] at the Mauldin’s house, so that he would not be charged with violating his parole. Mauldin agreed but returned the guns when he learned that Stidham had been killed with a .22-caliber rifle, which was the same type of weapon as one of the two guns Eddie Revis had brought to his house. He and Eddie Revis then took the guns and some ammunition to another friend, Helen Cole, and she agreed to keep them.
Shane Swinney, who had been a friend of Stidham’s and who discovered his body, heard that Mauldin had been given the rifle to keep for Eddie Revis and reported that information to an investigator with the district attorney’s office. The investigator then contacted Mauldin, who agreed to go to his friend’s house and fire the rifle. He brought two shell casings to the investigator that he acquired by firing the rifle, and they were sent to the Department of Forensic Sciences to be compared to the casings gathered from the scene of the Stidham’s murder. It was determined that all the casings had been fired from the same gun. Therefore, a search warrant was obtained, and the rifle and the ammunition were recovered from the friend’s home. The rifle was determined to be the weapon that was used in the murder of Stidham.
Revis was subsequently arrested pursuant to an outstanding warrant for worthless checks. He was questioned concerning his involvement in the present offense and gave two statements, originally denying involvement but then admitting to robbing and killing Stidham.
I.
Revis argues that the trial court reversibly erred by admitting his statements into evidence. He alleges as grounds that his statements were the fruit of an illegal arrest; that an incomplete version of one of the statements was erroneously admitted; that the State did not present independent proof of the corpus delicti; that his statements were involuntary; that his statements were not timely or completely disclosed; and his statements contained improper hearsay and prior-bad-acts evidence.
The record indicates that Revis gave his first statement on November 4, 2004, and gave a second statement on November 7, *261 2004, followed by a third statement given shortly thereafter. In his first statement, Revis indicated that he did not know that Stidham had been killed until he had been contacted by his mother on the day after the offense and that he had not had any contact with Stidham on the day of the offense.
In his second statement, Revis acknowledged that he and his uncle and brother had decided to rob Stidham of prescription pain pills but that there had been an agreement that Stidham not be hurt. Moreover, Revis stated that he had insisted that he not be required to approach Stidham or to enter the house, because he was friends with Stidham and Stidham could identify him. He stated that his uncle had taken the rifle, which he had retrieved from Revis’s great-aunt’s house, into Stidham’s mobile home. Revis also indicated that his younger brother had also gone into Stidham’s mobile home with his uncle. He stated that he never heard any gunshots and maintained that he did not know that Stidham had been killed until his mother so informed him.
Finally, just after giving the second statement,[7] Revis admitted that he had called the victim on the day before the offense and arranged to purchase the pills. He, his brother and uncle then took Re-vis’s great-aunt to the hospital and after-wards returned to Revis’s uncle’s home where the three men determined to rob Stidham of the pills. They also got a .22-caliber rifle that Revis’s uncle had hidden in his bedroom under his mattress and drove to Stidham’s mobile home, where Revis admittedly entered to allegedly buy the pills. Stidham walked out to his automobile to retrieve the pills from the trunk of the vehicle. After he had reentered the mobile home, Revis told Stidham that he was going to his vehicle to get the money to pay for the pills. However, Revis took the rifle from the vehicle and walked back into the mobile home. He stated that as he walked into the mobile home with the rifle, Stidham asked what he was doing and then appeared to reach toward a loveseat that was positioned close to the couch on which Stidham was seated. Revis stated that Stidham kept a gun under the loveseat. Revis stated that he fired approximately eight times toward Stidham.[8] He stated that he then grabbed the pills and ran from the trailer.
He further stated that his uncle and his brother entered the mobile home soon after he began firing and that his uncle cut Stidham’s throat. Revis indicated that his brother screamed at their uncle, demanding to know why he had cut Stidham’s throat. According to Revis, the uncle indicated that Stidham was still breathing after he had been shot.
A.
Revis contends that his statement was inadmissible because, he says, it was the fruit of a warrantless arrest. He argues that because there was no warrant to arrest him and no exigent circumstances to justify the arrest, his subsequent statements were inadmissible. Revis failed to raise this issue in the trial court and is arguing this point for the first time on appeal. Therefore, this issue is to be evaluated pursuant to the plain-error rule. Rule 45A, AIa.R.App.P.
“ ‘ “Plain error” has been defined as error “ ‘so obvious that the failure to notice it would seriously affect the *262 fairness or integrity of the judicial proceedings.’ ” Ex parte Womack, 435 So.2d 766, 769 (Ala.1983), quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981). “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.” Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000). This Court has recognized that the “ ‘plain-error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” ’ ” Burton v. State, 651 So.2d 641, 645 (Ala.Crim.App.1993), aff'd, 651 So.2d 659 (Ala.1994), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).’
“ ‘Eggers v. State, 914 So.2d 883, 890-91 (Ala.Crim.App.2004).’ ”
Eatmon v. State, 992 So.2d 64, 69-70 (Ala.Crim.App.2007), cert. denied, 555 U.S. 876, 129 S.Ct. 185, 172 L.Ed.2d 132 (2008).
However, the record indicates that Revis was originally arrested pursuant to a warrant charging him with having negotiated worthless checks. Throughout the trial, there was testimony to the effect that Revis was first arrested as to the worthless-checks warrant and, although Revis did not object to this testimony, the record is also otherwise silent as to this matter. Revis did not introduce or proffer any evidence to challenge the arrest.
“Speculation from a silent record will not support a finding of prejudice. Ex parte Walker, 972 So.2d 737, 755 (Ala.2007), cert. denied, Walker v. Alabama, 552 U.S. 1077, 128 S.Ct. 806, 169 L.Ed.2d 608 (2007). A reviewing court can not presume error from a silent record. ‘ “This court is bound by the record and not by allegations or arguments in brief reciting matters not disclosed by the record.” Webb v. State, 565 So.2d 1259, 1260 (Ala.Cr.App.1990). See also Acres v. State, 548 So.2d 459 (Ala.Cr.App.1987). Further, we cannot predicate error from a silent record. Owens v. State, 597 So.2d 734 (Ala.Cr.App.1992); Woodyard v. State, 428 So.2d 136 (Ala.Cr.App.1982), aff'd, 428 So.2d 138 (Ala.), cert. denied, 462 U.S. 1136, 103 S.Ct. 3120, 77 L.Ed.2d 1373 (1983).’ Whitley v. State, 607 So.2d 354, 361 (Ala.Crim.App.1992).”
Dotch v. State, 67 So.3d 936, 961 (Ala.Crim.App.2010). See also Saunders v. State, 10 So.3d 53, 77 (Ala.Crim.App.2007), cert. denied, — U.S. -, 129 S.Ct. 2433, 174 L.Ed.2d 229 (2009) (“ ‘The defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which error is predicated ever occurred.’ Ex parte Watkins, 509 So.2d 1074, 1077 (Ala.1987).”).
Here, there is no indication in the record that Revis’s arrest for worthless checks was warrantless or in any way improper. Moreover, before Revis was questioned, the sheriffs department had in its possession the rifle used to kill Stidham and the casings fired from Revis’s uncle’s rifle by Mauldin and subsequently determined to match those found at the scene of the offense. Therefore, even if there had been an impropriety in the original warrant, Revis’s statement would have been admissible. Hornsby v. State, 517 So.2d 631, 638 (Ala.Crim.App.1987), writ denied, 517 So.2d 639 (Ala.1987), cert. denied, 485 U.S. 961, 108 S.Ct. 1224, 99 L.Ed.2d 425 (1988) (“A court may admit evidence that *263 is the fruit of illegal police conduct if: (1) The evidence would inevitably have been discovered in the course of investigation; (2) the connection between the challenged evidence and the illegal conduct is so attenuated that it dissipates the taint of the illegal action; or (3) the evidence was obtained from a source independent of the constitutional violation. [United States v. Bailey, 691 F.2d 1009,] 1013 [(11th Cir.1982), cert. denied, 461 U.S. 933 (1983) ].”).
B.
Revis argues that the trial court improperly admitted “an incomplete version” of his statement. (Revis’s brief at 18.) Specifically, Revis refers to gaps in his audio-recorded statement, which were due to the cassette running out of tape before the statement was concluded, as well as to inaudible portions. Revis further alleges that this error was compounded because the trial court allowed the State to admit what he says was an incomplete and unreliable transcription of the tape recordings that was read to the jury by a witness who had previously testified that he did not have any independent recollection of what had been said during the statement. Re-vis also notes that only part of his statement was admitted into evidence, which, he submits, violates the doctrine of completeness. He also notes that the pages of the transcription are jumbled and confusing.[9]
Revis did not object to the fact that only part of his statement was admitted at trial, nor did he object to any inaccuracies or omissions. Defense counsel did, however, during the cross-examination of Investigator Kenneth Mays of the Marion County District Attorney’s office, who had taken Revis’s statement, question the reason for certain apparent gaps in the transcription. Investigator Kenneth Mays testified that these gaps were the result of the microcas-sette tapes running out of capacity. Revis also did not object to the transcription having been read to the jury by investigator Mays. Therefore, because Revis did not object on these grounds at trial, this issue is to be analyzed pursuant to the plain-error standard. Rule 45A, Ala. RApp.P.
The record contains a copy of the transcript of the statements given by Re-vis.[10] Although there are a few instances in the transcript wherein it indicated that comments were inaudible, there is no indication that these omissions were prejudicial or that they had any bearing on the statements or the intent of the statements.
“ ‘ “The fact that a recording is partially inaudible in those portions likely to contain material statements does not require its exclusion from evidence unless the recording is the only evidence offered as to the statements.” Austin v. State, 354 So.2d 40, 43 (Ala.Cr.App.1977), 354 So.2d 4[4] (Ala.1978). See also Boulden v. State, 278 Ala. 437, 179 So.2d 20, 33 (1965) (no reversible error in admitting transcriptions of tape recordings, where the trial judge played the tapes outside the presence of the jury and *264 decided that they were sufficiently audible to be played and, further, that the appellant could not have been hurt by the playing of the tapes in light of the testimony of the officer to whom he confessed.).’
“Hill v. State, 516 So.2d 876, 878 (Ala.Crim.App.1987). ‘Moreover, the appellant’s argument that the transcription was not a verbatim reproduction of a partially audible tape does not address the admissibility of the transcription, but rather the weight it would be given by the jury.’ Clark v. State, 562 So.2d 620, 624 (Ala.Crim.App.1989).
“ ‘ “Where the tape-recorded statement or conversation is missing or unavailable, ‘[a] typewritten transcript of [the recording] is admissible where the officer who listened to the conversation at the time of the recording testifies that the transcript accurately reflects] the conversation.’ Hawkins [v. State ], 443 So.2d [1312,] 1314-15 [ (Ala.Crim.App.1983) ]. We have also permitted the admission of a transcript where the tape recording was inaudible in places. Thornton v. State, 570 So.2d 762 (Ala.Cr.App.1990); Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987); Dawkins v. State, 455 So.2d 220 (Ala.Cr.App.1984).
“ ‘ “Although the tape recording in the present case was neither unavailable nor inaudible, we see no reason why a different rule should apply. Lieutenant Scogin was in a position to establish the reliability and accuracy of the transcript, see Gwin v. State, 425 So.2d 500, 505 (Ala.Cr.App.1982), cert. quashed, 425 So.2d 510 (Ala.1983), and did so. Furthermore, the transcript was merely cumulative evidence, the admission of which rests within the discretion of the trial court. White v. State, 587 So.2d 1218, 1228 (Ala.Cr.App.1990), affirmed, 587 So.2d 1236 (Ala.1991); Gainer v. State, 553 So.2d 673, 684 (Ala.Cr.App.1989). Consequently, the transcript was properly admitted for the limited purposes advanced by the prosecution.” ’
“Battle v. State, 645 So.2d 344, 346-47 (Ala.Crim.App.1994), quoting Jackson v. State, 594 So.2d 1289, 1297 (Ala.Crim.App.1991) (footnote omitted).”
Gobble v. State, [Ms. CR-05-0225, February 5, 2010] — So.3d -, - (Ala.Crim.App.2010).
The transcript of the statements also verifies that gaps were the result of the fact that the tapes ran out of capacity, as indicated by statements in the transcript made by Investigator Mays when the next tape was begun. (C. 254, 265, 285.) See also State v. Hester, (No. A-7130-03T4, November 14, 2006)(N.J.Super.A.D.2006) (not reported in A.2d)(Hester’s claim that the judge improperly allowed into evidence tape recordings that were incomplete, inaudible, and inaccurate, as well as the transcripts thereof, was without merit because, although there were gaps and inaudible sections in the recordings, the tapes included “ ‘substantially’ all of the ‘pertinent conversations.’ ”).
In United States v. Nicoll, 664 F.2d 1308 (5th Cir.1982), overruled on other ground, United States v. Henry, 749 F.2d 203 (5th Cir.1984), rejected in turn, United States v. Jones, 839 F.2d 1041 (5th Cir.1988), Nicoll claimed that a tape-recorded conversation between an agent with the Drug Enforcement Agency (“the DEA”) and his co-conspirator was inadmissible because of a gap in the recordings of the conversation. The court rejected Nicoll’s claim, stating:
“Finally, we do not agree that the trial court abused its discretion in admitting a tape of a conversation between Henry and the DEA despite a short gap *265 in the tape. In United States v. Greenfield, 574 F.2d 305 (5th Cir.), cert. denied, 439 U.S. 860, 99 S.Ct. 178, 58 L.Ed.2d 168 (1978), the court held that tapes that contained inaudible portions were nevertheless admissible unless the inaudible portions were ‘so substantial as to render the recording as a whole untrustworthy.’ Id. at 307 (quoting United States v. Avila, 443 F.2d 792, 795 (5th Cir.), cert. denied, 404 U.S. 944, 92 S.Ct. 295, 30 L.Ed.2d 258 (1971)). Here DEA agent Smith testified that no one had tampered with the recording or deleted any portions of it; rather, the short gap of approximately one minute resulted from the tape reaching the end of one side and needing to be turned over. The resulting gap hardly rendered the tape as a whole untrustworthy, and no error resulted from its admission.”
Nicoll, 664 F.2d at 1314.
Here, the gaps did not render the transcripts untrustworthy. Moreover, the indication in the transcript that certain fragments of comments were inaudible also did not render the transcripts inadmissible.
“[T]aken in context, those inaudible parts were not so substantial that they render the audiotapes untrustworthy. Rather, they are primarily small portions of conversations that do not appear to affect the accuracy of the substance of the conversations or otherwise detract from the purpose for which the audiotapes were admitted. ‘The quality of the tapefs] was a factor for the jury’s consideration in determining the weight to be given the evidence, rather than a factor concerning its admissibility.’ Davis v. State, 529 So.2d 1070, 1072 (Ala.Crim.App.1988).”
Blanton v. State, 886 So.2d 850, 868 (Ala.Crim.App.2003), cert. denied, 886 So.2d 886 (Ala.), cert. denied, 543 U.S. 878, 125 S.Ct. 119, 160 L.Ed.2d 131 (2004). See also Ex parte Morrow, 915 So.2d 539, 544-45 (Ala.2004) (“Couch [the victim] testified that the beginning of her statement was not recorded; however, the fact that a portion of Couch’s interview may not have been recorded does not affect the admissibility of the recording. See Avery v. State, 589 So.2d 1313, 1315 (Ala.Crim.App.1991) (‘The fact that parts of the tape recording were inaudible would not affect the admissibility of the recording but the weight which the jury places on the evidence.’).”).
This court has previously upheld the admission of tape recordings and transcripts of those recordings where the tape recording was inaudible in places. See Gobble v. State, — So.3d at -; Battle v. State, 645 So.2d 344, 346-47 (Ala.Crim.App.1994); Jackson v. State, 594 So.2d 1289, 1297 (Ala.Crim.App.1991); Thornton v. State, 570 So.2d 762 (Ala.Crim.App.1990); Hill v. State, 516 So.2d 876 (Ala.Crim.App.1987); Dawkins v. State, 455 So.2d 220 (Ala.Crim.App.1984). In the present case, a review of Revis’s statements regarding the portions deemed inaudible reveals that these omissions do not render the transcript unreliable or otherwise improper.
Revis additionally submits that Investigator Mays should not have been allowed to read portions of his statements to the jury, because Investigator Mays had previously testified that he did not have any independent recollection of the statements. Revis refers to Investigator Mays’s testimony at the preliminary hearing.
The supplemental record, which contains the testimony from the preliminary hearing, indicates that Investigator Mays did state a number of times that he did not have any independent recollection of or that he could not recall certain aspects of the statements. However, this did not include his recollection of administering *266 Miranda[11] warnings or the voluntariness of Revis’s statements, nor did his lack of recall address the basic substance of Re-vis’s statements. Cf. Hampshire v. State, 484 So.2d 1140 (Ala.Crim.App.1985) (both the transcript and the tape recording were inadmissible where the trial court ordered the State to produce a copy of the tape recording but it could not be located and the police officer who had interrogated the defendant had no independent recollection of his interrogation but remembered the interrogation only because it had been transcribed; further, the officer did not transcribe the tape recording of the interrogation, he never listened to the tape recording to determine if it accurately and correctly contained what was said during the interrogation, and he never compared the transcript to the tape recording; further, the prosecution did not call as a witness the person who had transcribed the tape recording.) Most of Investigator Mays’s testimony at the preliminary hearing, which was held before Revis’s case was severed from those of his uncle and his brother, concerned Revis’s uncle’s statements.
He testified that no statements were made other than those that were recorded and later transcribed by an employee of the district attorney’s office. Moreover, some of Investigator Mays’s statements indicating his lack of recall or of any independent recollection were made in answer to questions concerning parts of the investigation in which he did not participate and thus as to which he had no direct knowledge.
Thereafter, at trial, Investigator Mays testified as to Revis’s statements. Revis argues that, because Investigator Mays could not previously remember matters as to which he subsequently gave testimony, the statements should not have been allowed into evidence.
The particular parts of Investigator Mays’s testimony to which Revis now objects were not raised as an issue at trial. Rule 45A, Ala.R.App.P. Moreover, this objection would address the weight rather than the admissibility of the testimony. See Hammins v. State, 489 So.2d 809, 811 (Ala.Crim.App.1983) (trial court properly admitted Hammins’s statement although the officer did not remember in what manner Hammins had indicated that he understood his rights, as this lack of recall went only to the weight and not the admissibility of the statement).
In Alexander v. State, 370 So.2d 330 (Ala.Crim.App.1979), writ denied, Ex parte Alexander, 370 So.2d 332 (Ala.1979) (footnote omitted), Alexander challenged the admissibility of his confession because the deputy who took his statement testified that “the only thing he could remember was ‘the statement’ itself. However [The deputy] also testified that he could ‘remember basically what the conversation was’ and that his testimony was based on his ‘recollection’ as opposed to his ‘habit’ from testifying in other cases.” This court stated:
“The rule is that ‘a witness may testify as to facts within his knowledge, although his recollection thereof is vague or imperfect’. 97 C.J.S. Witnesses § 54 (1957).
“ ‘The law does not require absolute or positive knowledge or perfect recollection in a witness. His knowledge is sufficient if he had an opportunity of personal observation and did get some impressions even if his recollection is faint.
“ ‘When it appears that the witness had an opportunity to observe the *267 facts about which he offers to testify, and that his testimony signifies only imperfect observation or imperfect recollection, there is no valid objection to admitting the testimony.’
“C. Gamble, McElroy’s Alabama Evidence, § 115.01(1) (3rd ed.1977).
“The fact that Deputy Perkins could not remember the appellant’s manner of dress, what the appellant said word for word (‘that’s the reason I wrote the statement’); the weather; and certain other details of the day and time the appellant confessed goes to the weight and credibility to be given his testimony but not to its admissibility. Pond v. State, 55 Ala. 196 (1876); Brister v. State, 26 Ala. 107 (1855); Walker v. Blassingame, 17 Ala. 810 (1850).”
Alexander v. State, 370 So.2d at 331.
Here, although Investigator Mays could not recall some of the circumstances surrounding the five statements that he took from the three accomplices, Revis’s statements were admissible. Any discrepancies or questions would have concerned the weight of the evidence had this issue been raised at trial.
Revis further argues that the transcript should not have been admitted because, he says, it contained inaccuracies. Specifically, he argues that one of the statements indicated that it had occurred on May 11, 2004, an inaccurate date, and that one of the statements attributed a comment made by Revis to Investigator Tommy Moore.
As to the first alleged error, the transcript of the statement of May 4, 2004, which was Revis’s first statement, contains the proper date at the beginning of the interview; however, at the conclusion, the transcript reflects that Investigator Mays stated, “Okay. It’s 4:06 p.m. on (inaudible) 11th, 2004. And uh, we’ve been having an interview with Chris Revis.” (C. 336.) Defense counsel questioned Investigator Mays concerning the May 11, 2004, date at trial and asked whether another interview had occurred on that date. Investigator Mays answered that no interview took place on that date and stated that “[t]hat just had to be a mistake. I’ve never picked up on that.” (R. 597.)
There is no indication that Revis gave another statement on May 11, 2004, nor does Revis allege that this misstatement of the date by Investigator Mays was any more than a slip of the tongue. However, he alleges that this inaccuracy resulted in the statement being unreliable. “The appellant’s interpretation would pervert form over substance. See generally Dobbins v. State, 274 Ala. 524, 149 So.2d 814 (1963) (clerical and ministerial mistakes do not furnish ground to quash veni-re when no prejudice resulted).” Robinson v. State, 577 So.2d 928, 930 (Ala.Crim.App.1990). See also Smith v. State, 795 So.2d 788, 825 (Ala.Crim.App.2000) (“Clearly, this was an inadvertent slip of the tongue. We find no error, much less plain error, here. Baxter v. State, 723 So.2d 810 (Ala.Cr.App.1998).”).
The other inaccuracy cited by Re-vis involves a comment attributed in the transcript to Investigator Moore, although it had clearly been made by Revis when he was questioned concerning his whereabouts. This mistake was brought to Investigator Mays’s attention by defense counsel at trial as follows:
“Q. Right, and then he said, ‘Ronny Vickery (with the Marion County sheriffs department): A while ago where were you?’ And then it says, ‘Tommy Moore: At my girlfriend’s house.’
“A [Investigator Mays]. Obviously that’s wrong.
“Q. What should that have been?
*268 “A. It appears to me it should have been Chris Revis that said, ‘At my girlfriend’s house.’
“Q. Okay. I just wanted to clarify that for the record.
“A. Yes, sir.”
(R. 599.)
This mistake in the transcript was clearly a clerical or typographical error and did not prejudice Revis, nor does he allege that it prejudiced him. Although he contends that it casts doubt on the trustworthiness of the transcript, such an error does not affect the credibility or admissibility of the transcript. See Battle v. State, 645 So.2d 344, 347 (Ala.Crim.App.1994) (“We do not find the transcript objectionable because Chief Hudson ‘corrected’ the typewritten transcript so that it more accurately reflected the appellant’s interrogation. In fact, in order to lay a proper predicate for the admission of the transcript and the tape recording, the prosecution had to establish that the transcript and the tape accurately and reliably represented the actual event recorded.”).
Here, Investigator Mays fully testified concerning the statements given by Revis, apart from the transcript. His testimony concerning the basis of the accuracy of the transcript was not “the very existence of the transcript itself.” Hampshire v. State, 484 So.2d at 1141. Therefore, the transcript was properly admitted into evidence.
C.
Revis argues that the State did not present independent evidence of the corpus delicti and therefore that his statements should not have been admitted at trial.
“ ‘It has been the rule in Alabama that the State must offer independent proof of the corpus delicti of the charged offense to authorize the admission of a defendant’s confession or inculpatory statement. Robinson v. State, 560 So.2d 1130, 1135-36 (Ala.Cr.App.1989); see C. Gamble, McElroy’s Alabama Evidence, 200.13 (5th ed.1996). “ ‘The corpus delicti consists of two elements: “(1) That a certain result has been produced ... and (2) that some person is criminally responsible for the act.” ’ Johnson [v. State, 473 So.2d 607, 608 (Ala.Cr.App.1985)] (quoting C. Gamble, McElroy’s Alabama Evidence § 304.01 (3d ed.1977)).” Spear v. State, 508 So.2d 306, 308 (Ala.Cr.App.1987). “‘Positive, direct evidence of the corpus de-licti is not indispensable to the admissions of confessions.’” Bracewell v. State, 506 So.2d 354, 360 (Ala.Cr.App.1986), quoting Ryan v. State, 100 Ala. 94, 14 So. 868 (1894). “The corpus delicti may be established by circumstantial evidence.” Sockwell v. State, 675 So.2d 4, 21 (Ala.Cr.App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996).’
“Maxwell v. State, 828 So.2d 347, 357 (Ala.Crim.App.2000).
“ ‘ “ ‘Independent evidence of the corpus delicti need not be of such probative strength as that such evidence, standing alone, in the opinion of the trial or appellate court, would, ought to or probably would satisfy a jury beyond a reasonable doubt of the existence of the corpus delicti. Independent evidence of the corpus delicti may consist solely of circumstantial evidence. Whether the independent evidence tending to prove the corpus delicti is sufficient to warrant a reasonable inference of the existence thereof *269 depends, of course, upon the particular facts of each case.’ ”
“‘Bush v. State, 695 So.2d 70, 117 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.1997), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997), quoting C. Gamble, McElroy’s Alabama Evidence § 304.01 (4th ed.1991) (footnotes omitted in Bush); see also Howell v. State, 571 So.2d 396 (Ala.Cr.App.1990). “The presentation of facts, from which the jury may reasonably infer that the crime charged was committed, requires the submission of the question to the jury.” Watters v. State, 369 So.2d 1262, 1272 (Ala.Cr.App.1978), rev’d on other grounds, 369 So.2d 1272 (Ala.1979).
“ ‘Further, it is well settled that “ ‘ “inconclusive facts and circumstances tending prima facie to show the corpus delicti may be aided by the admissions or confession of the accused so as to satisfy the jury beyond a reasonable doubt, and so to support a conviction, although such facts and circumstances, standing alone, would not thus satisfy the jury of the existence of the corpus delicti.” ’
“‘Bush, 695 So.2d at 117-18, quoting Bridges v. State, 284 Ala. 412, 417, 225 So.2d 821, 826 (1969); see also Bracewell, 506 So.2d at 360; Spear, 508 So.2d at 308. “While a confession is inadmissible as prima facie proof of the corpus delicti, it can be used along with other evidence to satisfy the jury of the existence of the corpus delicti.” Bracewell, supra at 360; see also Howell, 571 So.2d at 397. As Professor Gamble has observed:
“ ‘ “The purpose of requiring proof of the corpus delicti, as a condition precedent to the admission of a confession, is to insure its trustworthiness. For this reason, there is some judicial language to the effect that corroborative evidence independent of the confession need not be sufficient to establish corpus delicti but must be sufficient independent evidence which would tend to establish the trustworthiness of the confession.”
“ ‘McElroy’s Alabama Evidence, § 200.13 at 100 (5th ed.1996). Finally, we have held:
“ ‘ “ ‘Evidence of facts and circumstances, attending the particular offense, and usually attending the commission of similar offenses — or of facts to the discovery of which the confession has led, and which would not probably have existed if the offense had not been committed — would be admissible to corroborate the confession. The weight which would be accorded them, when connected with the confession, the jury must determine, under proper instructions from the court.’ ”
“ ‘Bush, supra at 118, quoting Matthews v. State, 55 Ala. 187, 194 (1876); see also Bracewell, supra.’
“828 So.2d at 357-58. ‘The term corpus delicti means the body or the substance of the crime and connotes the commission of the offense by the criminal agency of someone.’ Tanner v. State, 57 Ala.App. 254, 264, 327 So.2d 749, 759 (1976). ‘Proof of the corpus delicti does not necessarily include evidence connecting [the] defendant with the crime.’ Arnold v. State, 57 Ala.App. 172, 173, 326 So.2d 700, 701 (1976). See also C. Gamble, McElroy’s Alabama Evidence, § 304.01 (6th ed.2009) (‘the term corpus delicti does not mean or include the guilty agency of the accused in the commission of the charged crime’). Inde *270 pendent evidence of the corpus delicti may be solely circumstantial, and the jury is free to draw reasonable inferences from that evidence. Howell v. State, 571 So.2d 396, 397 (Ala.Crim.App.1990). Furthermore, even if the corpus delicti is not proven before the admission or evidence of the confession, then such proof after its admission will cure the error. See Marcus v. State, 568 So.2d 342 (Ala.Crim.App.1990). See also Woods v. State, 641 So.2d 316, 321 (Ala.Crim.App.1993).”
Sheffield v. State, 87 So.3d 607, 626-27 (Ala.Crim.App.2010).
In the present case, the State presented sufficient evidence of the corpus delicti of capital murder, which the jury properly used, along with Revis’s statement, to convict him. “[AJlthough the facts and circumstances surrounding the offenses may be inconclusive without [Re-vis’s] confession, ‘they do tend to prima facie show the corpus delicti of [the offense].’ See Bush v. State, 695 So.2d 70, 119 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997).” Floyd v. State, [Ms. CR-05-0935, September 28, 2007] — So.3d —, — (Ala.Crim.App.2007). Here, the State proved that Stidham died as the result of gunshot wounds to the head and chest. His throat was also cut. The rifle used to fire the shots that killed Stidham was concealed by Revis’s uncle, who was with Revis and his brother around the time of the offense. There was testimony indicating that Stid-ham regularly kept prescription pain pills and that the caller-identification function on Stidham’s telephone showed that a call had recently come in from a telephone registered to the ex-wife of Revis’s uncle. It was determined this telephone was in the house in which Revis and his uncle were staying. Moreover, although the statements from Revis’s brother and his uncle were not admitted at trial, testimony concerning the statement by Revis’s uncle indicated that he had admitted cutting Stidham’s throat. (R. 600-01.) Defense counsel also acknowledged in his questioning that the statements of Revis’s brother and uncle implicated Revis in the murder.[12]
Although the money taken from Stidham was never recovered nor were the pills, the evidence showed that Stidham regularly kept and sold pills and that Revis had done some work for him and had previously been present in his mobile home, and a reasonable inference of robbery could be drawn from that evidence. See Irvin v. State, 940 So.2d 331, 359-60 (Ala.Crim.App.2005) (although [without Irvin’s confession] evidence of the corpus delicti was inconclusive, there was sufficient evidence from which it could be inferred that the murder occurred during the commission of a first-degree robbery; the evidence supporting the robbery was that the victim’s body was burned in his automobile and there was an inference that his money was taken). See Brown v. State, 56 So.3d 729 (Ala.Crim.App.2009) (sufficient proof of corpus delicti of murder where the victim had sought repayment of a loan to Brown on the day before he was killed, bullets and casings consistent with those used in the killing were found at Brown’s house, items stolen from the victim were found at the home of Brown’s accomplice, and Brown and his accomplice were together at *271 Brown’s house on the day the victim’s body was found).
The facts of this case and reasonable inferences from those facts support and corroborate Revis’s confession; thus, the State sufficiently proved the corpus delicti of the offense.
D.
Revis argues that his statements should have been suppressed because, he says, they were involuntary. He also raised this ground in a pretrial motion to suppress his statements. (C. 30-31.)
On appeal, he argues that the investigators used coercive tactics, such as talking to Revis concerning personal matters and referring to Revis as “son.” (Revis’s brief at 30 n. 11.) He also submits that they accused him of lying, which he says was unduly coercive. Revis further contends that the State failed to adequately prove that he knowingly and voluntarily waived his Miranda rights because, after informing Revis of his Miranda rights for the second time, Investigator Mays asked Re-vis an allegedly confusing and misleading question and Revis’s response was transcribed as being inaudible. Finally, Revis alleges that because no copy of his waiver form was introduced into evidence, the State failed to prove that he waived his rights.
It is not mandatory that the waiver-of-rights form be included in the record. Compare Smith v. State, 756 So.2d 892, 931 (Ala.Crim.App.1997) (officer’s failure to record that portion of the interrogation when he advised the appellant of his Miranda rights would not render the statement inadmissible; rather, it would be taken into consideration by the jury in determining the weight and credibility to assign the officer’s testimony regarding the appellant’s confession). Testimony from the interrogating officer that a defendant signed the form is evidence that defendant signed form. See, e.g., Hodges v. State, 926 So.2d 1060, 1070 (Ala.Crim.App.2005); Ex parte Jackson, 836 So.2d 979, 983 (Ala.), cert. denied, 537 U.S. 1031, 123 S.Ct. 582, 154 L.Ed.2d 448 (2002); Waldrop v. State, 859 So.2d 1138, 1157 (Ala.Crim.App.2000); Ex parte Brown, 11 So.3d 933, 937 (Ala.2008). Revis does not argue that he did not sign the waiver form.
As to Revis’s contention that Investigator Mays asked a misleading and confusing question after advising him of his Miranda rights for a second time, the record indicates that the following transpired:
“KM [Investigator Ken Mays]: Chris, you know the other evening we talked to you and your rights were read to you. I want to read your rights to you again. Make sure your rights are being protected. You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to talk to a lawyer and have him present while you are being questioned. If you couldn’t afford one, a lawyer, one will be appointed to represent you before any questioning if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements. So I’ve read your rights to you now, down here Chris is what we call a waiver of rights.
“CR [Chris Revis]: Uh-huh.
“KM: It said I’ve read, or in this case read and has been read, the above statement of your rights. I understand each of them. Having these rights in mind you waive them willing to make a statement. Are you willing to talk to Tommy and me?
“CR: (Inaudible).
*272 “KM: Okay if you’ll sign that right there indicating that you’re willing to talk to us. (Inaudible). And I’ll sign this as a witness.”
(C. 338.)
As to Revis’s argument that Investigator Mays’s statement concerning the waiver was confusing or misleading, he reiterated to Revis that by signing the waiver-of-rights form, he was acknowledging that he had read his rights or had his rights read to him and was choosing to waive those rights and to talk to the investigators. Although Revis’s response was inaudible, the context of the interview indicates that he was voluntarily choosing to waive his rights, to sign the form, and to talk to the investigators.
In Centobie v. State, 861 So.2d 1111 (Ala.Crim.App.2001), Centobie alleged that his statement was inadmissible because the record indicated that he had requested counsel. He cited the following excerpt from the transcript of his recorded statement:
“‘[Agent Borghini]: And you wish to stop answering questions and request a lawyer?
“ ‘[Centobie]: (Inaudible response.)’ ”
Centobie v. State, 861 So.2d at 1119-20. Based on an investigator’s testimony concerning the knowingness and voluntariness of Centobie’s statement, including his testimony that Centobie signed a waiver-of-rights form, as well as a review of the recording, a preponderance of the evidence indicated that the statement was admissible.
In the present case, Investigator Mays testified as to the voluntariness of Revis’s statement, including the lack of coercion, intimidation, threats, or promises. (R. 45.) His approach — assuming a friendly tone and language in questioning Revis — did not result in Revis’s will being overborne or his confession being involuntary. See Wilkes v. State, 917 N.E.2d 675, 681 (Ind.2009), cert. denied, — U.S. -, 131 S.Ct. 414 (2010) (“This Court has previously held that various interrogation techniques — ‘good cop, bad cop,’ providing a morally acceptable answer, blaming the victim, and bargaining — do not necessarily create an involuntary statement. Pierce v. State, 761 N.E.2d 821, 824 (Ind.2002).”). See also People v. Spresny, (No. 284222, August 13, 2009)(Mich.App.2009) (not reported in N.W.2d)(“The officer also feigned befriending defendant, including attempting to empathize with the supposed temptations of the situation, and portraying his inquiry as an effort to keep this matter in perspective and not have defendant’s reputation ruined. However, such assurances are not likely to induce a false confession. People v. Utter, 217 Mich. 74, 80, 185 N.W. 830 (1921), overruled in part on other grounds People v. Jones, 395 Mich. 379, 236 N.W.2d 461 (1975).”). See also Delao v. State, (No. 10-05-00323-CR, November 15, 2006)(Tex.Ct.App.2006) (not reported in S.W.3d)(“ ‘the fact that a friendly, supportive, low key, nonconfron-tational style may prove effective in eliciting incriminating statements does not mean that the style of questioning is improper or that the resulting statements are involuntary.’ Lane v. State, 933 S.W.2d 504, 513 (Tex.Crim.App.1996). Rozyskie’s attempts to befriend Delao and gain his trust did nothing more than ‘facilitate communication by being friendly and supportive.’ ”).
Moreover, any statements that the investigators made indicating that Revis was lying or accusing him of lying did not cross the boundaries of impropriety by becoming threats. See United States v. Artis, [No. 5:10-cr-15-01, September 16, 2010] - F.Supp.2d -, - (D.Vt.2010) (“[T]he only evidence that weighs in favor of a finding of involuntariness is the fact that *273 three law enforcement officers questioned Mr. Artis, confronting him with evidence of his guilt and accusing him of lying after telling him that lying to them would be a crime. This evidence supports a conclusion that the law enforcement officers were confrontational, but it does not support a conclusion that they were coercive. See Parsad [v. Greiner ], 337 F.3d [175] at 185 [ (2d Cir.2003) ] (‘all custodial interrogations inherently involve pressure, and officers routinely confront suspects with incriminating evidence’).”). See also State v. Owen, 202 Wis.2d 620, 642, 551 N.W.2d 50, 59 (1996) (the court found that Owen’s claim that his statement was involuntary because of improper police tactics such as “good eop/bad cop” and confrontational questioning was without merit and stated, “The adoption of roles by the investigators and [the investigator’s] accusation that Owen was lying and that he was responsible for [the victim’s] death are not improper police procedures. Further, the fact that the investigator raised his voice and invaded Owen’s space by getting close to him does not establish actual coercion.”). See also Estrada v. State, 313 S.W.3d 274 (Tex.Crim.App.2010) (statement by Estrada, a youth pastor, to police in which he admitted impregnating and murdering a member of his youth group was not coerced and involuntary despite the use of the following interrogation techniques: accusing him of impregnating and murdering the victim, falsely telling his girlfriend that he had admitted to their allegations and then allowing the girlfriend to meet with him, telling him he was the central figure in the investigation, and accusing him of lying).
Here, the trial court did not err by failing to suppress Revis’s statement as involuntary. As this court stated in Doster v. State, 72 So.3d 50 (Ala.Crim.App.2010):
“When reviewing a trial court’s ruling on a motion to suppress, we use the standard articulated by the Alabama Supreme Court in McLeod v. State, 718 So.2d 727 (Ala.1998):
“ ‘For a confession, or an inculpato-ry statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary. Ex parte Singleton, 465 So.2d 443, 445 (Ala.1985). The initial determination is made by the trial court. Singleton, 465 So.2d at 445. The trial court’s determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong. Marschke v. State, 450 So.2d 177 (Ala.Crim.App.1984)....
“ ‘The Fifth Amendment to the Constitution of the United States provides in pertinent part: “No person ... shall be compelled in any criminal case to be a witness against himself. ...” Similarly, § 6 of the Alabama Constitution of 1901 provides that “in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself.” These constitutional guarantees ensure that no involuntary confession, or other in-culpatory statement, is admissible to convict the accused of a criminal offense. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Hubbard v. State, 283 Ala. 183, 215 So.2d 261 (1968).
“ ‘It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe, 367 U.S. at 602, 81 S.Ct. at 1879, the Supreme Court of the United States explained that for a *274 confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, “if his will has been overborne” by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added).
“ ‘The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the “totality of the circumstance.” Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant’s will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstance), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.1990) (stating that, to admit a confession, a court must determine that the defendant’s will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is “whether the defendant’s will was overborne at the time he confessed”)(emphasis added).’
“718 So.2d at 729 (footnote omitted).”
Doster v. State, 72 So.3d at 77-78.
The totality of the circumstances of the interviews and statements supports the trial court’s determination that Revis’s will was not overborne as a result of police tactics in questioning him.
E.
Revis argues that the State improperly failed to timely disclose one of his statements, as well as his brother’s statement. He also alleges that the State acted improperly by stating at the preliminary hearing that the confidential informant who had informed the police about the .22-caliber rifle would not be testifying at trial and yet Shane Swinney, the informant, did testify at trial.
Revis alleges that the State improperly failed to disclose the identity of the confidential informant at the preliminary hearing on the basis that he would not be testifying at trial; yet Swinney did testify at trial. The record of the preliminary hearing reveals that Revis’s uncles’s defense counsel sought the identity of the informant during his examination of an investigator with the district attorney’s office. When the prosecutor objected on the grounds that the defense was not entitled to the name of the confidential informant and that the informant would not be testifying, the court sustained the objection and stated that the defense’s argument should be made by proper motion in the trial court. No further objections were made. Thus, Revis never raised this issue and any error must rise to the level of plain error. Rule 45A, Ala.R.App.P.
Revis has neither alleged nor demonstrated the necessary prejudice from Swin-ney’s testimony to prove a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), or Rule 16.1, Ala.R.Crim.P.
“To prove a Brady [v. Maryland, 373 U.S. 83 (1963),] violation, a defendant must show that ‘ “(1) the prosecu *275 tion suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issues at trial.” ’ ” Freeman v. State, 722 So.2d 806, 810 (Ala.Crim.App.1998) (quoting Johnson v. State, 612 So.2d 1288, 1293 (Ala.Crim.App.1992)). In the Brady context, “evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).
As to Rule 16, Ala.R.Crim.P., this court has stated:
“Rule 16.1(e), Ala. R.Crim. P., states, in part, that the defendant is not entitled to the discovery or inspection of ‘reports, memoranda, witness lists, or other internal state/municipality documents made by ... law enforcement agents, in connection with the investigation or prosecution of a case.’ Additionally, The Alabama Supreme Court has held that ‘[r]ecorded information received by a public officer in confidence,.... pending criminal investigations, and records the disclosure of which would be detrimental to the best interests of the public ... may not be subject to public disclosure.’ Stone v. Consolidated Publishing Co., 404 So.2d 678, 681 (Ala.1981). The question of disclosure or nondisclosure of the identity of a confidential police informant is a matter within the sound discretion of the trial court, and we will not overturn the trial court’s decision absent an abuse of that discretion. See Ex parte Pugh, 493 So.2d 393, 397 (Ala.1986).”
May v. State, 710 So.2d 1362, 1369 (Ala.Crim.App.1997).
Here, Revis has not shown any impropriety or prejudice as a result of the State’s alleged failure to disclose the identity of the confidential informant. The preliminary hearing revealed that the defense counsel was aware that Mauldin had had the rifle and retrieved it to fire it and retrieve the casings. The person who had made the police aware that Mauldin had been in possession of the rifle that he had received from Revis’s uncle before passing it off to Cole was not material to the case.
Additionally, Revis contends that he was not provided with his first statement in which he denied any involvement in the offense or his brother’s statement until the date he filed the motion to suppress, despite the fact that his discovery motions were granted. He fails to allege any prejudice because of this timing, nor did he object on this ground at trial. Rule 45A, Ala.R.App.P.
The record indicates that, at the close of a pretrial hearing at which several motions filed by Revis were considered, it was ascertained that he did not have copies of these statements. At that time, the trial court stated:
“On the first statement I want you to get the statement, and then you may want to augment the record in that regard after you’ve reviewed it, and I’m going to withhold ruling on the first statement until you’ve had an opportunity to actually see the statement.”
(R. 57.) Defense counsel agreed.
On appeal, Revis argues that because he was not given a copy of the statements until the date of the hearing, he was prejudiced. However, the trial court withheld his ruling until defense counsel could review Revis’s first statement, and the trial did not start for a week following this hearing so Revis had his brother’s statement to review before trial.
In Taylor v. State, 666 So.2d 36 (Ala.Crim.App.1994), this court held:
“There is no evidence that the prosecutor deliberately withheld any evidence *276 from the appellant. There is no indication that the belated discovery of this oral statement prejudiced the appellant. Prejudice caused by the late disclosure is a ‘prerequisite for a reversal on this issue.’ Pettway, 607 So.2d at 332. See Stewart v. State, 601 So.2d 491, 499 (Ala.Cr.App.1992); Robinson v. State, 577 So.2d 928, 930 (Ala.Cr.App.1990); Brown v. State, 545 So.2d 106, 114-15 (Ala.Cr.App.1988), affirmed, 545 So.2d 122 (Ala.), cert. denied, 493 U.S. 900, 110 S.Ct. 257, 107 L.Ed.2d 206 (1989). See also DeBruce v. State, 651 So.2d 599, 622 (Ala.Cr.App.1993) (‘ “Tardy disclosure of Brady material is generally not reversible error unless the defendant can show that he was denied a fair trial.” ... A delay in disclosing Brady material requires reversal only if the “lateness of the disclosure so prejudiced appellant’s preparation or presentation of his defense that he was prevented from receiving his constitutionally guaranteed fair trial.” ’). There is no probability that the jury would have resolved the appellant’s case differently had the State disclosed the oral statement on a timely basis.”
Taylor v. State, 666 So.2d at 54. See also Reynolds v. State, [Ms. CR-07-0443, October 1, 2010] — So.3d - (Ala.Crim.App.2010); Smith v. State, 79 So.3d 671 (Ala.Crim.App.2010.)
Moreover, as to the statement by Re-vis’s brother, it was not admitted at his trial although there was testimony or questioning that indicated that the brother’s statement had implicated Revis in the offense. Revis has not alleged that the statement contained anything exculpatory or that he was prejudiced as a result of the lateness of the disclosure.
Similarly, in McCart v. State, 765 So.2d 21 (Ala.Crim.App.1999), McCart alleged that he was entitled to certain tapes made during the course of the investigation that had involved a confidential informant and police officers. He contended that the tapes surely contained information that would be exculpatory to him or one of the codefendants. This court stated:
“ ‘To prove a Brady violation, a defendant must show that “ ‘(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issues at trial.’ ” ’ Freeman v. State, 722 So. 2d 806, 810 (Ala.Cr.App.1998) (quoting Johnson v. State, 612 So. 2d 1288, 1293 (Ala.Cr.App.1992)). In the Brady context, ‘evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,’ United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).”
McCart v. State, 765 So.2d at 23.
Here, there was no evidence indicating that the State deliberately withheld the statements or that Revis suffered any prejudice thereby.
F.
Revis alleges that his statements should have been suppressed because, he says, they contained inadmissible hearsay and prejudicial prior-bad-acts evidence. He argues that certain dialogue during the interviews contained in his statements refer to incriminating statements made by his uncle and brother that were not admitted at trial. Neither his uncle nor his brother testified at trial.
Moreover, he argues that mention was made concerning the fact that he used pain pills and other references to acts that he *277 alleges showed a bad character.[13] The references to acts that he says showed a bad character include that he quit his high-school football team after arguing with his coach; that he did not attend Stidham’s funeral; that he lied to his mother; that he dated more than one girl at a time; and that he dropped out of high school.
Revis did not object as to the alleged hearsay at trial, Rule 45A, Ala.R.App.P.; however, he filed a pretrial motion to exclude prior-bad-acts evidence.
The statements by Revis’s uncle and brother were not admitted at trial and thus did not violate Rule 801(d)(2)(E), Ala. R.Evid. See Hillard v. State, 53 So.3d 165 (Ala.Crim.App.2010). The references in Revis’s interrogation to the statements of his uncle and brother were harmless error, if error at all. The investigators’ allusions to a statement by Revis’s uncle were a tactic used to elicit a confession from Revis and were interwoven in Revis’s confession. These references were introduced to explain the circumstances of the confession and could be considered by the jury in weighing Revis’s statements.[14] On cross-examination of Investigator Mays, defense counsel elicited testimony that both Revis’s uncle and brother had given statements. The statements given by Revis’s uncle and brother did not rebut Mays’s own. Compare Hillard, supra, (holding that the admission of the statement of Hillard’s co-conspirator’s was not harmless beyond a reasonable doubt because it “directly rebutted Hillard’s statement and testimony to the effect that he was present during the planning and execution of the robbery but did not participate in either. Likewise, [the coconspirator’s] statement negated Hillard’s testimony that he was hiding from the police because there was an outstanding warrant for his arrest on an unrelated misdemeanor charge. Although the State presented a strong case of guilt, this Court cannot say that the State’s evidence of Hillard’s guilt was so overwhelming as to render the improper admission of Shackelford’s statement directly identifying Hillard as a participant in the robbery harmless beyond a reasonable doubt.”). See also Brownfield v. State, 44 So.3d 1, 25 (Ala.Crim.App.2007), affirmed, 44 So.3d 43 (Ala.2009), cert. denied, — U.S. -, 131 S.Ct. 505, 178 L.Ed.2d 370 (2010) (“According to Brownfield, he should have been permitted to introduce Smith’s full statements to law enforcement, statements he contends constituted exculpatory hearsay to rebut the prosecution’s inculpatory hearsay, i.e., the reference by investigators during the interrogation that someone had seen someone in a white Chrysler automobile at the Wallace Lane residence on December 24. However, even assuming that Brownfield is correct and the defense should have been allowed to introduce the full text of the officers’ notes on Smith’s statements — and we make no such determination that error actually occurred— Brownfield would not be entitled to any relief because the error, if any, was harmless.”).
Here, the references to statements made by Revis’s uncle and brother during the interrogation were harmless in light of the evidence and would not have contributed to the jury’s verdict. More *278 over, they were not so egregious as to rise to the level of plain error.
“ ‘The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is “particularly egregious” and if it “seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.” See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999).’ ”
Ex parte Brown, 11 So.3d 933, 935-36 (Ala.2008).
Moreover, the reference during the interview to Revis’s drug usage was made to determine Revis’s connection to the victim and as a possible motive for the offense. Thus, it was evidence of part of the res gestae of the offense as Revis was accused of murdering Stidham during a robbery in which he stole pills from Stidham, and the evidence indicates that acquisition of the pills was the reason for the offense. The statements concerning Revis’s drug usage were therefore introduced as an exception to the exclusionary rule.
“Alabama has long recognized the following exceptions to the general exclusionary rule now contained in Rule 404(b), Ala. R. Evid.:
“ ‘ “These exceptions fall under the following general divisions: (1) Relevancy as part of res gestae. (2) Relevancy to prove identity of person or of crime. (3) Relevancy to prove scien-ter, or guilty knowledge. (4) Relevancy to prove intent. (5) Relevancy to show motive. (6) Relevancy to prove system. (7) Relevancy to prove malice. (8) Relevancy to rebut special defenses. (9) Relevancy in various particular crimes.” ’
“Scott v. State, 353 So.2d 36, 38 (Ala.Crim.App.1977), quoting Wharton’s Criminal Evidence, § 31.
“As Professor Charles Gamble explained:
“ ‘Evidence of the accused’s commission of another crime or act is admissible if such other incident is inseparably connected with the now-charged crime. Such collateral misconduct has historically been admitted as falling within the res gestae of the crime for which the accused is being prosecuted. Most modern courts avoid use of the term “res gestae” because of the difficulty in measuring its boundaries. The better descriptive expression is perhaps found in the requirement that the collateral act be contemporaneous with the charged crime. This rule is often expressed in terms of the other crime and the now-charged crime being parts of one continuous transaction or one continuous criminal occurrence. This is believed to be the ground of admission intended when the courts speak in terms of admitting other acts to show the “complete story” of the charged crime. The collateral acts must be viewed as an integral and natural part of the circumstances surrounding the commission of the charged crime.
“ ‘Two theories have been adopted for justifying the admission of collateral misconduct under the present principle. Some courts hold that such contemporaneous acts are part of the charged crime and, therefore, do not constitute “other crimes, wrongs, or acts” as is generally excluded under Rule 404(b). Other courts hold that *279 Rule 404(b) is applicable to these collateral acts but that they are offered for a permissible purpose under that rule — i.e., that such acts are merely offered, rather than to prove bad character and conformity therewith, to show all the circumstances surrounding the charged crime.’
“C. Gamble, McElroy’s Alabama Evidence § 69.01(3) (5th ed.1996) (footnotes omitted).
“ ‘[One such] “special circumstance” where evidence of other crimes may be relevant and admissible is where such evidence was part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts. Commonwealth v. Murphy, 346 Pa.Super. 438, 499 A.2d 1080, 1082 (1985), quoting Commonwealth v. Williams, 307 Pa. 134, 148, 160 A. 602, 607 (1932). This special circumstance, sometimes referred to as the “res ges-tae” exception to the general proscription against evidence of other crimes, is also known as the complete story rationale, i.e., evidence of other criminal acts is admissible “to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.” ’
“Commonwealth v. Lark, 518 Pa. 290, 303, 543 A.2d 491, 497 (1988). Evidence of a defendant’s criminal actions during the course of a crime spree is admissible. See Phinizee v. State, 983 So.2d 322, 330 (Miss.App.2007) (‘Evidence of prior bad acts is admissible to “[t]ell the complete story so as not to confuse the jury.”’); Commonwealth v. Robinson, 581 Pa. 154, 216, 864 A.2d 460, 497 (2004) (‘The initial assault on Sam-Cali took place approximately two weeks before the Fortney homicide and Sam-Cali’s testimony provided the jury with a “complete story” of Appellant’s criminal spree from the Burghardt homicide in August of 1992 to Appellant’s capture in July of 1993.’); St. Clair v. Commonwealth, 140 S.W.3d 510, 535 (Ky.2004) (‘Here, the trial court properly permitted the Commonwealth to introduce evidence of Appellant’s prior crimes and bad acts that were part of a continuous course of conduct in the form of a “crime spree” that began with Appellant’s escape from an Oklahoma jail and ended with his flight from Trooper Bennett.’); People v. Sholl, 453 Mich. 730, 556 N.W.2d 851 (1996) (‘ “Evidence of other acts is admissible when so blended or connected with the crime of which defendant is accused that proof of one incidentally involves the other or explains the circumstances of the crime.” ’); State v. Charo, 156 Ariz. 561, 565, 754 P.2d 288, 292 (1988) (“‘The ‘complete story’ exception to the rule excluding evidence of prior bad acts holds that evidence of other criminal acts is admissible when so connected with the crime of which defendant is accused that proof of one incidentally involves the other or explains the circumstances of the crime.” ’); State v. Long, 195 Or. 81, 112, 244 P.2d 1033, 1047 (1952) (‘It is fundamental that the state is entitled to the benefit of any evidence which is relevant to the issue, even though it concerns the commission of the collateral crimes. If evidence of a collateral crime tends to prove the commission of the crime charged in the indictment, the general rule of exclusion has no application.’); State v. Schoen, 34 Or.App. 105, 109, 578 P.2d 420, 422 (1978) (‘The evidence, therefore, was relevant to complete the story of the crime charged.... The state is not required to “sanitize” its evidence by deleting background information to the point that the evidence *280 actually presented seems improbable or incredible.’).”
Doster v. State, 72 So.3d 50, 87-89 (Ala.Crim.App.2010).
Because Revis’s drug use was part of the res gestae and interwoven in the offense, it was admissible as an exception to the exclusionary rule. Moreover, because this evidence showed Revis’s motive in committing the capital offense, it was also admissible.
“In addition, ‘evidence tending to establish motive is always admissible.’ Jordan v. State, 629 So.2d 738, 741 (Ala.Cr.App.1993), cert. denied, 511 U.S. 1112, 114 S.Ct. 2112, 128 L.Ed.2d 671 (1994). As this court stated in Bradley [v. State, 577 So.2d 541 (Ala.Crim.App.1990) ]:
“ ‘ “If a crime is clearly shown to have been committed by the accused, as in the case of one intentionally and without cause striking a deadly blow with an ax, the question of motive would be of little importance. But where the direct evidence is in conflict as to whether the accused did the act, or is partially or wholly circumstantial upon that issue, the question of motive becomes a leading inquiry.”
‘“Fuller v. State, 269 Ala. 312, 113 So.2d 153, 175 (1959), cert. denied, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960) (quoting Harden v. State, 211 Ala. 656, 101 So. 442, 444 (1924)). “It is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense.” Bowden v. State, 538 So.2d 1226, 1235 (Ala.1988) (quoting earlier cases, emphasis in Bowden).’
“577 So.2d at 549.”
Presley v. State, 770 So.2d 104, 110 (Ala.Crim.App.1999), affirmed, 770 So.2d 114 (Ala.2000), cert. denied, Presley v. Alabama, 531 U.S. 881, 121 S.Ct. 194, 148 L.Ed.2d 135 (2000).
Similarly, the statements made during the interview cited by Revis that referred to the other bad acts, including that he quit football after arguing with his coach, that he did not attend the victim’s funeral, that he lied to his mother, that he dated more than one girl at a time, and that he dropped out of high school, were not overly prejudicial.
“ ““ “Prejudicial” is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.’ [Citation omitted.] ‘Of course, “prejudice, in this context, means more than simply damage to the opponent’s cause. A party’s case is always damaged by evidence that the facts are contrary to his contention; but that cannot be grounds for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis commonly though not always, an emotional one.” ’ ” Averette v. State, [469 So.2d 1371] at 1374 [(Ala.Crim.App.1985)].’
“ ‘ “[Robinson v. State,] 528 So.2d [343] at 347 [(Ala.Crim.App.1986)]. See also Hooker v. State, 840 So.2d 197, 213-14 (Ala.Crim.App.2002).” ’ ”
McMillan v. State, [Ms. CR-08-1954, November 5, 2010] - So.3d - (Ala.Crim.App.2010), quoting Baker v. State, 87 So.3d 587, 599 (Ala.Crim.App.2009).
The record indicates that most of the comments concerning these alleged bad acts were made by Revis in answering questions posed by Investigator Mays concerning his activities around the time of *281 the offense and his involvement in the murder. The comments were simply offhanded and were in no way emphasized. See Dotch v. State, 67 So.3d 936, 968 (Ala.Crim.App.2010) (“... ‘The State did not use this evidence to confuse the jury, or “ ‘to imply the inference of facts which do not exist,’ ” or “ ‘to bolster a weak case against the defendant.’ ” Blackmon v. State, 7 So.3d 397, 430 (Ala.Crim.App.2005).’ Johnson v. State, [Ms. CR-99-1349, October 2, 2009] — So.3d [-] at -.”).
Revis’s statements were properly allowed into evidence.
II.
Revis argues that the trial court erred by allowing into evidence the testimony of the State’s medical examiner, Dr. James Lauridson, that was based on evidence that was not admitted at trial. Specifically, Revis contends that Dr. Lauridson was allowed to give opinion testimony based on hearsay evidence from a pathologist’s notes, although the pathologist was not present at trial and his notes and x-rays were not allowed into evidence. Revis argues that Dr. Lauridson’s testimony was inadmissible because it was impermissible for him to rely on notes and x-rays that were not admitted into evidence or presented to the jury; and that Revis could not confront and cross-examine the medical examiner who had actually conducted the autopsy and made the notes and x-rays; and Dr. Lauridson should not have been allowed to testify as to the victim’s cause of death because he could not have done so based on the photographs of the body; and that the autopsy evidence was improperly allowed into evidence because it was not disclosed to the defense by the State.
A.
Revis contends that Dr. Lauridson should not have been allowed to give his opinion, which was based on sources that were not allowed into evidence, specifically Dr. Shores’s, a pathologist, notes and x-rays made by Dr. Shores, when he conducted the autopsy.[15] He argues that this testimony violated Ex parte Wesley, 575 So.2d 127 (Ala.1990).
In Ex parte Wesley, the Court stated:
“In Nash v. Cosby, 574 So.2d 700 (Ala.1990), we modified that traditional rule. In that case, we adopted a standard which allows a medical expert to give opinion testimony based in part on the opinions of others when those other opinions are found in medical records admitted into evidence. Nevertheless, our holding in Nash does not control the result of this case.
“‘There is a trend toward the admission of an expert’s opinion based partly on medical, psychological, or hospital reports not in evidence if the reports are of a type customarily relied upon by the expert in the practice of his profession. Annot., 55 A.L.R.3d 551 (1974). However, this trend has not been followed by the courts of this state. This is in accord with the general and traditional rule. [See] 31 Am.Jur.2d Expert and Opinion Evidence, Section 86 (1967).’
“Brackin [v. State, 417 So.2d 602], at 606 [(Ala.Crim.App.1982)]. (Citations omitted.) See Salotti v. Seaboard Coast Line R.R., 293 Ala. 1, 299 So.2d 695 (1974). See, also, C. Gamble, McElroy’s Alabama Evidence, § 130.01 (3d ed. 1977).
*282 “Thus, in Nash we modified the Court of Criminal Appeals’ holding in Brackin as it relates to the testimony of medical experts based on the opinions of others; but Nash has not changed the traditional rule followed in Alabama that the information upon which the expert relies must be in evidence.1
“There are recognized exceptions to this rule. The Court of Criminal Appeals has also recognized an exception where the expert is a deputy coroner who uses a toxicologist’s autopsy report as part of the basis for his testimony. See Jackson v. State, 412 So.2d 302 (Ala.Crim.App.1982); Woodard v. State, 401 So.2d 300 (Ala.Crim.App.1981).
“1 “[Nevertheless, our] cases are consistent in holding that an expert witness may give opinion testimony based upon either facts of which he has personal knowledge or facts which are assumed in a hypothetical question.... In either event, ‘the facts known to the expert or hypothesized] must be facts in evidence.’ Hagler v. Gilliland, 292 Ala. 262, 265, 292 So.2d 647 (1974).”
[[Image here]]
“ ‘ “An expert may give his opinion based upon his own knowledge of the facts, stating these facts, then his opinion; or, he may give an opinion based upon a hypothetical question, based upon facts in evidence. In either case, the facts known to the expert or [hypothesized] must be facts in evidence. Blakeney v. Alabama Power Co., 222 Ala. 394, 133 So. 16, 18 (1931).” ’
“Welch v. Houston County Hosp. Bd., 502 So.2d 340, 345 (Ala.1987), quoting Thompson v. Jarrell, 460 So.2d 148, 150 (Ala.1984). (Emphasis added in Welch.) See, also, Romine v. Medicenters of America, Inc., 476 So.2d 51 (Ala.1985). “ xIn Nash we recognized that ‘the recent trend has been toward allowing expert testimony that is based upon medical or hospital or psychological records, even in some cases where those records are not in evidence.’ 574 So.2d at 704. (Emphasis added.) There, the records upon which the expert partially based his testimony were in evidence. Our recognition of the recent trend, however, is not to be taken as an adoption of that trend, especially considering that the facts in Nash would not support our doing so. Accordingly, the phrase ‘even in some cases where those [medical] records are not in evidence’ should be given no significance insofar as the law of this state is concerned.
Ex parte Wesley, 575 So.2d at 128-29.
This issue was recently addressed by the Alabama Supreme Court and determined adversely to Revis. In Ex parte Mills, 62 So.3d 574 (Ala.2010), Mills argued that testimony from a medical examiner as to the victims’ causes of death was inadmissible because it was based on the notes and findings of another medical examiner who had performed the autopsy and who was not available for trial. Moreover, the autopsy report that was not admitted at trial was prepared by yet another medical examiner. In Ex parte Mills, as in the present case, the medical examiner testified that he was basing his testimony as to the cause of death on the photographs of the body that were admitted into evidence. (R. 404.) Moreover, in Ex parte Mills, as in the present case, the appellants argued that the testifying medical examiner had not been present for the autopsy and that photographs alone could not support the expert’s testimony as to the cause of death. The Alabama Supreme Court determined as follows:
*283 “In Mills’s case, the State argues that Dr. Snell’s testimony regarding the Hills’ causes of death was not inadmissible under Ex parte Wesley [575 So.2d 127 (Ala.1990),] because, the State says, the facts Dr. Snell relied upon in forming his opinion were in evidence. In this regard, the State notes that Dr. Snell testified that he relied only on certain ‘factual’ portions of the items — such as the autopsy reports prepared by Dr. James Lauridson based on Dr. Johnny Glenn’s notes or the diagram prepared by Dr. Glenn — that were not in evidence. The State contends, however, that the information in those ‘factual’ portions of the items not in evidence was in conformity with the autopsy photographs that were introduced into evidence.
“The State also maintains that Dr. Snell’s testimony was admissible under the exception noted in Ex parte Wesley ‘where the expert is a deputy coroner who uses a toxicologist’s autopsy report as part of the basis for his testimony.’ 575 So.2d at 129 (citing Jackson v. State, 412 So.2d 302 (Ala.Crim.App.1982), and Woodard v. State, 401 So.2d 300 (Ala.Crim.App.1981)). In both Jackson and Woodard, the Court of Criminal Appeals held that a coroner who had personally observed the bodies could give an opinion about the cause of death even though the coroner’s opinion was also based on information in autopsy reports that the coroner had not prepared. Jackson, 412 So.2d at 306; Woodard, 401 So.2d at 303.
“Mills attempts to distinguish Jackson and Woodard by arguing that unlike the coroners who testified in those cases, Dr. Snell was not present when the autopsies were performed and did not personally observe the bodies of Floyd and Vera Hill. We find that distinction unavailing. In this case, Dr. Snell relied on the photographs from the autopsies, which were admitted into evidence. As noted in Mills I [Mills v. State, 62 So.3d 553 (Ala.Crim.App.2008) ], there was an abundance of evidence indicating, among other things, that the photographs accurately depicted the bodies at the time the autopsies were performed and that the photographs were consistent with the factual information in the autopsy reports and the diagram. Mills asserts that ‘the idea that a set of photographs could convey all of the detailed information, including measurements and impressions, contained in a six-page narrative autopsy report ... is unsupportable.’ (Mills’s reply brief, p. 13.) But Mills has not offered any reason why Dr. Snell’s observation of the bodies by means of examining the autopsy photographs should not be considered the functional equivalent of the coroners’ personal observation of the bodies in Jackson and Woodard. Consequently, the State has shown that Dr. Snell’s testimony was admissible under the limited exception recognized in Jackson and Woodard. ”
Ex parte Mills, 62 So.3d at 593-94 (footnotes omitted).
Because Dr. Lauridson based his determination as to each of the bullet wounds that would have been fatal in the present case on what he observed in the photographs, which were properly admitted into evidence, there was no error in his testimony.
B.
Revis argues that his rights were violated because he was not allowed to confront and to cross-examine the medical examiner who had conducted the autopsy.
*284 The record indicates that Dr. William A. “Art” Shores, who had performed the autopsy, had left the Alabama Department of Forensic Sciences and was incapacitated at the time of trial. His notes were not admitted at trial, and another medical examiner testified concerning Stidham’s cause of death and testified concerning the photographs of Stidham’s wounds as depicted in the photographs from the autopsy. Revis has failed to raise any argument as to how a cross-examination of Dr. Shores would have affected his defense.
Although he argued that the medical examiner’s testimony was important because his uncle had slit Stidham’s throat, which may have been the cause of death, Dr. Lauridson testified that the cut was not deep enough to have reached the arteries and thus would have been survivable. (R. 397.) Moreover, he further determined that more than one of the gunshot wounds inflicted by Revis would have been fatal. Perkins v. State, 897 So.2d 457, 465 (Ala.Crim.App.2004) (“Perkins has submitted nothing to suggest that had he had the opportunity to cross-examine Dr. Embry, Dr. Embry would have changed his opinion as to the cause of Wysteria’s death. We fail to see how Dr. Embry’s presence would have added to the ‘fact-finding process.’ ... We note that our decision is consistent with previous decisions in which Alabama courts have upheld the admission of expert testimony based on the report of an unavailable forensic expert witness through another expert witness employed by the Department of Forensic Sciences without addressing the Confrontation Clause issue. See, e.g., Henderson v. State, 583 So.2d 276, 290-91 (Ala.Crim.App.1990), aff'd, 583 So.2d 305 (Ala.1991).”).
Revis was not prejudiced by Dr. Lauridson’s testifying rather than Dr. Shores nor did the fact that Dr. Shores was incapacitated at the time of trial affect Dr. Lauridson’s testimony. See Mills v. State, 62 So.3d 553, 570 (Ala.Crim.App.2008), affirmed, 62 So.3d 574 (Ala.2010) (“Even if Glenn was incompetent at the time of either autopsy, any challenge to the facts that formed the basis for Snell’s opinion went to the weight the jury assigned to his testimony.”)
C.
Revis argues that the autopsy evidence was not disclosed by the State, and therefore, because Dr. Lauridson’s testimony was based on these materials, it should not have been allowed into evidence. He specifically refers to Dr. Shores’s notes.
The following transpired at trial during the cross-examination of Dr. Lauridson:
“A. [Dr. Lauridson] Those are the handwritten notes that Dr. Shores created. I have a partial evidence form here also that indicates the presence of the bullets.
“[Defense counsel]: Your Honor, at this time I would like, if the Court would permit me, because of the serious nature of this case to have — and the fact that Dr. Shores isn’t here, I would like to have those handwritten notes copied and made a part of the record.
“[Prosecutor]: No objection.
“THE COURT: Certainly they — have they been reviewed by defense counsel before today? Were they made available to you, or was this the first time you’ve seen them?
“[Defense counsel]: That’s the first time I’ve seen those handwritten notes as far as I know.
“[Prosecutor]: I’ve never been provided with a copy of them, Judge.
“THE COURT: During the break we’ll make a copy of them, and I pre *285 sume you want them as part of the file, but not offered and admitted into evidence; is that correct?
“[Defense counsel]: Sir?
“THE COURT: Are you asking that they be offered and admitted into evidence?
“[Defense counsel]: Yes, sir, I am asking that they be offered and admitted into evidence.
“THE COURT: Objections to that?
“[Prosecutor]: No, sir.
“THE COURT: They’re admitted.
“[Defense counsel]: I feel for future review that that needs to be done at this point.
“THE COURT: We’ll copy what you have, and they will be admitted into evidence as Defendant’s Exhibit No. 1. We’ll do that during the break.”
(R. 410-11.)
Thus, the prosecutor did not have the notes, and there is no evidence that the prosecutor deliberately withheld them. Further, a copy was made for the defense by the trial court. See Ex parte Windsor, 683 So.2d 1042, 1055 (Ala.1996) (finding “ ‘no evidence that the State failed to make that evidence available as soon as practicable in this ease’ ”). See also Taylor v. State, 666 So.2d 36, 54 (Ala.Crim.App.1994) (“There is no evidence that the prosecutor deliberately withheld any evidence from the appellant. There is no indication that the belated discovery of this oral statement prejudiced the appellant. Prejudice caused by the late disclosure is a ‘prerequisite for a reversal on this issue.’ Pettway [v. State], 607 So.2d [325] at 332 [ (Ala.Crim.App.1992) ]. See Stewart v. State, 601 So.2d 491, 499 (Ala.Cr.App.1992); Robinson v. State, 577 So.2d 928, 930 (Ala.Cr.App.1990); Brown v. State, 545 So.2d 106, 114-15 (Ala.Cr.App.1988), affirmed, 545 So.2d 122 (Ala.), cert. denied, 493 U.S. 900, 110 S.Ct. 257, 107 L.Ed.2d 206 (1989).”).
Moreover, Revis has failed to show or argue any prejudice as a result of his inability to review the notes until trial. See Reynolds v. State, [Ms. CR-07-0443, October 1, 2010] — So.3d -, - (Ala.Crim.App.2010) (“Reynolds has not demonstrated that had he been provided the notes ‘there is a reasonable probability that ... the result of the proceeding would have been different.’ Giles [v. State ], 906 So.2d [963] at 973 [ (Ala.Crim.App.2004) ].”). See also Jennings v. State, 965 So.2d 1112, 1119-26 (Ala.Crim.App.2006).
III.
Revis argues that the trial court erred in admitting physical evidence that he says lacked a proper chain of custody. He specifically refers to the victim’s body, autopsy evidence collected from the body, the rifle, the bullets, and the shell casings. He contends that “a complete failure to keep track of the evidence” and “sloppy police work” undermined the reliability of the evidence and “destroyed the chain of custody from the very beginning.” (Revis’s brief at 51.)
“ ‘In Ex parte Slaton, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), the Alabama Supreme Court discussed the requirements for establishing the chain of custody:
“ ‘ “Ex parte Holton, 590 So.2d 918 (Ala.1991), sets forth the legal analysis to be applied in determining if a proper chain of custody has been established:
“ ‘ “ ‘The chain of custody is composed of “links.” A “link” is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, *286 the record must show each link and also the following with regard to each link’s possession of the item: “(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.” Imwinklereid, The Identification of Original, Real Evidence, 61 Mil. L.Rev. 145, 159 (1973).
“ ‘ “ ‘If the State or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a “missing” link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the “link,” as to one or more criteria or as to one or more links, the result is a “weak” link. When the link is “weak,” question of credibility and weight is presented, not one of admissibility.’
“ ‘ “590 So.2d at 920. While each link in the chain of custody must be identified, it is not necessary that each link testify in order to prove a complete chain of custody. Harrison v. State, 650 So.2d 603 (Ala.Crim.App.1994).”
“ ‘680 So.2d at 918. “ ‘In order to establish a proper chain, the State must show to a “reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.” ’ ” Ingram v. State, 779 So.2d 1225, 1254 (Ala.Crim.App.1999) (quoting Ex parte Holton, 590 So.2d at 919-20 (citation omitted in Holton)), aff'd, 779 So.2d 1283 (Ala. 2000), cert. denied, 531 U.S. 1193, 121 S.Ct. 1194, 149 L.Ed.2d 109 (2001). “[E]vidence that an item has been sealed is adequate circumstantial evidence to establish the handling and safeguarding of the item.” Lane v. State, 644 So.2d 1318, 1321 (Ala.Crim.App.1994); see also Ingram v. State, 779 So.2d at 1254. Additionally, “ ‘[c]hain of custody requirements do not apply with the same force to items of evidence which are unique and identifiable in themselves.’ ” Ex parte Scott, 728 So.2d 172, 182 (Ala.1998) (quoting Magwood v. State, 494 So.2d 124, 144 (Ala.Crim.App.1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986)), cert. denied, 528 U.S. 831, 120 S.Ct. 87, 528 U.S. 831 (1999).
[[Image here]]
“ ‘ “Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence.”
“ ‘§ 12-21-13, Ala.Code 1975. Therefore, any question as to the adequacy of the safeguarding and handling of the evidence did not go to its admissibility. Rather, it went to the weight the jury would assign to the evidence.’ *287 “Martin v. State, 931 So.2d 736, 748-49 (Ala.Crim.App.2003); aff'd in part, rev’d in part on unrelated ground, 931 So.2d 759 (Ala.2004).
“ ‘Additionally,
“ ““ “ ‘The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence.’ Ex parte Jones, 592 So.2d 210, 212 (Ala.1991); Harrell v. State, 608 So.2d 434, 437 (Ala.Cr.App.1992); Smith v. State, 583 So.2d 990 (Ala.Cr.App.1991), cert. denied, 583 So.2d 993 (Ala.1991). Moreover, the evidence need not negate the remotest possibility of substitution, alteration, or tampering, but instead must prove to a reasonable probability that the item is the same as it was at the beginning of the chain. Harrell, at 437; Ex parte Williams, 548 So.2d 518 (Ala.1989). Evidence has been held correctly admitted even when the chain of custody has a weak or missing link. Gordon v. State, 587 So.2d 427, 433 (Ala.Cr.App.1990), rev’d, 587 So.2d 434 (Ala.), on remand, 587 So.2d 435 (Ala.Cr.App.), appeal after remand, 591 So.2d 149 (Ala.Cr.App.1991); Shute v. State, 469 So.2d 670, 674 (Ala.Cr.App.1984).” ’ ” ’
“Broadnax v. State, 825 So.2d 134, 170 (Ala.Crim.App.2000).”
Reynolds v. State, [Ms. CR-07-0443, October 1, 2010] — So.3d -, - (Ala.Crim.App.2010).
A.
Revis first contends that the State failed to establish a proper chain of custody as to the ballistics evidence, including four fired bullets, an envelope containing 5 shell casings, and an envelope containing 17 shell casings.
However, the State proved that the four fired bullets, which were recovered from the scene of the offense because they had failed to strike the victim, were gathered by being dug out of a wall of the victim’s trailer by Investigator Ronny Vickery of the Marion County Sheriffs Department. (R. 320.) He then transported them to Huntsville to the Alabama Department of Forensic Science’s lab where they were tested by Tammi Fulgham.[16] (R. 320-21, 465-66.) Investigator Tommy Moore of the Marion County District Attorney’s Office retrieved the bullets after they were tested, and they were placed in a vault at the Marion County Sheriffs Department.[17] (R. 322.)
The five shell casings from the scene were collected by Selwyn Jones of the Alabama Department of Forensic Sciences. (R. 339-40, 362.) They were then given to Investigator Ronny Vickery. (R. 354.) They were later tested by Tammi Fulgham at the Alabama Department of Forensic Sciences lab in Huntsville. (R. 429, 466-67.) She returned them to Investigator Tommy Moore of the district attorney’s office. (R. 455.) They were kept in the vault at the sheriffs department. (R. 322.)
The 17 shell casings were recovered by Investigator Ted Smith of the district attorney’s office from an area around the residence of a third party who had been *288 investigated earlier concerning Stidham’s murder. (R. 425-26.) They were turned over to Investigator Ronny Vickery and later to the Alabama Department of Forensic Sciences for testing. (R. 427, 467, 470.) It was determined that these casings were not fired from the same rifle and they did not match the other casings. They were not admitted at trial.
Thus, the State established a sufficient chain of custody as to this ballistics evidence to ensure its authenticity and to ensure that it was not tampered with.
B.
As to the chain of custody of the rifle, Investigator Ted Smith of the district attorney’s office testified that he learned of the rifle through a tip from Shane Swin-ney, who had discovered the victim’s body. Swinney indicated that Burlón Mauldin may have the murder weapon in his possession. Mauldin testified that he had originally kept two guns, including the rifle, and some bullets for Revis’s uncle. However, Mauldin had contacted Revis’s uncle to remove the guns and bullets when he became aware that the rifle he was keeping was the same type of rifle that had been used to kill Stidham. Mauldin and Revis’s uncle had then taken the guns and bullets to Helen Cole’s house.
After being informed of the location of the rifle by Mauldin, Investigator Ted Smith of the district attorney’s office asked Mauldin to go to Helen Cole’s house and fire the rifle using the bullets from Revis’s uncle, so that the casings could be tested against the ballistics evidence from the scene of the murder. Mauldin testified that he fired the rifle into a jug of water and retrieved two shell casings, which he took to Investigator Smith. Investigator Smith took the casings to the Alabama Department of Forensics Sciences lab in Huntsville where they were tested by Tammi Fulgham; the casings were determined to match those recovered from the scene.
Investigator Moore, Investigator Ronny Vickery, and Sheriff Kevin Williams, pursuant to a search warrant, recovered the rifle from Helen Cole, who was keeping the rifle for Revis’s uncle. (R. 453.) Moore testified that Cole had stated that she had kept the rifle in her closet. (R. 450.) Investigator Moore then took the rifle to Tammi Fulgham with the Department of Forensic Sciences in Huntsville. (R. 454.) He received the rifle after it was tested. (R. 455-56.)
He also took the rifle to be tested for fingerprints by professor Tia Hall at Wallace State University. (R. 459.) Investigator Moore testified that she had indicated that the gun had appeared to have been wiped clean, and she had found no fingerprints.(R. 459.)
Revis argues that the chain of custody had missing links because Professor Hall did not testify, because an officer kept the rifle over a weekend before transporting it to the Alabama Department of Forensic Sciences, and because a civilian test-fired the rifle to retrieve the casings for testing.
Although Professor Hall did not testify, the rifle had already been matched to the casings found at the scene. The professor, after receiving the rifle from Investigator Moore, conducted three tests, according to Investigator Moore, and found no fingerprints. This link constitutes a weak link, because although each link must be identified by the State’s evidence, it is not necessary that there be testimony from each link in order to prove a complete chain of custody. Reynolds v. State, — So.3d at -, quoting Martin v. State, 931 So.2d 736, 748-49 (Ala.Crim.App.2003), affirmed in part, reversed in part on unrelated ground, 931 So.2d 759 *289 (Ala.2004), citing in turn Harrison v. State, 650 So.2d 603, 605 (Ala.Crim.App.1994). If the State has sufficiently shown each link, “but has done so with circumstantial evidence, as opposed to the direct testimony of the ‘link,’ as to one or more criteria or as to one or more links, the result is a ‘weak’ link. When the link is ‘weak,’ a question of credibility and weight is presented, not one of admissibility.” Ex parte Holton, 590 So.2d 918, 920 (Ala.1991).
The portion of the record to which Revis alludes concerning an officer’s keeping the rifle over the weekend addresses testimony at a pretrial hearing by Investigator Ted Smith. Investigator Smith stated that he believed that Investigator Moore had taken the guns from Helen Cole’s house to the district attorney’s office to be stored over the weekend before he could take them to the forensics lab on Monday. Investigator Moore also testified at the pretrial hearing that he had taken the rifle to the forensic-sciences lab to conduct a ballistics investigation on it; and that Tammy Ward, a lab technician, had telephoned him later that day to state that they had matched the rifle to the casings from the scene of the offense.
At most, the indication that the rifle was stored over the weekend at the district attorney’s office was a weak link and not a missing link in the chain of custody. “In order to establish a proper chain, the State must show to a ‘reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.’ McCray v. State, 548 So.2d 573, 576 (Ala.Crim.App.1988).” Ex parte Holton, 590 So.2d at 920.
Finally, Mauldin’s test-firing of the rifle did not contaminate the rifle, nor was there any indication of tampering with the rifle as he did so. The casings that he obtained were used to connect the rifle to the casings from the scene so that a search warrant could be obtained to retrieve the rifle. The rifle was then tested at the forensics lab to determine whether it was the murder weapon. Thus, those casings obtained by Mauldin related only to the securing of a search warrant. The State had not seized the rifle before executing the search warrant; therefore, the chain of custody had not yet begun.
“As this Court explained in Burrell v. State, 689 So.2d 992 (Ala.Crim.App.1996):
“ ‘Proper analysis of a chain of custody question, however, does not begin at the time of the offense; the chain of custody begins when [the] item of evidence is seized by the State. State v. Conrad, 241 Mont. 1, 785 P.2d 185 (1990); 29A Am.Jur.2d, Evidence § 947 (1994 ed.) (“The ehain-of-custo-dy rule does not require the prosecution to account for the possession of evidence before it comes into their hands.”) Anyone who has handled evidence in the State’s possession is a “link” in the chain of custody; once the evidence is in the State’s possession, it is the State’s duty to account for each link. § 12-21-13, Code of Alabama (1975). See, Ex parte Holton, 590 So.2d 918, 920 (Ala.1991).’
“689 So.2d at 995-96 (emphasis added). See also Birge v. State, 973 So.2d 1085 (Ala.Crim.App.2007); Yeomans v. State, 898 So.2d 878 (Ala.Crim.App.2004); Baird v. State, 849 So.2d 223 (Ala.Crim.App.2002); and Powell v. State, 796 So.2d 404 (Ala.Crim.App.1999), aff'd, 796 So.2d 434 (Ala.2001).”
Lane v. State, 80 So.3d 280, 300 (Ala.Crim.App.2010).
C.
Revis also argues that there was no chain of custody as to the victim’s body *290 and that therefore any evidence gained from testing the body, including the bullets removed from Stidham, was inadmissible.
Revis did not argue any impropriety in the chain of custody as to the victim’s body at trial; therefore, this issue must be analyzed pursuant to the plain-error rule. Rule 45A, Ala.R.App.P.
The record indicates that the body was removed from the scene by the coroner. (R. 340.) Moreover, the record contains a receipt-of-body form from the Alabama Department of Forensic Sciences showing that the body was received on February 23, 2004, at 10:25 a.m. (C. 387.) Although the medical examiner who conducted the autopsy did not testify, Matt Dyar, a death investigator with the Alabama Department of Forensic Sciences, testified that he attended the autopsy and assisted the medical examiner. He then took evidence from the lab to be tested. He took the bullets to be tested to Michelle Wheat, and ultimately they were tested by Tammi Fulg-ham.
There is no evidence of tampering and no indication of plain error in the admission of evidence retrieved from the victim’s body. See Lee v. State, 898 So.2d 790, 850 (Ala.Crim.App.2001), cert. denied, 898 So.2d 874 (Ala.), cert. denied, 543 U.S. 924, 125 S.Ct. 309, 160 L.Ed.2d 222 (2004) (“The record does not suggest that the bodies were tampered with or altered before they arrived at the laboratory where Wanger performed the autopsies. Finally, the appellant does not allege that the bodies were tampered with or altered, and he has not explained how he has been denied a substantial right or how the failure to show a chain of custody for the bodies has affected the fairness and integrity of his trial so as to rise to the level of plain error. Therefore, we do not find that there was any plain error in this regard.”).
IV.
Revis argues that the trial court erred in admitting evidence concerning his uncle’s rifle. Specifically, he refers to allegedly unreliable firearms-identification testimony and to evidence concerning the lack of fingerprints without the presence of the professor who had tested the rifle for fingerprints.
Revis did not object to either of these issues at trial; therefore, any alleged error must rise to the level of plain error. Rule 45A, Ala.R.App.P.
A.
Revis argues that the testimony of the firearms and toolmarks examiner for the Alabama Department of Forensic Sciences, wherein she testified that her testing revealed that the bullets from the victim’s body and the casings found at the scene matched test bullets fired from Revis’s uncle’s rifle, was inadmissible. He submits that she could not so testify because, he says, she was never qualified as an expert and her testimony concerning her qualifications, and her testing did not meet the standard for the admission of expert testimony.
Despite Revis’s argument that the witness’s testimony failed to meet the criteria of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), Frye v. United States, 293 F. 1013 (D.C.Cir.1923), and Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), regarding her testing procedures, his reliance on these cases is misplaced.
In Barber v. State, 952 So.2d 393 (Ala.Crim.App.2005), Barber challenged a witness’s print-identification testimony. This court stated:
“Because this case does not involve DNA evidence, the Daubert standard *291 does not apply. Also, because print identification involves subjective observations and comparisons based on the expert’s training, skill, or experience, we conclude that it does not constitute scientific evidence and that, therefore, Frye does not apply. Rather, print identification constitutes specialized knowledge that may be helpful to the jury in understanding or determining the facts. Therefore, Rule 702, Ala. R.Evid., governs the admissibility of Lamont’s testimony.”
Barber v. State, 952 So.2d at 417.[18] See also W.R.C. v. State, 69 So.3d 933 (Ala.Crim.App.2010) (“However, as this Court later clarified in Barber v. State, 952 So.2d 393 (Ala.Crim.App.2005), although Simmons [v. State, 797 So.2d 1134 (Ala.Crim.App.1999),] referred to Daubert and Kum-ho, “we did not specifically hold [in Simmons ] that Daubert governs the admissibility of nonscientific expert testimony,’ and ‘we do not [now] read Simmons to require that the admissibility of nonscientific expert testimony be governed by Daubert.’ 952 So.2d at 415. Further, this Court specifically noted in Barber that Rule 702 alone, and not Daubert, Kumho, or Frye v. United States, 293 F. 1013 (D.C.Cir.1923), governed the admissibility of nonscientific expert testimony, and we held that nonscientific expert testimony regarding fingerprint examination ‘satisfied the requirements of Rule 702’ when (1) the witness was qualified as an expert in the field and (2) the testimony assisted the jury in determining a fact in issue, i.e., the defendant’s guilt. 952 So.2d at 417. Rule 702 contains no requirement that the expected testimony be reliable under Dau-beii; it requires only that the testimony “will assist the trier of fact to understand the evidence or to determine a fact in issue,’ and this Court in Barber expressly rejected any interpretation of Simmons that would require a reliability determination under Daubert before admission of nonscientific expert testimony under Rule 702.”).
“ ‘Identification based upon a comparison of breechface imprints, firing pin impressions, and extractor and ejector marks, [has] achieved recognition by the courts-’ A. Moenssens and F. In-bau, Scientific Evidence in Criminal Cases 195 (2d ed.1978). In Alabama, a properly qualified expert should be permitted to testify whether or not a particular shell was fired from a specific firearm based upon his comparison of the distinctive marks on the shell "with the physical features of the firearm. See Douglas v. State, 42 Ala.App. 314, 329, 163 So.2d 477, 492 (1963), cert. denied, 276 Ala. 703, 163 So.2d 496 (1964), reversed on other grounds, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). See also 2 Wigmore, Evidence § 417(a) at 495 (Chadbourn rev.1979); 29 Am. Jur. P.O.F. Firearms Identification § 13 (1972).
[[Image here]]
“We recognize that ‘a witness need not be an expert, in the technical sense, to give testimony as to things which he knows by study, practice, experience, or observation on that particular subject.’ Paragon Engineering, Inc. v. Rhodes, 451 So.2d 274, 276 (Ala.1984). ‘Experience and practical knowledge may qualify one to make technical judgments as readily as formal education.’ International Telecommunications Systems v. *292 State of Alabama, 359 So.2d 364, 368 (Ala.1978). However, ‘[i]t is error for a court to allow an expert witness to testify outside his area of expertise.’ Cook v. Cook, 396 So.2d 1037, 1041 (Ala.1981).
“The admissibility of all types of expert testimony is ‘subject to the discretion of the trial court.’ Ex parte Williams, 594 So.2d 1225, 1227 (Ala.1992). ‘[T]he trial court’s rulings on the admissibility of such evidence will not be disturbed on appeal absent a clear abuse of that discretion.’ Id."
Bowden v. State, 610 So.2d 1256, 1257-58 (Ala.Crim.App.1992).
Here, the trial court did not abuse its discretion in determining that the firearms and toolmarks witness should be allowed to testify concerning the tests that were undertaken in determining that the rifle that discharged the test-fired hulls was the same weapon that discharged the casings gathered from the scene and the bullets that were removed from Stidham’s body.
The witness fully testified concerning her educational background, training, and credentials. She also stated that she had been working as a firearms and toolmark examiner for six years and had worked on over one thousand cases.
Rule 702, Ala.R.Evid., provides:
“If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.”
Moreover, the Committee’s Notes to this rule affirm that under Rule 702, as under preexisting law, the determination of whether a witness qualifies as an expert and should be allowed to testify as such rests largely within the discretion of the trial court. Griffin v. Gregory, 355 So.2d 691 (Ala.1978); Hagler v. Gilliland, 292 Ala. 262, 292 So.2d 647 (1974). There is no requirement that the court specifically state that it finds the witness to be qualified as an expert.
In the present case, the witness’s testimony established that she was qualified to testify as to the ballistics comparison, and the record indicates that this testimony would have aided the jury in its understanding of the evidence and its determination. Thus, the trial court did not abuse its discretion in allowing her testimony.
B.
Revis contends that Investigator Moore should not have been allowed to testify concerning fingerprint evidence taken from the rifle, because the professor who tested the rifle for fingerprints did not testify.[19] He refers to Investigator Moore’s testimony that the professor performed three tests for fingerprints on the rifle and that the professor was of the opinion that the rifle appeared to have been dusted off or rubbed down to remove any fingerprints. Revis submits that this testimony suggests that he rubbed or dusted his fingerprints off the rifle.
However, there is no error, plain or otherwise, on this ground. There was no testimony to the effect that Revis removed his fingerprints from the rifle. Woods v. State, 13 So.3d 1, 19 (Ala.Crim.App.2007) (testimony concerning an offi *293 cer’s search through city files for prior arrests was not improper because the officer “did not testify that he found any prior arrests for Woods in the search of the files, although he did testify that he located ‘a Nathaniel Woods’ and ‘an address in close proximity to this location,’ and with a date of birth that was close to the age he guessed Woods to be. (R. 507.) However, he did not testify that the person he located in the files was Woods in this case, nor did he testify that the person had a prior arrest.”). See Brownfield v. State, 44 So.3d 1, 25 n. 10 (Ala.Crim.App.2007), affirmed, 44 So.3d 43 (Ala.2009), cert. denied, — U.S. -, 131 S.Ct. 505, 178 L.Ed.2d 370 (2010) (Brownfield’s contention of error in the admission of an officer’s statement concerning an eyewitness was harmless, if error; moreover, the officer “did not state that a witness had seen Brownfield at the Wallace Lane residence on December 24. Rather, the officer asked Brownfield why he went back to the residence, told Brownfield that some folks had seen him at the residence, and asked Brownfield if he remembered getting his automobile jump-started.”). Saunders v. State, 10 So.3d 53 (Ala.Crim.App.2007) (coroner’s testimony was not improper because he did not testify to the relative positions of Saunders and the victim at the time of the offense, but rather as to the victim’s wounds and the victim’s position when he was struck). Johnson v. State, 612 So.2d 1288, 1301 (Ala.Crim.App.1992) (“Contrary to Johnson’s claim, the forensic expert did not testify that there was a 96% probability that the glass embedded in the bullet removed from Johnson’s back matched the glass from the glass pane in the victim’s door. Instead, he confined his testimony about probabilities to the F.B.I. samples, and he testified that if one utilized the F.B.I. samples, then four out of 100 samples could have the same physical properties as the glass in this case.”).
Revis does not challenge the professor’s findings that there were no fingerprints on the rifle. Compare Mester v. State, 755 So.2d 66, (Ala.Crim.App.1999) (finding that the State failed to establish the necessary predicate to admit blood-alcohol-test results when administering officer, who testified, did not- have personal knowledge concerning proper calibration of machine and the person who inspected machine did not testify). Further, he was not prejudiced by Investigator Moore’s testimony that no fingerprints were found on the rifle and that the rifle may have been wiped clean. Therefore, any error in Investigator Moore’s testimony concerning the professor’s findings did not rise to the level of plain error. Rule 45A, Ala.R.App.P.
V.
Revis argues that the trial court erred by allowing the State to use evidence of prior bad acts committed by Revis against him. He contends that the State was improperly allowed to introduce evidence of highly prejudicial and irrelevant evidence of prior arrests, uncharged bad acts, and bad character. Specifically, he refers to evidence that he had previously been arrested on bad-check charges that, before trial, the State had informed the court and defense counsel it intended to introduce. He also refers to evidence that he had previously been arrested on unrelated charges and held in the Franklin County jail; that he had illegally purchased and used drugs; that he had hunted after dark; that he had impermissibly written a check on his aunt’s account; that he had lied to his mother; that he had dated multiple women at the same time; that he did not attend the victim’s funeral; that he quit football during the season after arguing with the coach; that he had dropped out of high school; and that he had a bad reputation as an inmate.
*294 The record reveals that Revis filed a pretrial motion asking to be given notice of any prior bad-acts evidence that the State intended to introduce, citing Rule 404(b), Ala.R.Evid. The trial court granted the motion, and the State then informed the court that.it intended to introduce evidence of Revis’s bad-checks arrest because he had been picked up pursuant to a warrant for those charges when he was interviewed concerning his role in the present offense and, therefore, it was intertwined with the present case. Revis did not object to the prosecutor’s statement as to his intent to introduce this evidence. Nor did Revis object to any statement or allusion to any of the other acts of which he now complains. Therefore, any of these matters must rise to the level of plain error. Rule 45A, Ala.R.App.P.
All, except one, of the bad-acts or bad-character allusions cited by Revis were derived from comments or statements made during Revis’s interviews by the police during the guilt phase.[20] The other alleged bad act, that he had behaved badly as an inmate, was not introduced into evidence until the sentencing phase of the trial. The prior-arrests evidence included statements concerning his previous incarceration in the Franklin County jail, which was adduced both in his statement and at sentencing, and testimony concerning his arrest for writing bad checks, which was introduced during the testimony of Investigator Mays at the guilt phase as to why Revis was in custody when he made his statement.
The State’s evidence concerning Revis’s warrants and his arrest for writing bad checks was admissible to show why he was in custody when he made his statements. Woods v. State, 13 So.3d 1, 19 (Ala.Crim.App.2007) (“The State correctly argues that evidence of Officer Collins’s search through the City of Birmingham’s files was not offered as Rule 404(b)[, Ala. R.Evid.,] evidence, but rather, was offered as part of Officer Collins’s explanation of the steps he took to gain information about Woods.”).
Further, the State could properly admit evidence concerning Revis’s bad and violent behavior as an inmate at the penalty phase of the trial.
Section 13A-5-45(d), Ala.Code 1975, states:
“Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the State of Alabama.”
“In the conduct of the sentencing hearing, the rules of evidence should be relaxed .... ” Harris v. State, 352 So.2d 479, 495 (Ala.1977).
The evidence concerning Revis’s bad behavior in prison was properly introduced to rebut Revis’s mitigating evidence that he was a peaceful, helpful, and loving person.
“At a penalty phase in a capital-murder case, the State has the burden of proving the existence of any applicable aggravating circumstances and the burden of disproving the factual existence of any mitigating circumstances that are presented by the defendant. The State has the burden of proving the aggravating circumstances ‘beyond a reasonable doubt.’ § 13A-5-45(e), Ala.Code 1975. *295 Also, “when the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence.’ See § 13A-5-45(g), Ala.Code 1975.”
Smith v. State, [Ms. CR-97-1258, August 31, 2007] — So.Sd -, - (Ala.Crim.App.2007), affirmed in part and reversed in part on another ground, [Ms. 1080973, October 22, 2010] — So.3d - (Ala.2010).
Finally, the evidence concerning Revis’s bad character and the bad-acts evidence[21] that was contained in his statements were brief comments made in the course of the interview. See Read v. State, 686 So.2d 563, 566 (Ala.Crim.App.1996) (Read’s entire statement was properly admitted despite her claim that “the tape was offered solely as evidence of her bad character because it contained information that on the night before the shooting she had been at a poker game and had also been drinking”). Revis did not move to have any of these comments redacted based on any references to prior-bad acts. Although these references were not relevant to any issue at trial, their brief mention during Revis’s questioning was not such that their admission probably adversely affected Re-vis’s substantial rights and thus rose to the level of plain error. Rule 45A, Ala. R.App.P.
Moreover, their admission was harmless, as the brief mention of these acts did not probably injuriously affect Revis’s substantial rights. Rule 45, Ala.R.App.P. See Buchannon v. State, 554 So.2d 477, 482 (Ala.Crim.App.1989), overruled as to another ground, Pardue v. State, 571 So.2d 333 (Ala.1990) (introduction of fingerprint card that contained information indicating that Buchannon had had prior contact with the police was harmless error based on his incriminating statement and the “unem-phasized nature” of the prior arrest). It should be noted that certain of the conducts cited by Revis are not necessarily “bad acts.” See Gamble v. State, 791 So.2d 409, 429 (Ala.Crim.App.2000) (passages from Gamble’s statement that he argued contained references to collateral bad acts by his accomplice did not contain improper evidence of prior bad acts as intended by the exclusionary rule).
Evidence of the prior arrests and the other bad acts or bad-character evidence was not admitted “ ‘to show in the defendant a tendency or disposition to commit the crime with which he is charged.’ Ex parte Casey, 889 So.2d 615, 618 (Ala.2004) (quoting Garner v. State, 269 Ala. 531, 533, *296 114 So.2d 385, 386 (1959) (emphasis omitted)).” Ex parte Deardorff v. State, 6 So.3d 1235, 1242 (Ala.2008). Compare Spencer v. State, 58 So.3d 215, 230 (Ala.Crim.App.2008) (“Here, evidence that Spencer was engaged in a drug-dealing enterprise at the residence where the shootings occurred, evidence that Spencer was frequently seen in possession of a firearm at the residence, evidence that there had been a confrontation involving Spencer’s accomplice Woods and police officers earlier in the day of the shootings, and evidence that Spencer had outstanding warrants for his arrest were all properly admitted for reasons other than simple impeachment of Spencer’s credibility.”).
VI.
Revis argues that the prosecutor improperly told the jury to consider the opinion of Stidham’s family as to his sentencing in making its recommendation for his punishment. Revis refers to the following argument made by the prosecutor in his opening statement at the penalty phase of the trial: “My opening statement is simply going to be this, is that we consulted with the family, and they are asking for and the State of Alabama is seeking the death penalty in this case.” (R. 688.)
Revis did not object to this argument at trial; therefore, this issue is due to be analyzed pursuant to the plain-error rule. Rule 45A, Ala.R.App.P.
This argument by the prosecutor did not constitute plain error. See Woods v. State, 13 So.3d 1, 35-36 n. 6 (Ala.Crim.App.2007) (“Testimony from a victim’s family member as to a sentencing recommendation is generally not admissible in a capital case. See, e.g., Stallworth v. State, 868 So.2d 1128, 1176 (Ala.Crim.App.2001). Because Woods offered such testimony at the penalty phase of his trial, however, we find that, under the facts of this case, no plain error occurred as a result of the State’s witnesses’ testimony in rebuttal about a recommended sentence.”).
“Also, we have repeatedly held that victim-impact evidence is admissible at the penalty phase of a capital trial. See Smith v. State, [Ms. CR-97-1258, January 16, 2009] — So.3d -, -(Ala.Crim.App.2009); Gissendanner v. State, 949 So.2d 956 (Ala.Crim.App.2006); Miller v. State, 913 So.2d 1148 (Ala.Crim.App.2004); Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001); Smith v. State, 797 So.2d 503 (Ala.Crim.App.2000); Williams v. State, 795 So.2d 753 (Ala.Crim.App.1999).” Lee v. State, 44 So.3d 1145, 1174 (Ala.Crim.App.2009).
Moreover, the prosecutor could properly argue that the State was seeking the death penalty in this case. “ ‘In our adversarial system of criminal justice, a prosecutor seeking a sentence of death may properly argue to the jury that a death sentence is appropriate. See Hall v. State, 820 So.2d 113, 143 (Ala.Crim.App.1999).’ ” McMillan v. State, [Ms. CR-08-1954, November 5, 2010] — So.3d -, -(Ala.Crim.App.2010), quoting Vanpelt v. State, 74 So.3d 32 (Ala.Crim.App.2009).
The prosecutor made the statement in his opening argument and, as argument, the statement should be viewed as having been made in the heat of debate. Brown v. State, 74 So.3d 984, 1016 (Ala.Crim.App.2010) (“ ‘In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at *297 their true worth and are not expected to become factors in the formation of the verdict.’ ’’(citations omitted)).
Thus, there was no plain error in the prosecutor’s argument.
VII.
Revis argues that the trial court erred in allowing evidence ofnonstatutory aggravating circumstances during the penalty phase of his trial. Revis argues that the State improperly admitted the following evidence that Revis says was not relevant to any statutory aggravating circumstance: that Revis rented the “Jacuzzi” room at the Days Inn motel after Stidham’s murder; that Revis had a reputation for violence as a prisoner; that the cut to the victim’s throat was heinous; that he had previously been arrested and that he had not come forward after that offense; and that he quit football, was shuffled back and forth between his parents and grandparents, and used drugs, and that he fled from law enforcement after the offense.
A.
During the penalty phase, the prosecutor introduced testimony from two employees of the Days Inn motel to show that Revis, his uncle, and his brother had rented a higher priced room that featured a Jacuzzi tub after the offense and that they stayed there for a few hours before checking out. Revis also refers to the prosecutor’s comment in closing that Revis had rented the “Jacuzzi” room with the victim’s money.
This statement from the prosecutor was a proper inference from the evidence and supported the aggravating circumstance that was argued by the State, that the murder occurred during the course of a robbery. The evidence established that Revis paid cash for this motel room following the offense. McNabb v. State, 887 So.2d 929, 989 (Ala.Crim.App.2001), cert. denied, 543 U.S. 1005, 125 S.Ct. 606, 160 L.Ed.2d 466 (2004) (“ ‘ “[T]he prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.’” Reeves v. State, 807 So.2d 18, 45 (Ala.Crim.App.2000), quoting Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Crim.App.1987), rev’d on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted).”).
B.
The State presented evidence concerning Revis’s reputation as a violent prisoner while he was imprisoned for the present offense in order to rebut the defense’s mitigating evidence that Revis did not have “any violent propensity.” (R. 703.) Evidence concerning prior bad acts or conduct by Revis, specifically that he quit football, that he fled from police after the offense,[22] that he was shuffled back and forth between his parents and his grandparents, and that he used drugs, was also introduced by the prosecutor to rebut Revis’s evidence of his good character. This evidence was properly admitted as rebuttal. In Deardorff v. State, 6 So.3d 1205 (Ala.Crim.App.2004), affirmed, 6 *298 So.3d 1235 (Ala.2008), cert. denied, — U.S. -, 129 S.Ct. 1987, 173 L.Ed.2d 1091 (2009), this court stated:
“Section 13A-5-45(g), Ala.Code 1975, provides that, once the defendant offers as mitigation evidence a fact that the State disputes, the State ‘shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence.’
“In Jackson v. State, 791 So.2d 979 (Ala.Crim.App.2000), the appellant objected to the prosecutor’s cross-examination of Jackson’s character witnesses, claiming that the evidence was improper because it introduced evidence of his prior bad conduct. We rejected that argument, stating:
“ ‘To rebut Jackson’s claim of good character, the State cross-examined one of Jackson’s character witnesses regarding Jackson’s prior misdemean- or assault conviction and his suspension from school for carrying a gun. This cross-examination was proper both to test the witness’s credibility as to his knowledge of Jackson’s character and to rebut the mitigating evidence offered by Jackson.’
“791 So.2d at 1026.
“We have also held that an appellant’s disciplinary problems in jail were admissible to rebut mitigation evidence he offered regarding his good behavior in jail. In Clark v. State, 896 So.2d 584, 597 (Ala.Crim.App.2000) (on return to remand and on application for rehearing), we stated:
“ ‘Evidence of Clark’s prison disciplinary problems was clearly offered to rebut the evidence he had offered in mitigation that he was a “model inmate.” (R. 1547.) The evidence was relevant and probative to sentencing and was, thus, properly admitted. See, e.g., Jackson v. State, 791 So.2d 979 (Ala.Crim.App.), cert. denied, 791 So.2d 1043 (Ala.2000), cert. denied, 532 U.S. 934 (2001) (evidence of the defendant’s prior misdemeanor conviction and his suspension from high school was properly admitted to rebut the defendant’s mitigation evidence); and Hallford v. State, 548 So.2d 526 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989) (evidence that the defendant was having an incestuous relationship with his daughter was properly admitted to rebut the defendant’s mitigation evidence regarding his good character).’ ”
Deardorff v. State, 6 So.3d at 1230.
Thus, the State could properly disprove evidence offered by Revis as mitigation at the penalty phase by offering evidence of Revis’s reputation as a violent prisoner and evidence of the other cited bad acts. Moreover his drug use, which was also introduced by Revis through the testimony of his character witnesses, was relevant to prove the robbery element of the capital offense, in which he was charged with murdering the victim during a robbery of the victim to take prescription pain pills. This evidence was part of the res gestae and established motive.
C.
Revis argues that the State improperly admitted evidence that Stidham’s throat was cut, although the prosecutor conceded that Revis’s uncle, and not Revis, cut Stid-ham’s throat. Revis argues that this evidence was not relevant to any aggravating circumstance and that the State did not argue that the offense was especially heinous, atrocious, or cruel, when compared to other capital offenses, nor was he given notice of the State’s intention to argue that aggravating circumstance, if that was its *299 intent. He further submits that the trial court noted in its sentencing order that the victim’s throat was cut.
The record reveals that the trial court mentioned the fact that Revis’s uncle cut Stidham’s throat only in the findings of fact as to the offense. Moreover, the State did not argue in this case the aggravating circumstance that the offense was especially heinous, atrocious, or cruel. § 13A-5-49(8), Ala.Code 1975. Nor did the trial court find this aggravating circumstance to exist in this case.
The slashing of the victim’s throat was part of the res gestae of the offense and occurred immediately after Revis shot the victim. This evidence was adduced during the presentation of the evidence at the guilt phase and was thereby incorporated into the penalty phase. The comment was not made “ ‘in an excessive and intolerable manner, and [it] did not divert the jury’s attention from its proper function.’ ” Smith v. State, 581 So.2d 497, (Ala.Crim.App.1990), reversed on other grounds, Ex parte Smith, 581 So.2d 531 (Ala.1991), quoting Rutledge v. State, 523 So.2d 1087, 1101 (Ala.Crim.App.1987), reversed on other grounds, 523 So.2d 1118 (Ala.1988). Therefore, it was properly admitted during the penalty phase.
D.
Revis argues that, at sentencing, the State improperly allowed an officer to testify that Revis had previously been arrested and that he remained silent after the arrest. He alleges that this testimony constituted an impermissible comment on the assertion of his right to remain silent.
However, the record reveals that Investigator Ronny Vickery testified that, in the early stages of the investigation, when Stidham’s sons were being considered as possible suspects, he contacted Revis to act as an informant because Revis was a friend of one of Stidham’s sons. This testimony was elicited to rebut defense counsel’s argument in his opening statement that Revis had been very upset about having committed the offense and that he had come forward with his confession. Defense counsel argued:
“He could have kept his mouth shut. This case would have never been solved. But he didn’t do that. At some point this case was bothering him. It was bothering him to the point that maybe he couldn’t live with it.... But he could have kept his mouth shut along with the other people, and it would have never been solved.”
(R. 692.)
The prosecutor then argued in closing that Revis could have come forward when the police eventually contacted him, but he indicated that he would act as an informant against his friend, Stidham’s son, and later gave a statement indicating that his brother and uncle had killed Stidham.
Similarly, this court found in Killingsworth v. State, 82 So.3d 716, 755 (Ala.Crim.App.2009):
“We do not believe the prosecutor was commenting on Killingsworth’s decision not to testify. Rather, it appears that he was explaining that one possible inference from the evidence was that Kill-ingsworth and Connell had discussed killing someone while Jones retrieved the shotgun from his house and that that could have been why they had changed seats when Jones returned to the vehicle with the shotgun. Therefore, we find that the argument was about a reasonable inference from the evidence rather than a comment on the fact that Kill-ingsworth did not testify. Accordingly, we do not find that there was any plain error in this regard.”
Killingsworth v. State, 82 So.3d at 755.
The testimony of Investigator Vickery was proper rebuttal evidence, and *300 the prosecutor’s comment based on that testimony, as well as the evidence, was a proper inference. It was not a comment on Revis’s right to remain silent.
Revis also contends that Investigator Vickery’s testimony that he got Re-vis out of jail so that he would act as an informant against Stidham’s sons in this case improperly introduced irrelevant evidence of prior arrests. However, this testimony rebutted defense counsel’s argument that Revis came forward with his admission in order to solve the offense. Investigator Vickery’s testimony rebutted Revis’s argument that he was forthcoming and cooperative by revealing that, despite Revis’s agreement to act as an informant in order to be released, he failed to contact the police as he had promised. See Davis v. State, 740 So.2d 1115 (Ala.Crim.App.1998), affirmed, 740 So.2d 1135 (Ala.1999), cert. denied, 529 U.S. 1039, 120 S.Ct. 1535, 146 L.Ed.2d 349 (2000) (“The State offered evidence of six prior convictions to rebut the evidence concerning the appellant’s good character and reputation. Accordingly, the trial court properly allowed the State to introduce evidence of the appellant’s prior convictions for the limited purpose of rebutting mitigating evidence the appellant offered to show his good character and reputation. See Hallford v. State, 548 So.2d 526 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989).”).
Moreover, Investigator Vickery’s testimony did not indicate that Revis had been convicted or why he was in jail. Compare Smith v. State, [Ms. CR-97-1258, August 31, 2007] — So.3d - (Ala.Crim.App.2007), affirmed in part and reversed in part on other grounds, [Ms. 1080973, October 22, 2010] — So.3d - (Ala.2010) (in which the prosecutor’s argument in his opening statement at the penalty phase of the trial that Smith had prior convictions was harmless).
VIII.
Revis argues that the trial court’s instructions and the prosecutor’s comments denigrated the jury’s responsibility in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). He refers to arguments made by the prosecutor and an instruction from the trial court made during voir dire examination.
The following comment was made during the prosecutor’s opening remarks to the venire concerning the trial process:
“[T]he jury renders what is called an advisory verdict. Now, you’re saying life without or death, but that’s just an advisory verdict for the judge to consider when he does the final sentencing.”
(R. 179.)
Thereafter, during the voir dire examination, the prosecutor asked the panel if any member or members would be unable to vote for the death penalty under any circumstances. A potential juror responded that she was uncertain that she could vote for the death penalty and the trial court attempted to instruct her as to the trial process as follows:
“There are two phases in this case. You’ve already heard reference to both phases. We won’t even get to the sentencing phase if, in fact, you do not as a jury convict this defendant of a capital crime. The State of Alabama has charged him with a capital crime. The burden of proof is on the State to prove all the elements of that capital crime beyond a reasonable doubt. If after you hear all the evidence in the case you don’t feel like the State of Alabama has met that burden of proof, then it will be your duty not to convict this defendant of that capital crime. Now, assuming that you do, and you do convict him of a *301 capital crime, then and only then do we go to the second phase, and that’s the phase in which you will consider both aggravating circumstances and mitigating circumstances in deciding whether or not you would recommend to the Court the imposition of either the death penalty or life without the possibility of parole.”
(R. 197-98.)
The final instance cited by Revis as a violation of Caldwell v. Mississippi, supra, occurred immediately after the trial court’s instructions to the above-noted potential juror, when the prosecutor addressed the entire panel and stated:
“Okay. Again, anyone who feels like they could not impose the death penalty? (No response.) I guess impose is a little strong word. Recommend is probably the more appropriate.”
(R. 199.)
None of the instances cited by Revis misinformed any potential juror of his or her role as a juror, nor did the trial court’s instructions or prosecutor’s comments diminish the juror’s role as to sentencing.
“ ‘It is well established that “the comments of the prosecutor and the instructions of the trial court accurately informing the jury of the extent of its sentencing authority and that its sentence verdict was ‘advisory’ and a ‘recommendation’ and that the trial court would make the final decision as to sentence does not violate Caldwell [v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) ].” Martin v. State, 548 So.2d 488, 494 (Ala.Crim.App.[1988]), affirmed, 548 So.2d 496 (Ala.1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). See White v. State, 587 So.2d 1218 (Ala.Crim.App.1990), affirmed, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992); Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), affirmed, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).’ ”
McMillan v. State, [Ms. CR-08-1954, November 5, 2010] — So.3d -, - (Ala.Crim.App.2010).
As this court determined in Vanpelt v. State, 74 So.3d 32, 84 (Ala.Crim.App.2009):
“First, the circuit court and the prosecutor did not misinform the jury that its penalty-phase verdict is a recommendation. Under § 13A-5-46, Ala.Code 1975, the jury’s role in penalty phase of a capital case is to render an advisory verdict recommending a sentence to the circuit judge. It is the circuit judge who ultimately decides the capital defendant’s sentence, and, ‘[w]hile the jury’s recommendation concerning sentencing shall be given consideration, it is not binding upon the courts.’ § 13A-5-47, Ala.Code 1975. Accordingly, the circuit court and the prosecutor did not misinform the jury that its penalty-phase verdict is a recommendation.”
Here, there was no violation of the prohibition against misleading or misinforming the jury as to its role in the sentencing decision.
IX.
Revis argues that the prosecutor improperly and prejudicially contrasted Re-vis’s constitutional rights with those of the victim. Specifically, he contends that the prosecutor improperly argued that Revis was being allowed his constitutional rights, whereas the victim was no longer able to exercise his constitutional rights.
He cites the following argument by the prosecutor during his closing statement at *302 the penalty phase in support of his contention:
“All this that we’re going through for Chris Revis on his behalf, that’s what this week has been about is Chris Revis. Jerry Stidham got zero. He got no due process. He got nothing.”
(R. 811-12.)
Revis did not object to this argument by the prosecutor; therefore, any error must rise to the level of plain error. Rule 45A, Ala.R.App.P.
There was no plain error in the prosecutor’s comment. Mitchell v. State, 84 So.3d 968 (Ala.Crim.App.2010) (finding no plain error in prosecutor’s argument comparing the victim’s rights to Mitchell’s rights during the guilt-phase closing argument). See also Maples v. State, 758 So.2d 1, 56-57 (Ala.Crim.App.1999) (finding no impropriety in the prosecutor’s argument, “ ‘I’ll bet you [the victim] doesn’t think it’s a tougher punishment than death. Don’t you think the [victim’s family] would be tickled to go to the penitentiary this weekend and visit with their son? Sure, it’s a miserable place to be. Sure it’s awful to have to drive down there. Who would want to know their kid was in the penitentiary? That’s better than having him dead. Tougher than the death penalty? I don’t think so.”). But see McNair v. State, 658 So.2d 820, 337-38 (Ala.Crim.App.1992) (“The prosecutor made numerous references to the victim’s rights and several times implied that her rights were to be weighed against the appellant’s. This was clearly improper. However, we think these references were valued by the jury at their true worth, as having been uttered in the heat of debate and were not expected to become factors in the formation of the verdict. See Duren v. State, 590 So.2d 360, 364 (Ala.Cr.App.1990), affirmed, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992); Bankhead v. State, 585 So.2d 97, 106 (Ala.Cr.App.1989), affirmed as to instant issue and remanded on other grounds, 585 So.2d 112 (Ala.1991) (on rehearing), affirmed on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992); Harris v. State, 539 So.2d 1117, 1123 (Ala.Cr.App.1988).”).
“It is improper for a prosecutor to argue the victim’s rights and to compare those rights to the rights of the defendant. However, as we stated in McNair [v. State, 653 So.2d 320 (Ala.Crim.App.1992) ]:
“ ‘The prosecutor made numerous references to the victim’s rights and several times implied that her rights were to be weighed against the appellant’s. This was clearly improper. However, we think these references were valued by the jury at their true worth, as having been uttered in the heat of debate and were not expected to become factors in the formation of the verdict. See Duren v. State, 590 So.2d 360, 364 (Ala.Cr.App.1990), affirmed, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992); Bankhead v. State, 585 So.2d 97, 106 (Ala.Cr.App.1989), affirmed as to instant issue and remanded on other grounds, 585 So.2d 112 (Ala.1991) (on rehearing), affirmed on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992); Harris v. State, 539 So.2d 1117, 1123 (Ala.Cr.App.1988).’
“653 So.2d at 337-38. See also Calhoun v. State, 932 So.2d 923 (Ala.Crim.App.2005), cert. denied, 548 U.S. 926, 126 S.Ct. 2984, 165 L.Ed.2d 990 (2006) (no reversible error when prosecutor commented that the defendant’s mother got to plead for his life but that the victim’s mother did not get to plead for her son’s life); Lewis v. State, 889 So.2d 623 (Ala. *303 Crim.App.2003) (no reversible error when prosecutor argued that jury should consider the rights of the people living in the county in which the victim lived); Johnson v. State, 820 So.2d 842 (Ala.Crim.App.2000), aff'd, 820 So.2d 883 (Ala.2001), cert. denied, 535 U.S. 1058, 122 S.Ct. 1921, 152 L.Ed.2d 828 (2002) (no reversible error when prosecutor argued that it was not fair to the victim because she did not get a two-week trial like the defendant). For the reasons stated in McNair, we find no plain error.”
Brown v. State, 11 So.3d 866, 918-19 (Ala.Crim.App.2007), affirmed, 11 So.3d 933 (Ala.2008), cert. denied, — U.S. -, 129 S.Ct. 2864, 174 L.Ed.2d 582 (2009).
Here, the prosecutor made one brief mention of the fact that Revis was being accorded his constitutional rights while the victim no longer could be. The jury was instructed on numerous occasions that the arguments of counsel were not to be construed as evidence but to be considered as having been made in debate. There was no plain error as a result of this comment.[23]
X.
Revis argues that he was deprived of his rights to due process and a fair trial because of the trial court’s errors during the jury selection.
A.
Revis contends that the trial court erred by failing to remove three potential jurors who he alleges could not be impartial. He raises this issue for the first time on appeal; therefore, this matter is due to be evaluated pursuant to the plain-error rule. Rule 45A, Ala.R.App.P.
Juror S.D. stated during voir dire examination, in answering whether any potential jurors had any pretrial knowledge of the case or preconceived notions or biases, that he had read about the case. He then stated, “I do have a brother-in-law that works for the State of Alabama underneath you, Ken Mays, just to let you know that so we don’t have a problem later on.” (R. 70.) Subsequently, when the ve-nire was asked if any member knew any of the witnesses, Juror S.D. affirmed that Ken Mays was his brother-in-law. He was then asked if that relationship would affect his decision “one way or the other.” (R. 81.) He responded, “No, sir. I guess not.” (R. 81.) Juror S.D. ultimately served on the jury, but Revis never moved to strike this juror. Cf. Fisher v. State, 587 So.2d 1027, 1035 (Ala.Crim.App.1991), cert. denied, 587 So.2d 1039 (Ala.1991), cert. denied, 503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992) (“[Tjhe appellant was aware of these statements before the jury was empaneled. ‘Counsel with knowledge of a disqualification of a juror may not remain silent and gamble on a favorable verdict and if unfavorable, raise the matter in a motion for new trial.’ Daniels v. State, 49 Ala.App. 654, 275 So.2d 169, 172-73 (1973).”).
The fact that Juror S.D. was related by marriage to a State’s witness did not require that he be excused for cause. The statute that sets out the factors that would support a removal for cause is § 12-16-150, Ala.Code 1975. The removal of a veniremember as a result of his being related to a party is governed by § 12-16-150(4), Ala.Code 1975, which states that a *304 juror may be removed for cause if it is shown “that he is connected by consanguinity within the ninth degree, or by affinity within the fifth degree, computed according to the rules of the civil law, either with the defendant or with the prosecutor or the person alleged to be injured.” Thus, there is no provision for being removed for cause as a result of being related to a witness. Scott v. State, 473 So.2d 1167 (Ala.Crim.App.1985) (juror was not required to be removed for cause on the ground that she was a first cousin to a State’s witness, because she “was related to a witness, and not ‘the defendant or ... the prosecutor or the person alleged to be injured,’ the statute fails to support the appellant’s motion.” § 12-16-150(4), Ala. Code 1975). See also Proctor v. City of Prattville, 830 So.2d 38, 43 (Ala.Crim.App.2001) (The trial court properly denied Proctor’s motion for mistrial or, in the alternative, to strike the venire where a juror during the trial acknowledged that he might be the grandfather by marriage of one of the State’s witnesses; he was not certain that he knew the witness or that he was still married to the grandmother).
Moreover, although a juror may be removed for cause based on bias or impartiality, Revis has failed to show that Juror S.D. was biased in this case. Although Revis argues that Juror S.D. stated that he had prior knowledge of the case from Ken Mays, the record indicates that he stated that he had read about the case. There was no statement by him that his brother-in-law had told him about the case.
Juror S.D., further, stated that his being related to Investigator Mays would not effect his ability to serve as a juror.
“As the Alabama Supreme Court stated in Ex parte Burgess, 827 So.2d 193 (Ala.2000):
“ ‘The test for deciding a challenge for cause is whether the juror can ignore his preconceived ideas and render a verdict according to the evidence and the law. Ex parte Taylor, 666 So.2d 73, 82 (Ala.1995). A juror “need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it.” Kinder v. State, 515 So.2d 55, 61 (Ala.Crim.App.1986). For a juror to be disqualified, the juror’s opinion of the defendant’s guilt or innocence “must be so fixed that it would bias the verdict a juror would be required to render.” Oryang v. State, 642 So.2d 979, 987 (Ala.Crim.App.1993) (quoting Siebert v. State, 562 So.2d 586, 595 (Ala.Crim.App.1989)) (emphasis added). See also § 12-16-150, Ala.Code 1975.’ ”
Doster v. State, 72 So.3d 50, 68 (Ala.Crim.App.2010).
“Because a defendant has no right to a perfect jury or a jury of his or her choice, but rather only to an ‘impartial’ jury, see Ala. Const. 1901 § 6, we find the harmless-error analysis to be the proper method of assuring the recognition of that right.” Bethea v. Springhill Mem’l Hosp., 833 So.2d 1, 7 (Ala.2002). Even if Revis could show that Juror S.D. should have been removed for cause, he would need to show that he was prejudiced by being left with “a less-than-impartial jury.” Id. See also McGowan v. State, 990 So.2d 931, 981-82 (Ala.Crim.App.2003), cert. denied, 555 U.S. 861, 129 S.Ct. 136, 172 L.Ed.2d 104 (2008) (no error in trial court’s failing to sua sponte remove a juror for cause who stated that she was related to several witnesses and who indicated on voir dire that her relationship could have a bearing on her decision; however, “the voir dire examination falls short of proving an absolute bias that would have prevented [the *305 potential juror] from rendering a fair and impartial verdict had she been selected to serve on the jury. Under the circumstances here, we find that the trial court did not abuse its discretion in denying this challenge for cause”).
Much is left to the discretion of the trial court in determining whether a potential juror is biased or impartial, because the trial court is able to view the juror’s demeanor and hear the tenor of his or her responses during voir dire examination.
“ ‘To justify a challenge of a juror for cause there must be a statutory ground (Ala.Code Section 12-16-150 (1975)), or some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court.’ Nettles v. State, 435 So.2d 146, 149 (Ala.Crim.App.), aff'd, 435 So.2d 151 (Ala.1983). Section 12-16-150 sets out the grounds for removal of veniremembers for cause in criminal cases; however, we find that none of those statutory grounds are applicable in this case. In addition to the statutory grounds, there are other common-law grounds for challenging venire-members for cause where those grounds are not inconsistent with the statute. Smith v. State, [Ms. CR-97-1258, December 22, 2000] — So.2d - (Ala.Crim.App.2000), aff'd in pertinent part, rev’d in part, [Ms. 1010267, March 14, 2003] — So.2d - (Ala.2003); Kinder v. State, 515 So.2d 55, 60 (Ala.Crim.App.1986). Here, we are dealing with the common-law ground for challenge of suspicion of bias or partiality. See discussion of the common-law grounds for challenge in Tomlin v. State, 909 So.2d 213 (Ala.Crim.App.2002), remanded for resentencing, 909 So.2d 283 (Ala.2003). Ultimately, the test to be applied is whether the veniremember can set aside his or her opinions, prejudices, or biases, and try the case fairly and impartially, according to the law and the evidence. Smith v. State, supra. This determination of a veniremember’s absolute bias or favor is based on the veniremember’s answers and demeanor and is within the discretion of the trial court; however, that discretion is not unlimited. Rule 18.4(e), Ala.R.Crim.P., provides, in part: ‘When a prospective juror is subject to challenge for cause or it reasonably appears that the prospective juror cannot or will not render a fair and impartial verdict, the court, on its own initiative or on motion of any party, shall excuse that juror from service, in the case.’ Even proof that a veniremember has a bias or fixed opinion is insufficient to support a challenge for cause. A prospective juror should not be disqualified for prejudice or bias if it appears from his or her answers and demeanor that the influence of that prejudice or bias can be eliminated and that, if chosen as a juror, the veniremember would render a verdict according to the law and the evidence. Mann v. State, 581 So.2d 22, 25 (Ala.Crim.App.1991); Minshew v. State, 542 So.2d 307 (Ala.Crim.App.1988).”
McGowan v. State, 990 So.2d at 951. See Daniels v. State, 88 Ala. 220, 7 So. 337 (1890) (Daniel’s motion for new trial was properly denied following his conviction for carrying a concealed weapon, when the motion had alleged that one of the jurors was a first cousin the State’s witness who was in charge of the place where and when the pistol was said to have been exhibited. Although he did not know this fact when he accepted the juror and his counsel and, in making inquiry before accepting the jury, had been informed that there was no relationship between them; however, the refusal of the motion was discretionary.).
Juror S.D. was not due to be removed for cause under any of the statutory exclu *306 sions of § 12-16-150, Ala.Code 1975, ñor did Revis show any prejudice due to the trial court’s failure to remove this juror.
Revis further cites to two potential jurors who were not removed for cause sua sponte. Juror D.A. stated during questioning that he had been a victim of a crime; he was shot during an attempted robbery, and his son had been a victim of a theft. Juror D.A. also served on the jury. However, the record indicates that Juror D.A. affirmed to the trial court that he “could sit on a case and listen to the evidence as you hear it and make a fair and impartial decision based on the evidence as you hear it and make a fair and impartial decision based on what you hear.” (R. 104.) He further answered in the negative to a question as to whether he had any residual problems from the shooting. (R. 104-05.) Knop v. McCain, 561 So.2d 229, 232 (Ala.1989) (“Ultimately, the test to be applied is whether the juror can set aside her opinions and try the case fairly and impartially, according to the law and the evidence”).
Thus, there was no indication of prejudice caused by the trial court’s failure to remove Juror D.A. for cause.
Juror I.G. initially indicated that he had twice read about this case and that his prior knowledge regarding the case would affect his ability to serve as a juror. However, he next answered that he could put aside what he had read and base his decision on the evidence. Thus, Revis has failed to prove that this potential juror was biased.[24] See Hyde v. State, 13 So.3d 997, 1012 (Ala.Crim.App.2007), cert. denied, — U.S. -, 130 S.Ct. 396, 175 L.Ed.2d 273 (2009) (potential Juror J.M. “stated that he could base his decision on the evidence that was presented at trial and that he could follow the court’s instructions concerning the law. Thus, J.M. was rehabilitated, and the circuit court committed no error in denying Hyde’s challenge for cause of this prospective juror. See Brownfield v. State, supra.”). Perryman v. State, 558 So.2d 972, 977 (Ala.Crim.App.1989) (“Thus, even though a prospective juror admits to a potential bias, if further voir dire examination reveals that the juror in question can and will base his decision on the evidence alone, then a trial judge’s refusal to grant a motion to strike for cause is not error.”).
B.
Revis argues that the trial court erred by failing to remove a juror who had stated that he would automatically vote for the death penalty.
The record indicates that, during the voir dire examination of the venire, defense counsel asked if any potential jurors would automatically vote for the death penalty after seeing the gruesome pictures of the victim’s body in this case. Juror A.P. responded as follows:
“I’ve actually been up close with dismembered human bodies, and for a person to deliberately take that time to maliciously destroy a human body, a human person, I believe that if they do it with full intent and the evidence proves it, then by all means the death penalty should be invoked. That’s my opinion.”
(R. 229.)
Subsequently, defense counsel moved to strike Juror A.P. for cause, and the trial court denied the motion. The following transpired:
“[Defense counsel]: ... [Juror A.P.] said that he felt the same way [another potential juror] felt and that if you com *307 mitted a heinous act, you should get the death penalty.
“THE COURT: Well, he further said if the evidence showed that it was a heinous act, and of course, they will receive instructions if [the prosecutor] says that’s one of the aggravating circumstances, which I don’t know what you’re going to contend are the aggravating circumstances other than robbery, but if he does, then I think he has said he would listen and he would base it on the facts. So that’s a burden of proof the State has to prove beyond a reasonable doubt, so I don’t think I will strike him for cause unless you can tell me more.
“MR. GLENN: I don’t have any more.”
(R. 240.)
Juror A.P. did not serve on the jury and was struck by the State using its 5th strike of 15 strikes. (Supp. R. 148.)
“ ‘ “A trial judge is in a decidedly better position than an appellate court to assess the credibility of the jurors during voir dire questioning. See Ford v. State, 628 So.2d 1068 (Ala.Crim.App.1998). For that reason, we give great deference to a trial judge’s ruling on challenges for cause. Baker v. State, 906 So.2d 210 (Ala.Crim.App.2001).”
“ ‘Turner v. State, 924 So.2d 737, 754 (Ala.Crim.App.2002).
“ ‘ “The ‘original constitutional yardstick’ on this issue was described in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Under Wither-spoon, before a juror could be removed for cause based on the juror’s views on the death penalty, the juror had to make it unmistakably clear that he or she would automatically vote against the death penalty and that his or her feelings on that issue would therefore prevent the juror from making an impartial decision on guilt. However, this is no longer the test. In Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court held that the proper standard for determining whether a venire-member should be excluded for cause because of opposition to the death penalty is whether the venire-member’s views would ‘ “prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.” ’ [Quoting Adams v. Texas, 448 U.S. 38, 45 (1980).] The Supreme Court has expressly stated that juror bias does not have to be proven with ‘unmistakable clarity.’ Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).”
“ ‘Pressley v. State, 770 So.2d 115, 127 (Ala.Crim.App.1999), aff'd, 770 So.2d 143 (Ala.2000). See also Uttecht v. Brown, 551 U.S. 1, 9, 127 S.Ct. 2218, 2224, 167 L.Ed.2d 1014 (2007) (“[A] juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible.”).’
“Saunders v. State, 10 So.3d 53, 75-76 (Ala.Crim.App.2007), cert. denied, Saunders v. Alabama, — U.S. -, 129 S.Ct. 2433, 174 L.Ed.2d 229 (2009).”
Johnson v.State, [Ms. CR-99-1349, October 2, 2009] — So.3d -, - (Ala.Crim.App.2009).
Here, Juror A.P. did not say that he would automatically vote in favor *308 of the death penalty. He said that if the evidence proved that a body was dismembered then the death penalty was a proper sentence. Thus, there was an evidentiary basis stated for his imposition of the death penalty, and his vote for the death penalty would not be automatic. There was no indication that his feelings concerning the desecration of a body impheating a sentence of death would prevent or substantially impair his ability to follow the trial court’s instructions or to serve as an unbiased juror.
“Broad discretion is vested with the trial court in determining whether or not to sustain challenges for cause. Brown v. Woolverton, 219 Ala. 112, 121 So. 404 (1928); Clendenon v. Yarbrough, 233 Ala. 269, 171 So. 277 (1936); Glenn v. State, 395 So.2d 102 (Ala.Cr.App.[1980]) cert. denied, 395 So.2d 110 (Ala.198[1]). On appeal, this Court will look to see if the trial court’s discretion was properly exercised. Alabama Power Co. v. Henderson, 342 So.2d 323 (Ala.1976); Collins v. State, 385 So.2d 993 (Ala.Cr.App.1979), reversed on other grounds, 385 So.2d 1005 (Ala.1980).”
Ex parte Nettles, 435 So.2d 151, 154 (Ala.1983).
The trial court was in the best position to evaluate Juror A.P.’s demeanor in responding to this question. Juror A.P.’s response does not support a finding of abuse of discretion by the trial court. “ A trial judge is in a decidedly better position than an appellate court to assess the credibility of the jurors during voir dire questioning. See Ford v. State, 628 So.2d 1068 (Ala.Crim.App.1993). For that reason, we give great deference to a trial judge’s ruling on challenges for cause. Baker v. State, 906 So.2d 210 (Ala.Crim.App.2001).’ ” Saunders v. State, 10 So.3d 53, 75 (Ala.Crim.App.2007), cert. denied, — U.S. -, 129 S.Ct. 2433, 174 L.Ed.2d 229 (2009), quoting Turner v. State, 924 So.2d 737, 754 (Ala.Crim.App.2002).
Moreover, Juror A.P. did not serve on Revis’s jury, and Revis did not have to use one of his peremptory challenges to remove him from the jury. Thus, any error resulting from the trial court’s failure to excuse Juror A.P. for cause would have been harmless. Hagood v. State, 777 So.2d 162, 176 (Ala.Crim.App.1998), affirmed in part remanded on other grounds, 777 So.2d 214 (Ala.1999) (“Any error in the trial court’s failure to grant defense counsel’s challenge for cause was harmless and does not warrant reversal. Rule 45, Ala.R.App.P.”). The record reflects that the trial court subsequently excused prospective Juror A.P., because he indicated that he would have a problem with being sequestered. Morris v. State, 60 So.3d 326, 378 n. 10 (Ala.Crim.App.2010) (“We note that the record indicates that a third potential juror indicated that she had strong feelings about the death penalty but that she was not further questioned as to her beliefs. However, the record shows that neither party had to exercise a strike to remove this potential juror, and she did not serve on the jury.”). See also Beard v. State, 661 So.2d 789 (Ala.Cr.App.1995). Accordingly, no reversible error occurred in denying the challenge for cause.
C.
Revis argues that the trial court improperly granted the State’s challenges for cause as to three potential jurors who indicated that they could not impose the death penalty. He failed to object to their removal at trial. Therefore, any error must rise to the level of plain error. Rule 45A, Ala.R.App.P.
In this case, the trial court evaluated the potential jurors’ responses and determined that they would be unable to *309 impartially apply the law based on the evidence.
“[A] blanket declaration of support of or opposition to the death penalty is not necessary for a trial judge to disqualify a juror.
“ “Veniremen simply cannot be asked enough questions to reach the point where their bias has been made unmistakably clear; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. For reasons that will be developed more fully infra, this is why deference must be paid to the trial judge who sees and hears the juror.’
“Wainwright [v. Witt, 469 U.S. 412, 426, 105 S.Ct. 844, 854, 88 L.Ed.2d 841 (1985) ].”
Ex parte Whisenhant, 555 So.2d 235, 241 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990).
Here, all three potential jurors confirmed that they were inextricably opposed to the death penalty. As to Juror L.H., after affirming that she could not vote to impose a death penalty sentence, she later responded to the trial court’s follow-up questioning and stated:
“THE COURT: ... Without going any further than that, my question is, is would you disregard this Court’s instruction, vote against the death penalty regardless of what the evidence is?
“[Juror L.H.] No, sir.
“THE COURT: So you would be able to listen to the Court’s instruction, and under certain circumstances if the evidence dictates that the death penalty should be imposed, you would be able to vote for that; is that correct? Do you understand what I’m saying? Do you want me to re-explain it?
“[Juror L.H.]: No, sir. I guess I have to decline because I wouldn’t fully be honest about it.
“THE COURT: Okay. And that’s fine.
“[Juror L.H.]: I’d have to decline.
“THE COURT: That’s fine. That’s what we need to know.
“[Juror L.H.]: I would respect — respectfully, fully, but I’d have to decline.
“THE COURT: Okay. Thank you so much.”
(R. 170-71.)
Similarly, Juror S.H. had also responded to the prosecutor’s question as to whether there were any potential jurors who could not vote for the death penalty. She responded that “[m]y religious beliefs make me feel that way. I was raised Catholic, and we, as a religion, are against the death penalty. If it were an officer of the law, I could possibly, but probably not.” (R. 134.) Thereafter, when she was further questioned by the trial court, the following transpired:
“THE COURT: ... Let me ask it this way: Would you disregard the instructions that you would receive in the sentencing phase, vote against the death penalty regardless of what the evidence is in the case? Did you understand my question?
“[Juror S.H.]: Yes, and it’s really hard to answer that because, I mean, I would respect what you would tell me, but I just don’t think we have the right to take somebody else’s life. I think God has the right to do that, and we don’t.
*310 “THE COURT: And let me tell you, I respect that opinion. Okay. Great. Thank you very much.
“[Juror S.H.]: Thank you.”
(R. 172.) A potential juror may be removed for cause where religious convictions prevent him or her from making an impartial decision. Bryant v. State, 951 So.2d 702, 715-16 (Ala.Crim.App.1999), affirmed in part, reversed in part on other grounds, 951 So.2d 724 (Ala.2002) (“It is therefore understandable that the State would seek to ensure that it removes those jurors who might be unable to recommend a death sentence because of such factors as feelings of guilt, religious convictions, or moral philosophy.”).
Finally, Juror R.J. responded to the question as to whether any potential jurors would be unable to impose the death penalty. She stated that she did not feel that she would be able to impose the death penalty, and then stated that “I just don’t know.” (R. 135.) Later, the trial court extensively examined Juror R.J. as to her beliefs and reluctance to impose the death penalty. She stated that she did believe in the death penalty and acknowledged that it was unfair to “push the buck to somebody else to do the job.” (R. 175.) However, she maintained that she did not know if she could “take the instructions of the Court, listen to the instructions, follow those instructions, and if the evidence warrants it, impose the death penalty.” (R. 176.)
Although Juror R.J.’s answers were not consistent, she maintained that she might not be able to follow the instructions of the trial court and base her decision on the evidence. Because the trial court was in the best position to watch Juror R.J. as she responded and listen to the tenor of her statements, we cannot say that the court abused its discretion in granting the State’s motion to remove Juror R.J. for cause.
Because the record indicates that, based on the responses of the three potential jurors whose removal Revis challenges, their opposition to the death penalty would have interfered with their ability to serve as impartial jurors, the trial court did not abuse its discretion in granting the State’s challenges for cause. See Killingsworth v. State, 82 So.3d 716, 733 (Ala.Crim.App.2009). See also Saunders v. State, 10 So.3d 53 (Ala.Crim.App.2007), cert. denied, - U.S. -, 129 S.Ct. 2433, 174 L.Ed.2d 229 (2009) (“A review of the voir dire examination of J.L.M. and J.W.C. clearly demonstrates that each venire-member unequivocally stated that he would not be able to consider or vote for the death penalty in this case and that he could not set aside his personal beliefs and follow the trial court’s instructions as to the sentencing options. Clearly, J.L.M.’s and J.W.C.’s views on the death penalty would have substantially impaired the performance of their duties as jurors. The trial court did not abuse its discretion when it granted the State’s challenges for cause as to J.L.M. and J.W.C.”).
D.
Revis contends that by death-qualifying the venire, the trial court produced a conviction-prone jury and thus violated his rights to an impartial jury.
This court stated in Brown v. State, 11 So.3d 866 (Ala.Crim.App.2007), affirmed, 11 So.3d 933 (Ala.2008), cert. denied, — U.S. -, 129 S.Ct. 2864, 174 L.Ed.2d 582 (2009):
“In Davis v. State, 718 So.2d 1148 (Ala.Crim.App.1995) (opinion on return to remand), aff'd, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999), we stated:
*311 “‘A jury composed exclusively of jurors who have been death-qualified in accordance with the test established in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), is considered to be impartial even though it may be more conviction prone than a non-death-qualifíed jury. Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996). See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 187 (1986). Neither the federal nor the state constitution prohibits the state from ... death-qualifying jurors in capital cases. Id.; Williams; Haney v. State, 603 So.2d 368, 391-92 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).’
“718 So.2d at 1157. There was no error in allowing the State to death qualify the prospective jurors.”
Brown v. State, 11 So.3d at 891.
Moreover, death-qualifying a jury has been consistently held to be proper in Alabama.
“‘[I]n Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Supreme Court held that the Constitution does not prohibit states from “death qualification” of juries in capital cases and that so qualifying a jury does not deprive a defendant of an impartial jury. 476 U.S. at 173, 106 S.Ct. at 1764. Alabama courts have consistently held likewise. See Williams v. State, 556 So.2d 737 (Ala.Crim.App.1986), rev’d in part, 556 So.2d 744 (Ala.1987); Edwards v. State, 515 So.2d 86, 88 (Ala.Crim.App.1987); Martin v. State, 494 So.2d 749 (Ala.Crim.App.1985).’
“Sockwell v. State, 675 So.2d 4, 18 (Ala.Crim.App.1993), aff'd, 675 So.2d 38 (Ala.1995).”
Brown v. State, 74 So.3d 984, 1034 (Ala.Crim.App.2010).
There was no error on this ground.
XI.
Revis argues that the trial court committed a number of errors in its instructions to the jury in violation of his rights to a fair trial and a reliable verdict.
A.
Revis contends that the trial court shifted the burden of proof to the defense by using certain terminology to instruct the jury as to its duty throughout the trial.
Revis did not object at trial to the instructions of which he now complains; therefore, this issue is due to be evaluated pursuant to the plain-error rule. Rule 45A, Ala.R.App.P.
Specifically, Revis argues that the trial court improperly referred to an instruction by Judge McElroy, the author of Alabama Evidence, to jurors to “ ‘just do what’s right.’ ” (Revis’s brief 95.) However, Re-vis has taken this passage out of context. The record reveals that the trial court gave the following instruction:
“THE COURT: Ladies and gentlemen, you have now heard the case. You’ve heard the opening statements, the evidence and the closing arguments. It’s now my duty to instruct you concerning the law that applies in this case. Just thinking back to when I was in law school back in the late '70s, and there was a law professor there who had been the youngest circuit judge ever in the state of Alabama. His name was Judge McElroy. If any of y’all have ever seen the evidence book in Alabama, the bible on evidence in Alabama, it’s called McElroy’s on Evidence. Judge McEl-roy had been a circuit judge like I am today. But there’s a story about *312 Judge McElroy that was often told, that sometimes when he would try cases, at the end of the evidence he would simply just say to the jury, ‘Go back to the jury room and just do what’s right,’ and that was the instruction. Well, today things have changed in our judicial system. We have more laws, more guidelines, and it’s very, very important that I properly instruct you as to the applicable law that applies in this case. I cannot and would not just say, ‘Go back and do what’s right.’ Please listen to the law as I will give it to you, some which I will read straight from the statutes. But I’m asking you to listen like you have never listened before in your life.”
(R. 654-55.)
The trial court did not shift the burden of proof to Revis by this instruction. Rather, the judge was preparing the jury to be instructed as to the evidence and was informing the jurors of the importance of listening to his instructions on the law. The judge did not tell the jurors to do what is right.
The trial court instructed the jury fully as to its duty as fact-finders and weighers of the evidence immediately following the above-quoted instruction. The jury was also properly instructed that the State carried the burden of proof as follows:
“The defendant, in his answer to the indictment, says that he is not guilty. This places upon the prosecution, the district attorney, the burden of proving his guilt beyond a reasonable doubt. The burden never rests upon the defendant to establish his innocence, nor to disprove the facts tending to establish his guilt. In regard to this, I instruct you that the defendant is presumed to innocent, and the presumption that he is innocent remains until such time as each of you is convinced from the evidence the defendant is guilty beyond a reasonable doubt. This presumption of innocence is to be regarded by you as a matter of evidence and is a benefit to which the defendant is entitled. It attends the defendant throughout the trial.”
(R. 667.)
Revis also contends that the trial court improperly shifted the burden of proof by instructing the jury on “how to arrive ‘at the true facts.’ ” (Revis’s brief, at 96.) He refers to the following instruction by the trial court:
“The determination of the facts does not come within my province. That is your province, and it is of the highest importance in the administration of justice that our provinces be kept separate.
“Now, in arriving at the true facts you are directed to take into account all the testimony of the witnesses. It is your duty to attempt to reconcile all the testimony so that all the witnesses speak the truth if you can do so reasonably.”
(R. 656.)
Revis submits that the error resulting from this charge was compounded by the trial court’s earlier instruction to the jury that, “You have taken an oath to well and truly try all the issues in this case and to return a verdict in this case. As I have said before, the word verdict is from Latin, veridictus. It means to speak the truth, and that is what you will be asked to do in this case.” (R. 251.) According to Revis, the trial court erroneously instructed the jury that the defense had the burden of showing the jury the truth, meaning the burden of presenting evidence showing that the crime was committed by someone else.
However, the jury would not have reasonably construed this instruction to impart this meaning. “We think it a *313 reasonable assumption that the jury took a common sense view of the instructions and gave to them their plainly apparent meaning.” Harris v. State, 412 So.2d 1278, 1281 (Ala.Crim.App.1982).
‘““A trial court has broad discretion in formulating its jury instructions, provid[ed] those instructions accurately reflect the law and the facts of the case. Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999) (citing Roper v. State, 584 So.2d 544 (Ala.Crim.App.1991)). Moreover, this Court does not review jury instructions in isolation, instead we consider the instruction as a whole. Stewart v. State, 601 So.2d 491 (Ala.Crim.App.1992).” ’
“Living v. State, 796 So.2d 1121, 1130-31 (Ala.Crim.App.2000). Further, a trial court’s oral charge must be construed as a whole and must be given a reasonable — not a strained — construction. Wilson v. State, 777 So.2d 856 (Ala.Crim.App.1999). See also Maples v. State, 758 So.2d 1, 63 (Ala.Crim.App.), aff'd, 758 So.2d 81 (Ala.1999). Finally, it is always presumed that the jury followed the court’s instructions, Ex parte Stewart, 659 So.2d 122, 128 (Ala.1993), aff'd on remand, 730 So.2d 1203 (Ala.Crim.App.1996), aff'd, 730 So.2d 1246 (Ala.1999), and that the jury considered the entire charge.”
Smith v. State, [Ms. CR-97-1258, December 22, 2000] — So.2d -, - (Ala.Crim.App.2000), affirmed in part and reversed in part on other grounds, [Ms. 1010267, March 14, 2003] - So.3d - (Ala.2003).
The trial court’s instructions to the jury were proper. Knotts v. State, 686 So.2d 431, 463 (Ala.Crim.App.1995) (finding no plain error as to Knotts’s claim that the trial court’s instruction “ ‘created a presumption of truth in favor of the state’s evidence of guilt’ ” by charging the jury, “ ‘Now the law says if you find differences or discrepancies in the testimony, your first job is to reconcile it and mesh it together and make it all speak the truth.’”). See also Ex parte Scott, 728 So.2d 172, 180 (Ala.1998) (finding no error in jury instructions stating that “ ‘[i]f the jury is not satisfied beyond a reasonable doubt of the truth of some of this evidence tending to prove the defendant’s guilty connection with the charged felonies, other than the testimony of Mr. Linder or Mr. Fletcher, the jury could not find the Defendant guilty5 ”).
Here, the trial court was informing the jury as to its duty as a fact-finder in arriving at a true verdict. The instruction did not refer to Revis or shift the burden of proof.
B.
Revis alleges that the trial court’s reasonable-doubt instruction was erroneous because, he says, it allowed his conviction to be based on proof insufficient to meet the standard established in In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). He did not object on this ground at trial; therefore, this issue is due to be analyzed pursuant to the plain-error rule. Rule 45A, Ala.R.App.P.
The record reveals that the trial court charged the jury as to reasonable doubt as follows:
“It does not mean beyond all doubt, but simply beyond a reasonable doubt. A reasonable doubt is a doubt of a fair-minded juror honestly seeking the truth after careful and impartial consideration of all the evidence in the case. It is a doubt based upon reason and common sense and to which you can assign a reason based on the evidence, the lack of evidence or a conflict in the evidence. A *314 reasonable doubt is not a mere guess or surmise. It is a doubt based on reason and logic and not upon speculation, and as I said before, it is a reasonable doubt, not beyond all doubt, but a reasonable doubt is a doubt that you can assign a reason to based on the evidence, the lack of evidence or a conflict in the evidence. If after considering all the evidence in this case you have an abiding conviction of the truth of the charge, then you are convinced beyond a reasonable doubt, and it would be your duty to convict the defendant. The reasonable doubt which entitles an accused to an acquittal is not a mere fanciful, vague, conjectural or speculative doubt, but a reasonable substantial doubt arising from the evidence or from the lack of evidence that remains after a careful consideration of the testimony. As I’ve said before, the State’s not required to convince you of the defendant’s guilt beyond all doubt and to a mathematical certainty, nor beyond a shadow of a doubt, but simply beyond a doubt.”
(R. 668-69.)
Revis argues that because the charge contains the terms “not a mere possible doubt,” “not a mere guess or surmise,” and “reasonable substantial doubt,” the charge diminished the degree of guilt necessary to convict him and impermissibly shifted the burden of proof by requiring him to come forward with substantial reasons why he should not be convicted.
In Brown v. State, 74 So.3d 984, 1025 (Ala.Crim.App.2010), this court stated:
“In Knotts v. State, 686 So.2d 431 (Ala.Crim.App.), opinion after remand, 686 So.2d 484 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996), we held:
“ ‘The Due Process Clause of the Fourteenth Amendment “protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.” In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). In Cage v. Louisiana, [498 U.S. 39 (1990),] the United States Supreme Court found that a jury charge that defined “reasonable doubt” by using the phrases “grave uncertainty,” “actual substantial doubt,” and “moral certainty” could have led a reasonable juror to interpret the instructions to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause. Subsequently, the Court “made it clear that the proper inquiry is not whether the instruction ‘could have’ been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it.” Victor v. Nebraska, 511 U.S. 1, 6, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994) (quoting Estelle v. McGuire, 502 U.S. 62, 72-73, and n. 4, 112 S.Ct. 475 482, and n. 4, 116 L.Ed.2d 385 (1991), emphasis in original). Thus •the constitutional question presented here is whether there is a reasonable likelihood that the jury understood the instructions to allow the conviction based on proof insufficient to meet the Winship reasonable doubt standard. Victor v. Nebraska; Ex parte Kirby, 643 So.2d 587 (Ala.), cert. denied, [513] U.S. [1023], 115 S.Ct. 591, 130 L.Ed.2d 504 (1994); Cox v. State, 660 So.2d 233 (Ala.Cr.App.1994).
“ ‘In reviewing the reasonable doubt instruction, we do so in the context of the charge as a whole. Victor v. Nebraska; Baker v. United States, 412 F.2d 1069 (5th Cir.1969), cert. denied, 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970); Williams v. *315 State, 538 So.2d 1250 (Ala.Cr.App.1988). So long as the definition of “reasonable doubt” in the charge correctly conveys the concept of reasonable doubt, the charge will not be considered so prejudicial as to mandate reversal. Victor v. Nebraska; Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954).’
“686 So.2d at 459. ‘ “Use of some but not all of the terminology found offensive in Cage does not automatically constitute reversible error.” ’ Taylor v. State, 666 So.2d 36, 56 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995) (quoting Dobyne v. State, 672 So.2d 1319, 1343 (Ala.Crim.App.1994), aff'd, 672 So.2d 1354 (Ala.1995)). Further, we have previously held that the statement that a reasonable doubt is a doubt for which a reason can be given does not violate Cage and does not improperly lessen the State’s burden of proof. See Burgess v. State, 827 So.2d 134 (Ala.Crim.App.1998), aff'd, 827 So.2d 193 (Ala.2000); Ex parte McWilliams, 640 So.2d 1015 (Ala.1993), aff'd, 666 So.2d 90 (Ala.1995); McMillian v. State, 594 So.2d 1253 (Ala.Crim.App.1991).
“Although the trial court used some of the language found objectionable in Cage, taken as a whole, the trial court’s instructions in this case properly conveyed the concept of reasonable doubt to the jury and did not lessen the State’s burden of proof. Also, there is not a reasonable likelihood that the jury applied the instructions in a manner that would violate Brown’s constitutional rights. Therefore, we do not find that there was any plain error in this regard.”
Brown v. State, 74 So.3d at 1026.
Similarly, in the present case, the trial court’s use of some of the terms found objectionable in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), did not lessen the State’s burden of proof when the charge is read in its entirety-
Moreover, the charge did not im-permissibly shift the burden of proof to Revis by implying that he must come forward with substantial reasons why he should not be convicted. Such a construction warps the clear meaning of the charge, and the jury would not have understood the charge to place this burden on Revis.
C.
Revis argues that the trial court diminished the State’s burden of proof by failing to charge the jury on every element of the offense. Specifically, he alleges that the judge did not define “controlled substance” as contained in count II of the indictment. In a footnote in his brief, Revis further submits that the State did not prove the type of pills taken from Stidham by Revis or that the pills were a controlled substance.
Revis failed to object on this ground at trial; therefore, this issue will be evaluated pursuant to the plain-error rule. Rule 45A, Ala.R.App.P.
The record, however, establishes that the trial court charged the jury as to each element of the capital offense of murder committed during a robbery. The indictment alleged that Revis intentionally killed Stidham during the course of committing a theft of “a controlled substance(s),” by the use of force with the intent to overcome the victim’s physical resistance while Revis was armed with a deadly weapon. § 13A-5-40(a)(2), Ala. Code 1975. “Controlled substance” is not an element of the capital offense with which Revis was charged, nor is it an *316 element of first-degree robbery. § 13A-8-41, Ala. Code 1975.
Section 13A-5-40(a)(2), Ala.Code 1975, defines the capital offense of murder committed during a robbery as “[m]urder by the defendant during a robbery in the first degree or an attempt thereof committed by the defendant.”
Section 13A-8^1, Ala.Code 1975, states that
“[a] person commits the crime of robbery in the first degree if he violates Section 13A-8-43 and he ... [i]s armed with a deadly weapon or dangerous instrument; or ... [clauses serious physical injury to another.”
Section 13A-8-43, Ala.Code 1975, states that
“[a] person commits the crime of robbery in the third degree if in the course of committing a theft he:
“(1) [U]ses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance; or
“(2) [T]hreatens the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property.”
“The present robbery statutes, however, do not require a ‘taking’ of property, Marvin v. State, 407 So.2d 576 (Ala.Cr.App.1981); Ala.Code [1975,] §§ 13A-8-40 through 13A-8-44 (1975) (Commentary), so that not only is the value of the property immaterial, but also the indictment need not allege an actual theft to constitute the offense. The operative words of the current robbery statute are ‘in the course of committing a theft,’ which includes an attempted theft, Marvin v. State, supra, rather than the common law element of an actual ‘taking from the person.’ ”
Grace v. State, 431 So.2d 1331, 1333 (Ala.Crim.App.1982). See Ex parte Windsor, 683 So.2d 1042, 1045-46 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997). See also Ex parte Verzone, 868 So.2d 399, 402 (Ala.2003) (“The State’s emphasis on the ownership of the property is misplaced, because Ver-zone was not charged with theft of property. Instead, he was charged with robbery, which is a crime against the person; it does not require that a theft be accomplished for the elements of robbery to be established.”(footnote omitted)).
Because the property taken or intended to be taken during the robbery is not an element of the crime of robbery, there was no error by the trial judge’s failure to charge the jury on the definition of “controlled substance” or by the State’s failure of prove the type of pills taken.
D.
Revis argues that the trial court erred in failing to instruct the jury regarding its consideration of the prior-bad-acts evidence. Specifically, he alleges that the trial court did not instruct the jury that it could not consider these prior bad acts as evidence of his guilt. Revis did not raise this matter at the trial court level; therefore, this matter is due to be analyzed pursuant to the plain-error rule. Rule 45A, Ala.R.App.P.
As previously noted, Revis’s arrest for the worthless-checks charges was introduced to explain the reason that he was in jail when he gave his statements as to the present offense. The evidence as to his drug use was part of the res gestae of the offense because it established motive. Therefore, because this evidence was properly admitted, no limiting instructions were warranted.
*317 “It is contradictory and inconsistent to allow, on the one hand, evidence of Johnson’s prior bigamy conviction and prior bad acts as substantive evidence of the offense with which she was charged, yet, on the other hand, to require a limiting instruction instructing the jury that it cannot consider the evidence as substantive evidence that Johnson committed the charged offense. Other jurisdictions that have considered this issue have concluded that a limiting instruction is not required when evidence of other crimes or prior bad acts is properly admitted as part of the res gestae of the crime with which the defendant is charged. See People v. Coney, 98 P.3d 930 (Colo.Ct.App.2004) (holding that evidence of other offenses or acts that are part and parcel of the charged offense is admissible as res gestae and may be admitted without a limiting instruction); State v. Long, 173 N.J. 138, 171, 801 A.2d 221, 242 (2002) (evidence of the defendant’s actions ‘served to paint a complete picture of the relevant criminal transaction’ and therefore was admissible, and a limiting instruction was unnecessary because the evidence was admitted under the res gestae exception); and Camacho v. State, 864 S.W.2d 524, 535 (Tex.Crim.App.1993) (holding the evidence of the extraneous offenses showed the context in which the criminal act occurred, i.e., the res gestae, and was therefore admissible and not subject to the requirement of a limiting instruction).”
Johnson v. State, [Ms. 1041313, October 6, 2006] — So.3d -, - (Ala.2006). See also Vanpelt v. State, 74 So.3d 32, 62 (Ala.Crim.App.2009).
Moreover, the references in Revis’s statements to alleged bad acts or that show bad character were not introduced as impeachment evidence and thus did not require sua sponte limiting instructions by the trial court. Johnson v. State, — So.3d -. These were not prior convictions and were brief and vague references. See Belisle v. State, 11 So.3d 256, 315 (Ala.Crim.App.2007), affirmed, 11 So.3d 323 (Ala.2008), cert. denied, — U.S. -, 129 S.Ct. 2865, 174 L.Ed.2d 582 (2009) (finding no plain error in trial court’s failure to sua sponte give limiting instructions as to prior bad acts, stating: “Here; we can only describe the reference to a prior charge as vague at best. There is no indication that the jury was made aware of the contents of the fingerprint card. There was no reference made to the card when it was admitted or at any other point in the trial. Also, the card was one of 115 exhibits that were introduced and admitted by the State.”). Moreover, some of the acts Revis says constituted “prior bad acts” did not constitute conduct that was necessarily a bad act.
“Here, the evidence [Revis] contends required a limiting instruction was not evidence of prior convictions; further, the evidence was not offered to impeach [Re-vis’s] credibility. Rather, the evidence was properly admitted for other reasons, including, but not limited to, evidence of his intent and motive.” Spencer v. State, 58 So.3d 215, 230 (Ala.Crim.App.2008). Therefore, there was no plain error on this ground.
E.
Revis contends that the trial court’s instructions misinformed the jury as to the weighing process during the penalty phase. He objects on this ground for the first time on appeal; therefore, any error must rise to the level of plain error. Rule 45A, Ala.R.App.P.
Revis points out the following slip of the tongue by the trial court during its instructions concerning the process of weighing *318 the aggravating circumstances and the mitigating circumstances:
“Now, ladies and gentlemen of the jury, if after a full and fair consideration of all the evidence in this case you are convinced that the aggravating circumstance of capital murder during the course of robbery in the first degree outweighs the mitigating circumstances, your verdict would be, ‘We, the jury, recommend the defendant, Christopher Dewayne Revis, be sentenced to death.’.... However, if after a full and fair consideration of all the evidence in the case you’re not convinced that the aggravating circumstance of capital murder during the course of robbery in the first degree does not outweigh the mitigating circumstances, your verdict would be, ‘We, the jury, recommend that the defendant, Christopher Dewayne Revis, be punished by life imprisonment without parole.’ ”
(R. 820-21.)
The trial court’s use of a double negative [25] in explaining the appropriate advisory verdict if the jury were to find that the aggravating circumstance did not outweigh the mitigating circumstances was a slip of the tongue. This court has recently addressed a similar argument and stated:
“Johnson’s argument is based on a single word by the trial court during his charge, wherein he stated, ‘The defendant is presumed to be innocent until she is proven guilty beyond a reasonable doubt by the evidence in the case.’ (R. 1211.) She argues that the trial court’s use of the word ‘until’ rather than ‘unless’ required the jury to return a verdict of guilt. ‘The incorrect instruction could have been a mere slip of the tongue on the part of the trial court or, perhaps, is the result of an error made by the court reporter in transcribing the court’s oral charge.’ Woods v. State, 13 So.3d 1, 41 n. 1 (Ala.Crim.App.2007) (finding no plain error in trial court’s misstatement that the prosecutor’s burden in disproving a mitigating circumstance by a preponderance of the evidence means that the jury should consider that the circumstance does not exist unless the evidence as a whole makes it more likely that it does exist). See Dorsey v. State, 881 So.2d 460, 517 (Ala.Crim.App.2001), affirmed in part, reversed in part on other grounds, Ex parte Dorsey, 881 So.2d 533 (Ala.2003), overruled on other grounds, Heard v. State, 999 So.2d 992 (Ala.2007) (comment by the trial court in charging the jury as to a finding of guilt on a lesser included offense was a clear inadvertent slip of the tongue and did not constitute plain error in light of the entire charge).
“This same issue has been previously presented to this Court and decided adversely to Johnson’s position. In Snyder v. State, 893 So.2d 488, 548 (Ala.Crim.App.2003), Snyder contended that the trial court lessened the State’s burden of proof by using the word ‘until’ rather than ‘unless’ in its charge on the presumption of innocence. He argued that the use of this word ‘ “informed the jury that a guilty verdict was expected.” ’ 893 So.2d at 548. This Court found no error due to this charge, stating:
“ ‘The Alabama Supreme Court has used the word “until” to characterize the State’s burden of proof. In Ex parte Scroggins, 727 So.2d 131, 134 (Ala.1998), the court stated, “The burden of proof in all criminal prosecu *319 tions rests upon the State, with the presumption of innocence attending the defendant until the burden of proof has been met.” Also, we approved a similar instruction in Thomas v. State, 824 So.2d 1 (Ala.Crim.App.1999).
“ ‘The trial court’s jury instructions, when viewed as a whole, correctly informed the jury that if the State did not meet its burden, the jury had a duty to acquit the defendant. No reasonable juror would have concluded that the instructions implied that the State would always meet that burden. There was no error, much less plain error, in the trial court instruction on the presumption of innocence.’
“893 So.2d at 549.
“ ‘A review of the trial court’s entire charge, rather than this statement in isolation, shows that the jury was properly informed of the law concerning the presumption of innocence. Therefore, Johnson’s substantial rights were not adversely affected by this charge.’ ”
Johnson v. State, [Ms. CR-99-1349, October 2, 2009] — So.3d -, - (Ala.Crim.App.2009).
When viewed in light of the entire charge, the jury would have reasonably understood its role in the weighing process. The jury had previously been charged:
“The process of weighing aggravating and mitigating circumstances against each other in order to determine the proper punishment is not a mathematical process. In other words, you should not merely total the number of aggravating circumstances and compare that number to the total number of mitigating circumstances. The law of this State recognizes that it is possible in at least some situations that one or a few aggravating circumstances might outweigh a large number of mitigating circumstances. The law of this state also recognizes that it is possible in at least some situations that a large number of aggravating circumstances might not outweigh one or a few mitigating circumstances. In other words, the law contemplates that different circumstances may be given different weights or values in determining the sentence in a case, and you, the jury, are to decide what weight or value is to be given to a particular circumstance in determining the sentence in light of all other circumstances in this case. You must do that in the process of weighing the aggravating circumstance against the mitigating circumstances.”
(R. 818-19.)
Moreover, had the jury specifically adhered to the erroneous instruction, Revis would have benefited from the instruction because the jury would have returned an advisory verdict of life imprisonment without parole if it found that the aggravating circumstance outweighed the mitigating circumstances.
There was no plain error as a result of the trial court’s instructions to the jury regarding its role in the weighing process.
F.
Revis argues that the trial court’s instructions to the jury as to its consideration of mitigating circumstances were erroneous. Specifically, he alleges that the trial court’s instruction to the jury that it could not consider passion, prejudice, or any other arbitrary factor in arriving at its decision erroneously informed the jury that it could not consider mercy as mitigating evidence. Revis did not object to this instruction by the trial court; thus, this claim must be evaluated pursuant to the plain-error rule. Rule 45A, Ala.R.App.P.
*320 This court has recently addressed this same argument and held adversely to Re-vis. This court stated:
“To the extent Vanpelt asserts that the circuit court erroneously instructed the jury not to consider passion, prejudice, or any other arbitrary factor, this argument is without merit. In California v. Brown, 479 U.S. 538, 539, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), the United States Supreme Court upheld a jury instruction in the penalty phase of a capital trial that informed the jurors that they ‘must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.’ This court has repeatedly held that a court does not err in the penalty phase of a capital trial when it instructs the jury that it should ‘avoid the influence of any passion, prejudice, or any other arbitrary factor.’ See Brown v. State, 11 So.3d 866, 922 (Ala.Crim.App.2007); Ex parte Jefferson, 473 So.2d 1110, n. 3 (Ala.1985) (‘The ... jury ... was properly instructed to avoid the influence of passion, prejudice, or any other arbitrary factor....’); Reeves v. State, 807 So.2d 18, 46 (Ala.Crim.App.2000) (‘[T]he jury was properly instructed ... that its sentencing recommendation was not to be influenced by passion, prejudice, or any other arbitrary factor.’); Barber v. State, 952 So.2d 393 (Ala.Crim.App.2005); Morrison v. State, 500 So.2d 36 (Ala.Crim.App.1985). Therefore, the circuit court’s instruction was not error, much less plain error. See Rule 45A, Ala. R.App. P.”
Vanpelt v. State, 74 So.3d 32, 93 (Ala.Crim.App.2009) (footnote omitted).
Therefore, there was no error by the trial court in instructing the jury to avoid considering passion, prejudice, or any other arbitrary factor in arriving at its decision.
XII.
Revis argues that the trial court’s sentencing order was erroneous because the trial court failed to And two statutory mitigating circumstances to exist, accorded little weight to another statutory mitigating circumstance, and failed to consider the nonstatutory mitigating evidence. Revis failed to object at trial on these grounds; therefore, any error must rise to the level of plain error. Rule 45A, Ala.R.App.P.
A.
Revis submits that the trial court should have found the existence of two statutory mitigating circumstances: his young age and the fact that he was an accomplice in the capital offense that was committed by his uncle and in which his participation was relatively minor. §§ 13A-5-51(7) and (4), Ala.Code 1975, respectively.
The trial court properly determined that age was not a mitigating circumstance in this case. The trial court stated in its order:
“The defendant was 26 years old at the time of the crime. The legislature does not provide even a clue what it had in mind when enumerating ‘age’ as a mitigating circumstance. Some argue this means a young age; others argue that it means an old age. This mitigator may only apply to a juvenile and not to an adult; but, who knows what lurks in the hearts and minds of our legislators on this point? Regardless, the court does find it indeed difficult to order the execution of a young man with all of his life before him. However, weighed against his youth (an object of sympathy) is the total lack of remorse the defendant projected during all phases of the trial and sentencing in this case. Additionally, the court recalls the testimony of the Sheriff in which he charac *321 terized the defendant as a bully prisoner frequently engaging in fistfights over the past several months of his incarceration while waiting for his trial. Despite the fact he is a mature adult, he has not altered his aggressive and mean behavior, even faced with capital murder charges. The court finds that this mitigating factor, even if it exists in this case under the law, would be minuscule compared to the atrocity of this crime.”
(C. 150-51.)
The trial court’s determination, after fully considering this mitigating circumstance, that it did not exist was proper. In Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999), affirmed, 779 So.2d 1283 (Ala.2000), cert. denied, 531 U.S. 1193, 121 S.Ct. 1194, 149 L.Ed.2d 109 (2001), this court found that the trial court’s determination that Ingram’s age did not support the statutory mitigating circumstance was proper, although there was evidence indicating that Ingram was 24 years old when in fact he was 22 years old at the time of the offense. This court held that the trial court’s decision rested on the evidence concerning Ingram’s circumstances and maturity and was therefore proper. It stated:
“The record shows that the crime was committed on July 31,1993. Thus, to be exact, he was 22 years, 4 months, and 23 days of age on the date the crime was committed and 24 years, 5 months, and 14 days of age at the time of sentencing, a difference of approximately 2 years and 21 days. The record shows that the trial court considered the presentence report in arriving at its sentence. The record also shows that just before sentencing on June 16, 1995, the trial court asked Ingram, ‘How old are you now?’ Ingram responded, ‘Twenty-four.’ (R. 1051-52.) The state suggests that the finding could have been a typographical or clerical error, and if not, because of Ingram’s obvious maturity at the time the crime was committed, it would have made no reasonable difference to the trial court, even if the finding had been that he was 22 years of age. In other words, the state maintains that whether he was 24 or 22 would have made no difference in the trial court’s findings in this case. In support of its argument, the state correctly points out that before committing the crime, Ingram had fathered a child, had embarked on a career as a drug dealer, and was no longer a youth but was ‘living out in the world.’ We note from the record that although unmarried, Ingram was the father of a one-year-old child, had spent much of his life in Brooklyn, New York, had dropped out of school when he was 10 years of age, was obviously dealing in drugs, was worldly and streetwise, and was sui juris and legally responsible for his acts. We agree with the state that whether Ingram was 24 or 22 when he committed this crime, his age had no reasonable bearing upon its commission. We think that under the facts presented, even if the trial court’s finding had been that Ingram was 22 at the time he committed the crime, its ruling would have been the same.”
779 So.2d at 1244. Thompson v. State, 542 So.2d 1286, 1297 (Ala.Crim.App.1988), affirmed, 542 So.2d 1300 (Ala.), cert. denied, Thompson v. Alabama, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989) (affirming the trial court’s finding that “while the age of a criminal defendant is an important consideration, it is not ‘solely determinative of the existence of a mitigating circumstance’ Thompson was 20 at the time of the offense and, under the facts of the case, this mitigating circumstance was properly not found to exist). See McMillan v. State, [Ms. CR-08-1954, November 5, 2010] — So.3d - (Ala.Crim.App. *322 2010) (finding that trial court’s determination that the mitigating circumstance of age, where McMillan was 18 years old at time of offense, was to be accorded little weight was not improper based on the facts and circumstances of the case). But see Burgess v. State, 962 So.2d 272, 277 (Ala.Crim.App.2005) (finding Burgess’s age of 26 at the time of the offense to be a mitigating circumstance; however, the facts indicated that Burgess tried to commit suicide following the offense, leaving a note that stated “ ‘[t]he reason for this is because the relationship wasn’t ... [not legible] and I didn’t have her mother or father on my side, and at first, I really tried to get to know them’ ”).
Revis’s argument that the trial court should have found the existence of the mitigating circumstance that he was an accomplice in the offense and that his participation was relatively minor is also without merit. The trial court properly made the following findings concerning this statutory mitigating circumstance:
“This circumstance was introduced to the jury during the guilt phase of the trial, but was obviously rejected by the jury. Further, this court finds from the overwhelming evidence, including the November 7th confession of the defendant, that Christopher Revis was, in fact, the mastermind of the robbery and the person who delivered the fatal shots to the victim. In his first statement to law enforcement prior to his arrest, the defendant initially denied any involvement with Jerry Stidham on February 21st or February 22nd other than a possible phone call to ascertain whether he had any drugs to sell. Eventually when confronted with forensic and other circumstantial evidence, he admitted being at the victim’s, home in the early morning of February 22d for the purpose of robbing him of his pain medication, but denied entering the home or having any knowledge of the shooting. Although he admitted the robbery was his idea, according to the defendant, his brother and uncle carried out the plan while he remained in the vehicle outside the' victim’s home. The defendant denied knowing that Stidham had been shot and denied hearing shots being fired. He claimed that his Uncle Eddie carried the .22 rifle in the house, and, approximately 20 minutes later came out of the house with 40-50 Lortab pill's and the .22 rifle. The defendant’s first statement was filled with inconsistencies and unbelievable prevarication that the jury obviously chose not to believe. Nor does this court. On November 7, 2004, a second interview was conducted with the defendant after his arrest. Prior to this confession, the defendant was informed that Uncle Eddie had already given a statement to law enforcement. Later during the statement he was informed that his Brother Jason had been arrested in Dubuque, Iowa and had just arrived at the Hamilton airport for questioning. Initially, in the second interview, the defendant confessed that the plan to rob Stidham of both the pills and money was his, but again denied that he was present when the shooting took place. In planning the robbery, the defendant stated that he told both his uncle and brother not to ‘hurt’ Stid-ham. After admitting that he alone had gone into the victim’s home first to talk with him about a drug deal, he claimed he refused to re-enter the house during the robbery, illogically explaining that he could not get involved because, ‘if he’d (Stidham) went to the cops he’d have picked me out.’ Only after he was informed that his brother had been arrested and arrived from Iowa for questioning did the defendant confess involvement in the murder. He confessed *323 that the plan was for him, not Jason or Eddie, to rob the victim. Although, he further stated that their plan did not include shooting the victim, he stated, ‘But then when I shot him he reached for a gun.’ He recalled shooting the victim ‘about eight’ times. As soon as he fired the shots Jason and Eddie ran in the house. The defendant then admitted taking the pills while Eddie cut the victim’s throat. Upon exiting the mobile home, Christopher thought that his brother Jason had the defendant’s wallet. They drove a short distance to Hodges, Alabama, where they divided the money and pills, burned the defendant’s wallet, and then checked into the most expensive room at the Hamilton Day’s Inn. The forensic evidence in this case, as well as the confession of the defendant, clearly show that the defendant was much more than an accomplice in the capital murder and his participation is far from minor. The court rejects, as did the jury, any assertions made by the defendant to the contrary as a mitigating circumstance under 13A-5-51.”
(C. 147-49.)
The trial court fully considered this mitigating circumstance and, based on the evidence, determined that it did not exist in the present case. There was no error as to this decision by the trial court.
B.
Revis further argues that the trial court erred by according little weight to the statutory mitigating circumstance that he had no significant history of prior criminal activity. § 13A-5-51(l), Ala. Code 1975. As to this finding, the trial court stated:
“The court does find this to be a mitigating circumstance in the present case. The state produced no evidence to the jury in the sentencing phase regarding [Revis’s] prior criminal activity. The sentencing report by the Alabama Department of Pardons and Paroles offered by the state at the sentencing hearing before the court contains a few misdemeanor offenses committed by [Revis] (Harassing Communications, 2 DUI’S, Public Intoxication) but none of these have any relevance in this case. None would have been admissible at the trial of this case, and, the court places no weight adverse to [Revis] on them now.”
(C. 146-47.)
The trial court did not state that it placed little weight on this mitigating circumstance. Rather, it stated that it accorded no weight to the State’s evidence as to the misdemeanor offenses offered to refute Revis’s evidence concerning the existence of this mitigating circumstance. Thus, there is no error here.
C.
Revis also contends that the trial court failed to consider the nonstatutory mitigating evidence offered by the defense: specifically, his abusive and unstable family background; his kindness, generosity, helpfulness, and respectfulness; his drug addiction; his strong religious background; and the love and close relationship that he shared with his family and friends.
The record reveals that although the trial court did not make specific findings as to these nonstatutory mitigating circumstances in his sentencing order, it did state that “[i]n addition to the mitigating circumstances specified in Section 13A-5-51 [Ala.Code 1975,], the court is to consider any other relevant mitigating circumstances or any aspect of the defendant’s character or record and any circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.” (C. 146.) *324 In conclusion, the trial court further acknowledged that it had given “[c]omplete consideration to the weight to be given to ... all mitigating circumstances.” (C. 151.) Moreover, the trial court had instructed the jury during the penalty phase as follows:
“Now, the defendant is allowed to offer any evidence in mitigation; that is, evidence that indicates or tends to indicate that the defendant should be sentenced to life imprisonment -without eligibility for parole instead of the death sentence. The defendant does not bear a burden of proof in this regard. All the defendant must do is simply present the evidence. The laws of this state provide that mitigating evidence shall include, but are not limited to, the following enumerated mitigating circumstances, ... and as I’ve said before, they [sic] are some that if proven by the defendant, you may consider, but that is not an all-inclusive list of possible mitigating circumstances. The laws of this State further provide that mitigating circumstances shall not be limited to those I have just read, but may also include any aspect of the defendant’s character or background, any circumstances surrounding the offense, and any other relevant mitigating evidence that the defendant offers as support for a sentence of life without parole instead of death.”
(R. 815-17.)
In Morris v. State, 60 So.3d 326, 348 (Ala.Crim.App.2010), this court found no plain error in the trial court’s failure to make specific findings concerning any non-statutory mitigating circumstances in the case and stated:
“In Johnson v. State, [Ms. CR-99-1349, October 2, 2009] — So.3d - (Ala.Crim.App.2009), this Court determined that the trial court’s failure to make specific findings as to each non-statutory mitigating circumstance in its sentencing order did not constitute plain error. Moreover, as in the present case, the sentencing order addressed all that was required, although it did not list or find any nonstatutory mitigating circumstances. In so holding, we wrote:
“ ‘In Ex parte Lewis, 24 So.3d 540 (Ala.2009), the Alabama Supreme Court quoted Clark v. State, 896 So.2d 584 (Ala.Crim.App.2000), concerning a trial court’s duty in considering whether proffered evidence constitutes a mitigating circumstance, stating:
“ ‘ “ ‘The sentencing order shows that the trial court considered all of the mitigating evidence offered by Clark. The trial court did not limit or restrict Clark in any way as to the evidence he presented or the arguments he made regarding mitigating circumstances. In its sentencing order, the trial court addressed each statutory mitigating circumstance listed in § 13A-5-51, Ala.Code 1975, and it determined that none of those circumstances existed under the evidence presented. Although the trial court did not list and make findings as to the existence or nonexistence of each nonstatutory mitigating circumstance offered by Clark, as noted above, such a listing is not required, and the trial court’s not making such findings indicates only that the trial court found the offered evidence not to be mitigating, not that the trial court did not consider this evidence. Clearly, the trial court considered Clark’s proffered evidence of mitigation but concluded that the evidence did not rise to the level of a mitigating circumstance. *325 The trial court’s findings in this regard are supported by the record.
“ ‘ “ ‘Because it is clear from a review of the entire record that the trial court understood its duty to consider all the mitigating evidence presented by Clark, that the trial court did in fact consider all such evidence, and that the trial court’s findings are supported by the evidence, we find no error, plain or otherwise, in the trial court’s findings regarding the statutory and nonstatutory mitigating circumstances.’
“ ‘ “896 So.2d at 652-53 (emphasis added).”
“ ‘24 So.3d at 545.
“‘Here, it is clear that the trial court considered all of the evidence offered and made proper findings as to what evidence constituted nonstatu-tory mitigating circumstances. ‘“[T]he trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating.’ Williams v. State, 710 So.2d 1276, 1347 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).” Brown v. State, 11 So.3d 866, 932 (Ala.Crim.App.2007), affirmed, Ex parte Brown, 11 So.3d 933 (Ala.2008), cert. denied, Brown v. Alabama, — U.S. -, 129 S.Ct. 2864, 174 L.Ed.2d 582 (2009). “We have often stated that ‘ “[a]lthough the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with thé senteneer.” ’ Boyd v. State, 715 So.2d 825, 840 (Ala.Crim.App.1997), aff'd, 715 So.2d 852 (Ala.1998), quoting Williams v. State, 710 So.2d 1276, 1347 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).” Hodges v. State, 856 So.2d 875, 932 (Ala.Crim.App.2001), affirmed, Ex parte Hodges, 856 So.2d 936 (Ala.2003), cert. denied, Hodges v. Alabama, 540 U.S. 986, 124 S.Ct. 465, 157 L.Ed.2d 379 (2003) (finding that “a trial court is not bound to find as a mitigating circumstance that a codefendant received a lesser sentence than death. See Johnson v. State, 820 So.2d 842 (Ala.Crim.App.2000), aff'd, 820 So.2d 883 (Ala.2001)”).’
“— So.3d at -.”
Morris v. State, 60 So.3d 326, 348-49 (Ala.Crim.App.2010).
Here, the jury was instructed that it could consider any mitigating evidence as to Revis’s character, background, or any other relevant mitigating evidence he presented that would support a sentence of life imprisonment rather than death. Furthermore, the trial court’s sentencing order reflects that the trial court considered all the mitigating evidence in arriving at a sentencing judgment. Therefore, there was no error on this ground.
To the extent that Revis argues that these alleged individual errors resulted in cumulative error that required a reversal of his conviction, “ ‘ “[b]ecause we find no error in the specific instances alleged by the appellant, we find no cumulative error.” Lane v. State, 673 So.2d 825 (Ala.Crim.App.1995). See also McGriff v. State, 908 So.2d 961 (Ala.Crim.App.2000).’ Calhoun v. State, 932 So.2d 923, 974 (Ala.Crim.App.2005).” Harris v. State, 2 So.3d 880, 928 (Ala.Crim.App.2007), cert. denied, 555 U.S. 1155, 129 S.Ct. 1039, 173 L.Ed.2d 472 (2009). There was no error in the trial court’s findings regarding nonstatutory *326 mitigating circumstances, either cumulative or as to the individual allegations, in the present case.
XIII.
Revis argues that his sentence of death is due to be vacated pursuant to Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). He argues that the jury never determined that the statutory aggravating circumstance existed beyond a reasonable doubt or that it outweighed the mitigating circumstances. He also argues that the jurors were misinformed about the significance of their role; however, in this opinion we have previously determined this matter adversely to Revis. See Issue VIII. He further argues that the Alabama Supreme Court’s decision in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), is contrary to the law and “undermines the reliability of the capital sentencing process and unfairly skews sentencing toward the imposition of the death penalty. Adams v. Texas, 448 U.S. 38, 46-47 (1980).” (Revis’s brief, at 114.) Thus, he submits that this decision runs afoul of the Due Process Clause and the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution in capital cases.
In Ex parte Waldrop, the Alabama Supreme Court held in applying Ring:
“Because the jury convicted Waldrop of two counts of murder during a robbery in the first degree, a violation of Ala.Code 1975, § 13A-5-40(a)(2), the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, Ala. Code 1975, § 13A-5-49(4), was ‘proven beyond a reasonable doubt.’ Ala.Code 1975, § 13A-5-45(e); Ala.Code 1975, § 13A-5-50. Only one aggravating circumstance must exist in order to impose a sentence of death. Ala.Code 1975, § 13A-5-45(f). Thus, in Wal-drop’s case, the jury, and not the trial judge, determined the existence of the ‘aggravating circumstance necessary for imposition of the death penalty.’ Ring [v. Arizona], 536 U.S. [584,] 609, 122 S.Ct. [2428,] 2443, 153 L.Ed.2d 556 [ (2002) ]. Therefore, the findings reflected in the jury’s verdict alone exposed Waldrop to a range of punishment that had as its maximum the death penalty. This is all Ring and Apprendi [v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) ] require.”
Ex parte Waldrop, 859 So.2d at 1188.
The decision in Ex parte Waldrop has been consistently followed and upheld. See, e.g., Mitchell v. State, 84 So.3d 968, 988 (Ala.Crim.App.2010); Spencer v. State, 58 So.3d 215, 247 (Ala.Crim.App.2008); Yeomans v. State, 898 So.2d 878, 903 (Ala.Crim.App.2004), cert. denied, 546 U.S. 879, 126 S.Ct. 175, 163 L.Ed.2d 180 (2005); Ex parte McNabb, 887 So.2d 998, 1005-06 (Ala.2004), cert. denied, 543 U.S. 1005, 125 S.Ct. 606, 160 L.Ed.2d 466 (2004). Fur ther, this court is bound by the decisions of the Alabama Supreme Court. As we stated in Reynolds v. State, [Ms. CR-07-0443, October 1, 2010] — So.3d - (Ala.Crim.App.2010):
“Reynolds also challenges the constitutionality of the Alabama Supreme Court’s decision in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002). He claims that the decision ‘impermissibly eased the State’s burden of proving that the death penalty is appropriate by ensuring that the jury was unaware that its guilt-innocence phase finding authorized the trial judge to impose the death penalty without additional process,’ and that the Waldrop decision ‘undermines the reliability of the capital sentencing process and unfairly skews sentencing toward the imposition of the death penalty.’ (Reynolds’s brief, at 111-12.) ‘However, *327 this Court is bound by the decisions of the Alabama Supreme Court and has no authority to reverse or modify those decisions. See § 12-3-16, Ala.Code 1975.’ Doster, supra, 72 So.3d at 103 n. 13.”
Reynolds v. State, — So.3d at - n. 31.
Moreover, Revis’s specific arguments have been previously addressed by this court and determined adversely to him. See Lewis v. State, 24 So.3d 480, 533 (Ala.Crim.App.2006) (wherein Lewis argued among other specific grounds that Alabama’s death-penalty statute violates Ring because “it does not require a unanimous finding by the jury as to whether the aggravating circumstances exist beyond a reasonable doubt and whether the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt”).
Thus, there is no merit to this claim.
XIV.
Revis argues that the trial court’s refusal to appoint additional defense counsel deprived him of his rights to due process, equal protection, and a fair trial. He cites Quick v. State, 825 So.2d 246, 260 (Ala.Crim.App.2001), in which it was noted that it is preferable to have two attorneys in a capital case.
However, in Quick v. State, Quick claimed that he should have been provided co-counsel because his defense counsel had never tried a death-penalty case, but this court held that Quick was not entitled to a second counsel because the decision to appoint co-counsel is discretionary with the trial court and is a privilege rather than a right of the defendant. This court stated:
“In the present case, a review of the record clearly demonstrates that the appellant was represented by capable and effective counsel, who had practiced criminal law for at least 10 years. ‘A defendant is entitled to representation by counsel; there is no guarantee to be represented by more than one counsel.... Furthermore, ... the defendant had very effective and able counsel. The refusal to appoint additional counsel was not error.’ State v. Balfa, 506 So.2d 1369, 1374 (La.Ct.App.1987).”
825 So.2d at 260.
In Sale v. State, 8 So.3d 330 (Ala.Crim.App.2008), cert. denied, 8 So.3d 352 (Ala.2008), cert. denied, Sale v. Alabama, — U.S. -, 129 S.Ct. 2062, 173 L.Ed.2d 1141 (2009), this court stated:
“ ‘We have held that § 13A-5-54, Ala. Code 1975, requires only that one attorney meet the statutory requirements. “In Parker v. State, 587 So.2d 1072 (Ala.Crim.App.1991), we held that when a person accused of a capital offense has one attorney whose experience meets that required in § 13A-5-54, the requirements of that section have been satisfied.” Hodges v. State, 856 So.2d 875, 899 (Ala.Crim.App.2001).’ Belisle v. State, 11 So.3d 256, 279 (Ala.Crim.App.2007). Furthermore, a defendant in a capital case is entitled to only one attorney with five years’ experience. See Robitaille v. State, 971 So.2d 43, 51-52 (Ala.Crim.App.2005); and Whitehead v. State, 777 So.2d 781, 851 (Ala.Crim.App.1999).”
Sale v. State, 8 So.3d at 341.
Moreover, there is no statutory authority to support Revis’s claim. As this court has previously stated in Robitaille v. State, 971 So.2d 43 (Ala.Crim.App.2005), cert. denied, 552 U.S. 990, 128 S.Ct. 490, 169 L.Ed.2d 339 (2007):
“Section 13A-5-54, Ala.Code 1975, states:
‘“Each person indicted for an offense punishable under the provisions of this article who is not able to afford *328 legal counsel must be provided with court appointed counsel having no less than five years’ prior experience in the active practice of criminal law.’
“This Court previously addressed this issue in Whitehead v. State, 777 So.2d 781, 851 (Ala.Crim.App.1999):
“ ‘Whitehead also contends that he was entitled, under both Alabama and federal constitutional law, to “two attorneys who were experienced in criminal and capital litigation.” ... In support of his claim, Whitehead cites this court to § 13A-5-54, Ala. Code 1975, which provides that a person indicted for a capital offense who is not able to afford an attorney must be provided with court-appointed counsel having no less than five years’ prior experience in the active practice of criminal law. Initially we note that Whitehead did not raise this issue in the trial court; therefore, our review will be for plain error. Rule 45A, Ala.R.App.P.
“ ‘As the state correctly points out in its brief to this court, Whitehead does not argue on appeal, nor does the record indicate, that his appointed attorney, Hoyt Baugh, lacked the requisite five years’ experience in the active practice of criminal law required under § 13A-5-54. Whitehead complains only that he should have been appointed two attorneys instead of one. However, under § 13A-5-54, contrary to Whitehead’s claim, Whitehead was only entitled to one attorney with five years’ experience in the active practice of criminal law; therefore, because § 13A-5-54 does not provide for the appointment of two attorneys with five years’ experience in the active practice of criminal law, we find that Whitehead had the counsel to which he was entitled.’
“While we recognize that in some cases there may be a need to appoint two attorneys, Alabama has no statute requiring that two attorneys be appointed to a capital defendant. Robitaille makes no argument that his appointed attorney, John H. Wiley III, did not have the requisite five years of experience as required by law. Robitaille ‘had the counsel to which he was entitled.’ Whitehead, 777 So.2d at 851.”
Robitaille v. State, 971 So.2d at 52 (footnote omitted).
In the present case, Revis was afforded with counsel meeting the statutory requirements to represent him. There was no abuse of discretion or error by the trial court in its decision to decline appointing Revis a second counsel to represent him.
XV.
Revis argues that Alabama’s method of execution is unconstitutional because, he says, it constitutes cruel and unusual punishment.
This issue has previously been decided adversely to Revis. In deciding that this same issue lacked merit when raised in an earlier death-penalty case, this court stated:
“However, in Ex parte Belisle, 11 So.3d at 338, the Alabama Supreme Court held that, in light of the safeguards included in the administration of the drugs used for executions by lethal injection in Alabama, these procedures do not constitute cruel and unusual punishment.
“ ‘We note that Alabama’s statutory death-penalty scheme has repeatedly been upheld against constitutional challenges. A comprehensive listing of the cases dealing with these challenges can be found in Travis v. State, *329 776 So.2d 819, 873 (Ala.Crim.App.1997), aff'd, 776 So.2d 874 (Ala.2000), cert. denied, 531 U.S. 1081, 121 S.Ct. 785, 148 L.Ed.2d 681 (2001). Moreover, we know of no authority in support of the general proposition that death by lethal injection violates a defendant’s constitutional rights. Indeed, a number of jurisdictions have rejected such claims. See, e.g., Sims v. State, 754 So.2d 657, 668 (Fla.2000); State v. Carter, 89 Ohio St.3d 593, 608, 734 N.E.2d 345 (2000); Ritchie v. State, 809 N.E.2d 258, 262 (Ind.2004); Wheeler v. Commonwealth, 121 S.W.3d 173, 186 (Ky.2003). Today, we join these jurisdictions in holding that death by lethal injection is not per se cruel and unusual punishment.’
“Bryant v. State, 951 So.2d 732, 747-48 (Ala.Crim.App.2003), cert. denied, 951 So.2d 732 (Ala.2006), cert. denied, 549 U.S. 1324, 127 S.Ct. 1909, 167 L.Ed.2d 569 (2007). (Footnote omitted.)”
Morris v. State, 60 So.3d 326, 383 (Ala.Crim.App.2010).
Alabama’s method of execution is not unconstitutional.
XVI.
Revis argues that the trial court erred by failing to secure a reliable and adequate record of the proceedings in this case. He complains that the record is inadequate because it does not show that he was present at every stage of the trial; he refers to a pretrial hearing and cites the introductory caption page for the transcript of the hearing that names those present as the trial court, the prosecutor, and defense counsel. He also alleges that he was not present during an off-the-record voir dire examination of venire-members. He further argues that the record is inadequate in that it fails to include the arraignment, portions of the jury selection, and a conference regarding the jury charges. Lastly, he argues that the transcript improperly fails to show that the jury was sworn.
Revis raises these issues for the first time on appeal; therefore, they are to be analyzed pursuant to the plain-error rule. Rule 45A, Ala.R.App.P.
Initially, we note that the record reveals that the venire, as well as the petit jury, was administered its oath (R. 64-65, R. 251). Thus, this issue lacks merit.
As to Revis’s claimed absences during an off-the-record voir dire examination of potential jurors,[26] as noted, there was no objection by defense counsel, nor has Re-vis claimed or shown any prejudice or harm resulting from his alleged absence. See Peraita v. State, 897 So.2d 1161 (Ala.Crim.App.2003) (“Also, even when his absence was brought to defense counsel’s attention, defense counsel did not object on that basis.... Finally, his attorneys were present at all times. These factors weigh against any claim of prejudice the appellant now makes.”). See also Williams v. State, 410 So.2d 911, 912 (Ala.Crim.App.1982) (“Merely because no statement by the trial court indicating appellant’s presence at this time appears in the record, such, when viewed in conjunction with the remainder of the record, is insufficient to mandate reversal of this cause. See Durden v. State, Ala.Cr.App., 394 So.2d 967 (1980), cert. denied, Ala., 394 So.2d 977 (1981).”).
*330 More importantly, the page cited by Re-vis to substantiate his claim that he was not present during a portion of the voir dire does not contain any indication of his absence. (R. 61.) Rather, the record reveals that at the beginning of the voir dire examination that Revis was present. The record reflects:
“THE COURT: Ladies and gentlemen, at this time I’m going to qualify you in the case of State of Alabama versus Christopher Revis. Mr. Revis is in the courtroom.
“Would you please stand, Mr. Revis?
“(The defendant complied.)
“THE COURT: Mr. Christopher Re-vis. You may be seated.
“(The defendant complied.)”
(R. 58.)
Although Revis also alludes to the failure of the record to list him as present on the caption page for a pretrial hearing, the record does not indicate that he was not present. Revis has also failed to allege or show any prejudice resulting from his alleged absence.
In Hall v. State, 820 So.2d 113 (Ala.Crim.App.1999), this court stated:
“Hall next argues that the trial court violated his right to be present at every phase of the trial when the court conducted an off-the-record hearing outside his presence.
[[Image here]]
“Initially, as the State notes in its brief to this Court, there is absolutely no indication in the record that Hall was not present at this off-the-record conference. As this Court has often stated, We will not predicate error on a silent record.’ Maples v. State, 758 So.2d 1 (Ala.Cr.App.1999), citing, Foster v. State, 587 So.2d 1106 (Ala.Cr.App.), opinion extended after remand, 591 So.2d 151 (Ala.Cr.App.1991).
“Even if we were to assume that Hall was absent from this hearing, we would still conclude that no violation of Hall’s constitutional rights occurred here. As this Court reiterated in Borden v. State, 769 So.2d 935 (Ala.Cr.App.1997):
“ ‘Recently, in Ponder v. State, 688 So.2d 280 (Ala.Cr.App.1996), this court stated:
“ ‘ “ ‘The court in Proffitt v. Wainwright, [685 F.2d 1227 (11th Cir.1982), cert. denied, 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983) ], acknowledged in a footnote that in Snyder v. Massachusetts, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934), “which was a capital case, [the Court] stated the sixth amendment privilege of confrontation could ‘be lost by consent or at times even by misconduct.’ Snyder v. Massachusetts, 291 U.S. at 106, 54 S.Ct. at 332.” Proffitt v. Wainwright, supra, at 1257, n. 43. See also State v. Davis, 290 N.C. 511, 227 S.E.2d 97, 110 (1976) (“[t]he strict rule that an accused cannot waive his right to be present at every stage of his trial upon an indictment charging a capital felony, State v. Moore, 275 N.C. 198, 166 S.E.2d 652 (1969), is not extended to require his presence at the hearing of a pretrial motion for discovery when he is represented by counsel who consented to his absence, and when no prejudice resulted from his absence”). See also State v. Piland, 58 N.C.App. 95, 293 S.E.2d 278 (1982), appeal dismissed, 306 N.C. 562, 294 S.E.2d 374 (1982) (“[t]he [capital] defendant in this case has not demonstrated any prejudice to him by his absence from a part of the hearing. The evidence elicited was not disputed and there *331 has been no showing that it would have been different had the defendant been present”).
“ ‘ “ ‘Thus, if the appellant’s presence ... would have been useless to [his] defense and if the [pretrial] hearing was not considered to be a “critical stage” of [his] trial, then we can find no error in the appellant’s absence from the hearing.’ ”
“ ‘688 So.2d at 285, quoting Harris v. State, 632 So.2d 503, 512 (Ala.Cr.App.1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) .... See also Dobyne v. State, 672 So.2d 1319 (Ala.Cr.App.), on return to remand, 672 So.2d 1353 (Ala.Cr.App.1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996); Ex parte DeBruce, 651 So.2d 624 (Ala.1994); Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995).’
“769 So.2d at 943.
“Since this Court released Borden we have had several occasions to address this issue and on each occasion we found no reversible error. See McWhorter v. State, 781 So.2d 257 (Ala.Cr.App.1999) (McWhorter’s absence from initial qualifying of the jury venire was not reversible error); Sneed v. State, 783 So.2d 841 (Ala.Cr.App.1999), and Hardy v. State, 804 So.2d 247 (Ala.Cr.App.1999) (Sneed’s and Hardy’s absence from in-chambers hearing concerning redaction of statements and in-chambers hearing concerning jury’s request during deliberations for two video-recorders was not error). See also Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997) (Burgess’s absence from two pretrial motion hearings, an in-chambers discussion with counsel and the victim’s family during voir dire, and an in-chambers discussion with counsel about suspending Burgess’s telephone privileges was not reversible error).
“Hall has not shown that he was prejudiced by his absence from this off-the-record discussion where his attorney was present. No error, much less plain error, occurred here.”
820 So.2d at 136-37 (footnote omitted).
Revis has shown neither that he was absent at any stage of the trial nor that he was prejudiced by any alleged absence. The record is not unreliable on this ground.
Revis further contends that the record is inadequate because it does not contain a transcription of the arraignment, portions of the jury selection, and a conference regarding the jury charges. Revis fails to indicate what portion of the jury selection was not transcribed. Although the actual transcription of the entry of strikes by the parties is not included in the record, a form containing the strikes and indicating the party entering the strike as to each potential juror is included in the record. Further, although he argues that a conference regarding jury charges was not transcribed, the page to which he cites for this error contains an apparent complete transcription of the conference. (R. 632.)
Although the arraignment was not transcribed, there is no requirement that the arraignment be transcribed. See generally, Fox v. State, 50 So.3d 494, 496 (Ala.Crim.App.2007) (on appeal in a capital-murder trial this court noted that, “nor is there a transcript of arraignment in the record”). Revis makes no allegation of any impropriety during.his arraignment, nor does he allege that the arraignment was not held. Furthermore, the record *332 discloses that, in sentencing Revis, the trial court stated that Revis had entered pleas of not guilty to the charges against him. (C. 142.) Compare O’Leary v. State, 417 So.2d 217 (Ala.1981), cert. denied, 463 U.S. 1206, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983) (“In reaching its conclusion that the record did not affirmatively show that the defendant/respondent pleaded to the indictment, the Court of Criminal Appeals doubtless gave great, and in our judgment, undue weight to the transcript of the court reporter’s stenographic notes, which did not reflect an arraignment.... We have been cited to no authority which gives to a court reporter’s stenographic notes a conclusive presumption of accuracy or otherwise prevents their content from being impeached or contradicted.”).
Thus, there was no plain error caused by the lack of transcription of the arraignment.
XVII.
Pursuant to § 13A-5-53(a), Ala. Code 1975, and Rule 45A, Ala.R.App.P., this court must search the record and take note of any error that has or probably has adversely affected the substantial rights of the appellant.
In the present case, Revis was convicted of two counts of capital murder for killing Jerry Stidham during the commission of a robbery. One count was based on the theft of Stidham’s wallet; the other count was based on the theft of controlled substances. Both counts were based on the same conduct and required the same proof of the necessary elements, because the property taken during the robbery is not an element of the capital offense.
In Wynn v. State, 804 So.2d 1122 (Ala.Crim.App.2000), this court addressed a situation in which Wynn was charged with two counts of robbery/murder and two counts of burglary/murder for the murder of the same victim. This court held that only one count of robbery/murder and one count of burglary/murder could stand and stated concerning the robbery/murder convictions:
“Count I alleged that the appellant committed the robbery-murder ‘while [he] was armed with a deadly weapon or a dangerous instrument.’ (C.R. 19.) Count II alleged that, in the course of the robbery-murder, the appellant ‘caused serious physical injury to the said Denise Bliss.’ (C.R. 19.)
“ ‘A person commits the crime of robbery in the first degree if he violates Section 13A-8-43 and he:
“ ‘(1) Is armed with a deadly weapon or dangerous instrument; or
“ ‘(2) Causes serious physical injury to another.’
“§ 13A-8-41(a), Ala.Code 1975 (emphasis added).
“ ‘A person commits the crime of robbery in the third degree if in the course of committing a theft he:
“ ‘(1) Uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance; or
“ ‘(2) Threatens the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property.’
“§ 13A-8nl3(a), Ala.Code 1975. Clearly, Counts I and II were simply alternative methods of proving the single offense of robbery-murder.”
Wynn v. State, 804 So.2d at 1148-49.
“A single crime cannot be divided into two or more offenses and thereby subject the perpetrator to multiple con *333 victions for the same offense.” Ex parte Darby, 516 So.2d 786, 787 (Ala.1987). As we stated in Abrams v. State, 978 So.2d 794, 797 (Ala.Crim.App.2006):
“ ‘ “The constitutional guarantee against double jeopardy protects a defendant from being subjected to multiple punishments for the same offense. This guarantee bars the conviction of a defendant for two separate counts of first-degree robbery where the evidence adduced at trial tended to show that the defendant committed only one act of robbery against one victim. Moore v. State, 709 So.2d 1324 (Ala.Crim.App.1997).”
“‘Young v. State, 724 So.2d 69, 73 (Ala.Crim.App.1998).
“ ‘ “This is not a case where the same act or transaction constitutes a violation of two distinct statutory provisions. See Blockburger v. United States, 284 U.S. 299 (1932).... The pertinent inquiry in deciding whether [these convictions are] acceptable in the face of constitutional guarantees against double jeopardy then becomes defining the correct unit of prosecution. Bell v. United States, 349 U.S. 81 (1955).
“ ““ “A single crime cannot be divided into two or more offenses and thereby subject the perpetrator to multiple convictions for the same offense. Const. of 1901, Art. I, § 9; U.S. Const. Amend. V.” Ex parte Darby, 516 So.2d 786, 787 (Ala.1987). Such question of double jeopardy is determined by the following principles:
“ ““ “It has been aptly noted that ‘the Blockburger [v. United States, 284 U.S. 299 (1932),] test is insufficient where ... the concern is not multiple charges under separate statutes, but rather successive prosecutions for conduct that may constitute the same act or transaction.’ Rashad v. Burt, 108 F.3d 677 (6th Cir.1997). This is because when ‘a defendant is convicted for violating one statute multiple times, the same evidence test will never be satisfied.’ State v. Adel, 136 Wash.2d 629, 965 P.2d 1072 (1998). The ‘appropriate inquiry’ in such a case ‘asks what “unit of prosecution” was intended by the Legislature as the punishable act.... The inquiry requires us to look to the language and purpose of the statutes, to see whether they speak directly to the issue of the appropriate unit of prosecution, and if they do not, to ascertain that unit, keeping in mind that any ambiguity that arises in the process must be resolved, under the rule of lenity, in the defendant’s favor.’ Commonwealth v. Rabb, 431 Mass. 123, 725 N.E.2d 1036 (2000) (concluding that allegedly multiple drug possessions justify multiple charges if the possessions are sufficiently differentiated by time, place or intended purpose, the case here regarding defendant’s possession of drugs at his residence for immediate sale and his possession of drugs at motel for future sales).”
“ ‘ “ ‘4 Wayne R. LaFave et al., Criminal Procedure § 17.4(b), 2001 Pocket Part n. 66 (2d ed.1999). See also Project, “Twenty Ninth Annual Review of Criminal Procedure,” 88 Geo. L.J. 879, 1293 (2000) (“when the government seeks to prove that a single act or occurrence results in multiple violations of the same statute, the rule of lenity requires only one punishment unless legislative *334 intent to impose multiple punishments is shown”).’
“ ‘ “Townsend v. State, 823 So.2d 717, 722 (Ala.Crim.App.2001) (footnote omitted [in Girard ]).”
“ ‘Girard [v. State ], 883 So.2d [714] at 715-16 [ (Ala.Crim.App.2002) ].
“ ‘ “ ‘Robbery is an offense against the person....”’ Ex parte Windsor, 683 So.2d 1042, 1046 (Ala.1996) (quoting Windsor v. State, 683 So.2d 1027, 1032 (Ala.Crim.App.1994)). That is, the victim in this case was Gallahar, not the dry-cleaning business, although some of the property taken belonged to the business. Proof of an actual taking of property is not required to sustain a conviction for robbery. See Cook v. State, 582 So.2d 592 (Ala.Crim.App.1991). Thus it is the use of force, or the threat of the use of force, against the person that constitutes the crime; therefore, the unit of prosecution is the act of violence against the person. Thus, the number of charges against the defendant is not determined by the number of pieces of property actually taken, as was done in this case. Cf. Connolly v. State, 539 So.2d 436, 441-42 (Ala.Crim.App.1988) (“The State could not convert a single theft of various items of property into separate offenses by alleging the theft of different items in separate indictments. All the property was taken during the same transaction and constituted one offense. Such is not permitted”).
“ ‘In Young, this Court reasoned:
“ ‘ “In the present case, the court differentiated the two counts of robbery as follows:
“ ‘ “ ‘And the State is maintaining that the first robbery charge is in regard to the $42 or $43 that [V.E.] said was taken from his wallet. And then that the other robbery charge was the going to the, I believe, the front bedroom, seeking money on that occasion.’
“ ‘ “(R. 416.)
“ ‘ “The State presented evidence of one [robbery], but not two separate robberies. The evidence tended to show that Young committed one continuous act of robbery against V.E., using a deadly weapon while committing a theft. The fact that Young forced V.E. into another room does not create a second robbery. The trial court erred in instructing the jury that it did. See Rolling v. State, 673 So.2d 812, 815 (Ala.Crim.App.1995).”
“ ‘724 So.2d at 73.
“ ‘The evidence in this case, like the evidence in Young, shows that Craig committed one continuous act of robbery against Gallahar. For the reasons stated above, the fact that Craig took property from both Gallahar and from the dry-cleaning business does not create two separate robbery offenses. Therefore, because Craig was twice placed in jeopardy by being indicted for and convicted of two separate charges of first-degree robbery when he in fact committed only one crime against one victim, one of Craig’s convictions for first-degree robbery is to be vacated, along with the accompanying sentence.’
“[Craig v. State ], 893 So.2d [1250] at 1252-56 [ (Ala.Crim.App.2004) ] (footnote omitted). See Smith v. State, 895 So.2d 381, 382-385 (Ala.Crim.App.2004) (relying on Craig, this Court found that two convictions for first-degree robbery violated principles of double jeopardy where the appellant took money from *335 the business cash drawer and from office manager’s purse); McPherson v. State, 933 So.2d 1114 (Ala.Crim.App.2005) (finding Craig to be factually similar, this Court found the appellant’s convictions for two counts of discharging a firearm into an occupied dwelling during one course of conduct was a double-jeopardy violation).”
Abrams v. State, 978 So.2d at 797-99.
Thus, the two counts of murder during robbery in the present case charged Revis with committing the same offense. Moreover, the fact that the sentences would have been served concurrently does not obviate the harm resulting from the unlawful conviction.
“The separate conviction, apart from the concurrent sentence, has potential adverse collateral consequences that may not be ignored. For example, the presence of two convictions on the record may delay the defendant’s eligibility for parole or result in an increased sentence under a recidivist statute for a future offense. Moreover, the second conviction may be used to impeach the defendant’s credibility and certainly carries the societal stigma accompanying any criminal conviction. See Benton v. Maryland, 395 U.S. 784, 790-791, 89 S.Ct. 2056, 2060-2061, 23 L.Ed.2d 707 (1969); Sibron v. New York, 392 U.S. 40, 54-56, 88 S.Ct. 1889, 1898-1899, 20 L.Ed.2d 917 (1968). Thus, the second conviction, even if it results in no greater sentence, is an impermissible punishment.”
Ball v. United States, 470 U.S. 856, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985).
We note that Revis attached as an addendum to his appellate brief a document alleged to be an addition to the case-action summary that was filed in Marion County and purportedly signed by the trial judge. The document indicates that the jury verdict as to count one of the indictment was being vacated “as duplicitous of the aggravating circumstances, Robbery in the First Degree, during the commission of capital murder.” (Revis’s brief Appendix B.) However, this document is not contained in the record and therefore may not be considered by this court.
“This court may not consider matters outside the record that are included in an appellate brief. Wal-Mart Stores, Inc. v. Goodman, 789 So.2d 166, 176 (Ala.2000). Our supreme court has explained:
“ ‘ “ ‘[Attachments to briefs are not considered part of the record and therefore cannot be considered on appeal.’” Morrow v. State, 928 So.2d 315, 320 n. 5 (Ala.Crim.App.2004) (quoting Huff v. State, 596 So.2d 16, 19 (Ala.Crim.App.1991)). Further, we cannot consider evidence that is not contained in the record on appeal because this Court’s appellate review ‘“is restricted to the evidence and arguments considered by the trial court.’ ” Ex parte Old Republic Sur. Co., 733 So.2d 881, 883 n. 1 (Ala.1999) (quoting Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala.1992), and citing Rodriguez-Ramos v. J. Thomas Williams, Jr., M.D., P.C., 580 So.2d 1326 (Ala.1991)).’
“Roberts v. NASCO Equip. Co., 986 So.2d 379, 385 (Ala.2007).”
Hildreth v. State, 51 So.3d 344, 352 (Ala.Civ.App.2010). See also Ex parte Ruggs, 10 So.3d 7, 10 n. 2 (Ala.2008); Ex parte Brooks, 897 So.2d 1017, 1020-21 (Ala.2004); Wilson v. State, 830 So.2d 765, 788 (Ala.Crim.App.2001).
Even if we could consider this document, it was filed on April 26, 2007.[27] However, *336 the notice of appeal in this case was filed on December 12, 2006, and the amended notice of appeal was filed with this court on December 14, 2006. At that point, the trial court no longer had jurisdiction to vacate the conviction and sentence as to count one. Rule 3(a)(2) and Rule 4(b), Ala.R.App.P.; Rule 24.1(b), Ala.R.Crim.P. See also Stevenson v. State, 75 So.3d 1215, 1219 (Ala.Crim.App.2010); Ex parte Denson, 57 So.3d 195, 196 (Ala.2010).
Therefore this case is due to be remanded to the trial court with orders that the court vacate one of the convictions and sentences entered against Revis. Due return should be made to this court within 28 days of the release of this opinion.
Because this case must be remanded to the trial court for further proceedings, we pretermit discussion of the statutory analysis of the propriety of the death sentence until return is made to this remand order.
REMANDED WITH INSTRUCTIONS.
WELCH, WINDOM, and KELLUM, JJ., concur.

On Return to Remand

JOINER, Judge.[1]
Christopher (“Chris”) Dewayne Revis was convicted of two counts of capital murder for the intentional murder of Jerry Stidham by shooting him with a .22-caliber rifle during the course of committing a first-degree robbery of money (count I) and drugs (count II). See § 13A-5-40(a)(2), Ala.Code 1975. The jury recommended, by a vote of 11-1, that Revis be sentenced to death. The trial court sentenced Revis to death. This Court affirmed one of Revis’s convictions and sentences for capital murder for killing Stidham during the commission of a robbery. Revis v. State, 101 So.3d 247 (Ala.Crim.App.2011). This Court, however, remanded this case for the trial court to vacate one of the convictions and sentences entered against Revis.[2] Specifically, this Court held that “the two counts of murder during robbery in the present case charged Revis with committing the same offense [and] the fact that the sentences would have been served concurrently does not obviate the harm resulting from the unlawful conviction.” Revis, 101 So.3d at 335. The trial court, on return to remand, has complied with our instruction and vacated Revis’s conviction for capital murder for intentionally murdering Stidham during the course of committing a first-degree robbery of money (count I) and the death sentence associated with that conviction.
In our opinion on original submission, because we were remanding the case for the vacation of one of Revis’s convictions and sentences, we pretermitted our statutorily required analysis of the propriety of Revis’s death sentence. Re-vis, 101 So.3d at 336. Because the trial court has complied with this Court’s direction on return to remand and has vacated one of Revis’s convictions and sentences for murder during a first-degree robbery, in accordance with § 13A-5-53, Ala.Code 1975, we must address the propriety of Revis’s death sentence. Revis was convicted of murdering Jerry Stidham during *337 the course of a first-degree robbery, an offense defined as capital by § 13A-5-40(a)(2), Ala.Code 1975. The record reflects that Revis’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53 (b)(1), Ala.Code 1975.
The trial court found the existence of one aggravating circumstance — that the murder was committed during a robbery, § 13A-5-49(a)(4), Ala.Code 1975, and that the aggravating circumstance outweighed the one mitigating circumstance argued— that Revis had no significant criminal history, § 13A-5-51Q), Ala.Code 1975. We held in our original opinion of January 13, 2011, that the trial court’s findings as to the statutory aggravating circumstance and statutory mitigating circumstance were proper.
Section 13A-5-53(b)(2), Ala.Code 1975, requires this Court to weigh the aggravating circumstances and the mitigating circumstances independently to determine the propriety of Revis’s sentence of death. Section 13A-5-48, Ala.Code 1975, provides:
“The process described in Sections 13A-5-46(e)(2), 13A-5-46(e)(3) and Section 13A-5-47(e) of weighing the aggravating and mitigating circumstances to determine the sentence shall not be defined to mean a mere tallying of aggravating and mitigating circumstances for the purpose of numerical comparison. Instead, it shall be defined to mean a process by which circumstances relevant to sentence are marshalled [sic] and considered in an organized fashion for the purpose of determining whether the proper sentence in view of all the relevant circumstances in an individual case is life imprisonment without parole or death.”
“The determination of whether the aggravating circumstances outweigh the mitigating circumstances is not a numerical one, but instead involves the gravity of the aggravation as compared to the mitigation.” Ex parte Clisby, 456 So.2d 105, 108-09 (Ala.1984). “[W]hile the existence of an aggravating or mitigating circumstance is a fact susceptible to proof, the relative weight of each is not; the process of weighing, unlike facts, is not susceptible to proof by either party.” Lawhorn v. State, 581 So.2d 1159, 1171 (Ala.Crim.App.1990). Clearly, the trial court gave the mitigating circumstance little weight in light of the aggravating circumstance present in this case. “The weight to be attached to the aggravating and the mitigating evidence is strictly within the discretion of the sentencing authority.” Smith v. State, 908 So.2d 273, 298 (Ala.Crim.App.2000). We agree with the trial court’s findings. An independent weighing of the aggravating circumstance and the mitigating circumstance indicates that death is the proper sentence.
As required by § 13A-5-53(b)(3), Ala. Code 1975, this Court must determine whether Revis’s sentence was disproportionate or excessive when compared to penalties imposed in similar cases. The sentence of death in this case is neither excessive nor disproportionate to the penalties imposed in similar cases, considering the crime and Revis. See, e.g., Stanley v. State, [Ms. CR-06-2236, April 29, 2011] — So.3d -, -(Ala.Crim.App.2011); McMillan v. State, [Ms. CR-08-1954, Nov. 5, 2010] — So.3d - (Ala.Crim.App.2010); Yancey v. State, 65 So.3d 452 (Ala.Crim.App.2009) (opinion on return to remand); Floyd v. State, [Ms. CR-05-0935, Aug. 29, 2008] — So.3d - (Ala.Crim.App.2007) (opinion on return to remand); Gamble v. State, 791 So.2d 409 (Ala.Crim. *338 App.2000); Gaddy v. State, 698 So.2d 1100 (Ala.Crim.App.1995) (all cases involving the offense of murder committed during the course of a robbery).
Having searched the entire record for any error that may have adversely affected Revis’s substantial rights and given that the trial court complied with our remand instruction and vacated one of Revis’s convictions and sentences, we now affirm the trial court’s judgment.
AFFIRMED.
WELCH, P.J., and WINDOM, KELLUM, and BURKE, JJ., concur.

. The victim's name was Gerald Stidham, but he was referred to as “Jerry” throughout the testimony. For consistency, this opinion will refer to him as Jerry Stidham.

. This rifle was determined to have belonged to Eddie Revis’s uncle.

.In his statement, Revis told Investigator Mays that he believed that the pills were Lorcets. (C. 301.)

.Although Revis stated that he was not certain who had taken the wallet, he explained in his statement that he did not take the wallet and that Jason Revis handed him the wallet when they got into the vehicle after leaving Stidham's mobile home.

. There was approximately $1,800 in the wallet, so each man got approximately $600.

. Aside from the .22-caliber rifle that had belonged to his uncle, Eddie Revis had another gun that he kept in a box.

. The record indicates that there was an eight-minute gap between the conclusion of the second statement and the beginning of Revis’s confession. (C. 375, 376.)

. Stidham suffered five gunshots wounds.

. Revis's contention that the pages of the transcribed recording were misplaced and out of order in the record on appeal is correct. However, there is no evidence or indication that this was the case at trial. Thus, he has made no showing of error or prejudice on this ground.

. The microcassette tapes do not appear to have been admitted at trial. However, Revis did not object to this omission at trial or pretrial, nor does he raise this objection on appeal. There was testimony, however, during the preliminary hearing in the proceedings involving Revis, his uncle, and his brother that the State possessed the microcassette tapes. (S.R. 41.)

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The following occurred in the cross-examination of Investigator Mays: "Q. Besides the statements you have of these three people, is there other corroborating evidence that shows that Chris Revis was the person that perpetrated this crime?” “A. I don't think I'm in a position to answer that.” (R. 602.)

. Although Revis seeks to incorporate his prior-bad-acts claim raised in Issue V of his brief here, only the references made during the interrogations will be addressed here.

. Revis's uncle originally denied involvement in the murder and ultimately confessed to the same facts as Revis. The content of Revis’s brother's statement is not clear from the record, although he apparently implicated Revis in the offense.

. The record however indicates that, upon motion by defense counsel, Dr. Shores’s notes were admitted into evidence; however, it is unclear if they were ever submitted to the jury or if they were admitted only for the record on appeal. (R. 410-11.)

. Tammi Fulgham is also referred to at trial as Tammi Ricketts because of a recent marriage. For the sake of consistency, this opinion will refer to her as Tammi Fulgham. (R. 433.)

. The bullets removed from the victim’s body were taken by Mathis Dyar, who worked with the Department of Forensic Sciences and who witnessed the autopsy, to the lab in Huntsville, where they were tested by Tammi Fulgham. (R. 418-19, 420-21.)

. Rule 702, Ala.R.Evid., provides: "[I]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.”

. Revis again raises his claim that the State failed to present a proper chain of custody as to the rifle because, he argues, the professor’s absence constituted a missing link. However, this issue has previously been discussed and determined adversely to Revis. See Issue III. B.

. His incarceration in the Franklin County jail was also mentioned at sentencing.

. As noted, the bad-acts evidence cited by Revis was that he had hunted after dark, that had used drugs, and that he had impermissi-bly written a check on his aunt's account. The bad-checks arrest was already properly before the jury through Investigator Mays’s testimony. See McNabb v. State, 887 So.2d 929, 971 (Ala.Crim.App.2001), affirmed, 887 So.2d 998 (Ala.), cert. denied, 543 U.S. 1005, 125 S.Ct. 606, 160 L.Ed.2d 466 (2004) (" ' “[T]estimony that may be inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred.” ’ See also Dawson v. State, 675 So.2d 897, 900 (Ala.Crim.App.1995), affirmed, 675 So.2d 905 (Ala.1996) ('The erroneous admission of evidence that is merely cumulative is harmless error.'); and Thompson v. State, 527 So.2d 777, 780 (Ala.Crim.App.1988) ('Testimony which may be apparently illegal upon admission may be rendered prejudicially innocuous by subsequent or prior lawful testimony to the samé effect or from which the same facts can be inferred.').”). (Citations omitted.) As to his drug usage, this opinion has already found that this evidence was admissible under the motive and res gestae exceptions to the exclusionary rule. See Issue I.F.

. It should be noted that the prosecutor never argued or implied that Revis fled from the police. The portion of the record to which Revis cites to support this claim comes from the prosecutor’s opening argument at the guilt phase wherein he was submitting in detail what he believed the evidence would show. He stated that after leaving the rented hotel room and getting Revis's great-aunt out of the hospital, Revis, his brother, and his uncle "disappeared” until the police received a tip concerning the location of the gun. (R. 267.) This reference was an argument indicating that nothing more occurred until the tip was made.

. In this argument, Revis also alludes to the claim that Revis was penalized for his invocation of his right to remain silent when he was contacted by the police to act as an informant but did not confess at that time. This claim has previously been discussed in this opinion and determined adversely to Revis. See Issue VII.D.

. Juror I.G. did not serve on the jury.

. This double negative in the transcript could be the result of a clerical error in preparing the transcript; thus, Revis would have suffered no prejudice, and no error would have occurred.

. We note that the record contains no entry as to the arraignment in the case-action summary. However, the case-action summary does reflect that arraignment was set for August 10, 2005, and, the trial court stated in its sentencing order that previously "[i]n response to the foregoing charges the defendant entered pleas of not guilty." (C. 142.)

. The record on appeal was filed on March 8, 2007, and the supplemental record was filed on April 18, 2007.

. This case was originally assigned to another member of this Court. It was reassigned to Judge Joiner on March 1, 2011.

. We previously remanded this case by order.